## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| FALLS CHURCH MEDICAL CENTER, LLC d/b/a FALLS CHURCH HEALTHCARE CENTER, on behalf of its patients, physicians, and staff; WHOLE WOMAN'S HEALTH ALLIANCE, on behalf of its patients, physicians, and staff; ALL WOMEN'S RICHMOND, INC. d/b/a A CAPITAL WOMEN'S HEALTH CLINIC, on behalf of its patients, physicians, and staff; VIRGINIA LEAGUE FOR PLANNED PARENTHOOD, each on behalf of its patients, physicians, and staff; and DR. JANE DOE, on behalf of herself and her patients,<br><br>            Plaintiffs,<br><br>   v.<br><br>M. NORMAN OLIVER, Virginia Health Commissioner; ROBERT PAYNE, Acting Director of Virginia Department of Health's Office of Licensure and Certification; FAYE O. PRICHARD, Chairperson of the Virginia Board of Health; THEOPHANI STAMOS, Commonwealth's Attorney for Arlington County and the City of Falls Church; ROBERT TRACCI, Commonwealth's Attorney for Albemarle County; SHANNON L. TAYLOR, Commonwealth's Attorney for Henrico County; ANTON BELL, Commonwealth's Attorney for the City of Hampton; MICHAEL N. HERRING, Commonwealth's Attorney for the City of Richmond; and COLIN STOLLE, Commonwealth's Attorney for the City of Virginia Beach, each in their official capacities, as well as their employees, agents, and successors,<br><br>            Defendants. | Case No.<br>3:18-cv-428-HEH |

## AMENDED COMPLAINT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 6

PARTIES ........................................................................................................................... 6

I.    Plaintiffs.......................................................................................................................... 6

II.   Defendants ...................................................................................................................... 8

FACTUAL ALLEGATIONS ............................................................................................. 9

I.    Abortion is an Essential Component of Basic Healthcare........................................... 9

   A.   Methods of Providing Abortion Care ............................................................... 10

   B.   Abortion is an Extremely Safe Medical Procedure.......................................... 12

II.   The Commonwealth is Denying Virginians Their Constitutional Right to Access Abortion 15

   A.   The Challenged Statutes and Regulations........................................................ 15

   B.   Virginia has a Long History of Unconstitutionally Restricting Abortion Access ............ 20

III.  Virginia's Licensing Scheme, Hospital Requirement, and Physician-Only Law Target
Access to Abortion Care with No Corresponding Benefit........................................... 26

   A.   There is No Legitimate Medical Reason to Regulate Abortion Differently Than Any Other
   Comparable Medical Procedure ........................................................................ 26

   B.   The Licensing Scheme Provides Little to No Medical Benefit ........................ 28

   C.   The Hospital Requirement Is Without Medical Justification and Outdated ..... 31

   D.   Virginia's Physician-Only Law is Outdated and Not Based on Evidence......... 37

   E.   Virginia's Medically Unjustified Laws Impose Heavy Burdens on Access to Abortion .. 39

IV.   The Two-Trip Mandatory Delay Law Provides No Benefits, Imposes Substantial Obstacles
to Abortion Access, and Demeans People Seeking Abortion ...................................... 48

   A.   Mandating an Unnecessary Trip to Obtain an Ultrasound 24 Hours Before an Abortion,
   and Receive Information that Serves No Purpose, Lacks Any Benefit .................... 48

   B.   The Two-Trip Mandatory Delay Law Imposes Unjustified Burdens on Access and
   Shames People Seeking Abortion Care with No Corresponding Benefits............... 53

V.    The Harsh Criminal Penalties that Virginia Imposes in Conjunction with the Challenged
Laws Punish Healthcare Professionals and Patients.................................................... 56

VI.   The Challenged Laws Cumulatively Impose an Undue Burden on Virginians' Access to
Abortion Care................................................................................................................ 57

ATTORNEY'S FEES ...................................................................................................... 61

REQUESTS FOR RELIEF .............................................................................................. 61

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

## PRELIMINARY STATEMENT

1.     In the half-century since it decided *Roe v. Wade*, 410 U.S. 113 (1973), the U.S. Supreme Court has, time and again, reaffirmed "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992). The right to decide when, whether, and how to have children is essential to the "ability of women to participate equally in the economic and social life of the Nation." *Id.* at 856.

2.     Most recently, in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), the Court held that laws passed under the pretext of protecting women's health, or any other interest, are unconstitutional when the burdens they impose on abortion access outweigh the benefits, if any, they confer. *Id.* at 2309–10.

3.     Despite these clear constitutional protections, and the proven safety of abortion care, the Commonwealth of Virginia has spent over four decades enacting layer upon layer of unnecessary and onerous abortion statutes and regulations. These interlocking restrictions subject abortion providers and their patients to a vast array of requirements that fail to provide benefits sufficient to outweigh their burdens. These laws are not supported by medical evidence. Many are outdated and inconsistent with the standard of care. They serve only to place substantial burdens on and impede the ability of Virginians to access safe, legal, and high-quality abortion care.

4.     Plaintiffs challenge several core components of Virginia's burdensome statutory and regulatory scheme because each of the challenged laws, individually and in conjunction with related laws, lacks any legitimate justification, medical or otherwise; impedes Plaintiffs' ability to

1

provide safe, effective medical care; and has the purpose and effect of placing substantial obstacles in the way of patients' access to abortion care in Virginia. They include:

a.    A statute that singles out any medical facility that provides five or more first trimester abortions per month and subjects it to stringent licensure requirements, Va. Code Ann. § 32.1-127(B)(1) (the "**Licensing Statute**");

b.    The statute's extensive, onerous implementing regulations, 12 Va. Admin. Code § 5-412 *et seq*. (the "**Licensing Regulations**") (together with the Licensing Statute, the "**Licensing Scheme**"), that subject medical facilities providing five or more first trimester abortions per month to a medically unnecessary regulatory scheme that is far more burdensome than Virginia's regulations governing providers of comparable office-based outpatient care;

c.    A statute criminalizing second trimester abortions performed outside of a licensed hospital, Va. Code Ann. § 18.2-73 (the "**Hospital Requirement**"), that draws medically unjustified, arbitrary, and obsolete distinctions based on the trimester framework and gestational age limitations;

d.    A statute forbidding trained, highly qualified advanced practice clinicians from providing abortion care, despite evidence that such healthcare providers can safely and effectively provide such care, Va. Code Ann. § 18.2-72, (the "**Physician-Only Law**");

e.    A statute imposing a series of unjustified mandates requiring the provision of an unnecessary ultrasound and information that serves no legitimate purpose, plus the offering of materials containing irrelevant, misleading, and false statements, which collectively require each patient to make two trips to a facility and delay

their care by at least 24 hours, Va. Code Ann. § 18.2-76 (the "**Two-Trip Mandatory Delay Law**"); and

f.  In conjunction with the other challenged laws, statutes criminalizing abortion care unless performed in accordance with the Licensing Scheme, Hospital Requirement, and Physician-Only Law, Va. Code Ann. §§ 18.2-71, 32.1-27(A), -136 (the "**Criminalization Laws**").

5.  Each of these laws targets abortion providers and patients by imposing on them a unique regulatory scheme that affects virtually every aspect of care in ways that (a) are unjustified and unnecessary because they have nothing to do with patient health or providing safer abortion care; (b) far exceed the Commonwealth's regulation of physician's offices and providers of other similarly low-risk, outpatient procedures; (c) are obsolete or inconsistent with accepted medical standards; (d) in the case of the Licensing Scheme, drastically and arbitrarily depart from how first trimester abortion was safely regulated in Virginia until 2011 and allow for multi-day, unannounced, unlimited warrantless inspections of facilities; and (e) impermissibly burden patient access by delaying care, increasing logistical, financial, and emotional burdens, mandating the provision of unnecessary information, and offering misinformation to those who seek care. Providers are forced to comply with this onerous scheme under threat of severe civil and criminal penalties, to the detriment of their patients.

6.  Absent the requirements mandated by the challenged laws, providers of abortion care and the facilities in which they offer care would still be subject to robust government and professional regulation and oversight—including the Commonwealth's generally applicable professional licensure, health, and tort laws and regulations—to ensure that procedures are performed safely and in accordance with the governing standard of care.

7.       The multitude of targeted, onerous restrictions that Virginia heaps onto providers and clinics simply because they provide abortion care—access to which is a constitutionally protected right, and which is one of the safest and most common forms of medical care in the United States—are not justified by any legitimate interest and fail to make abortion safer.

8.       For many Virginians, the challenged laws have made abortion substantially more difficult to access. The challenged laws have contributed to a lack of providers, higher access costs, and burdensome travel—all of which create substantial obstacles to obtaining care. Further, patients are subject to medically unnecessary and arbitrary requirements that negatively impact their experience, including the Two-Trip Mandatory Delay Law that forces them to jump through needless hoops, without any corresponding benefit.

9.       These unnecessary statutes and regulations contribute to a climate of secrecy and stigma against abortion in Virginia, which deters clinicians from offering abortion care and penalizes those who continue to provide it. Stigma in turn harms pregnant people seeking abortions in the Commonwealth by reducing access and demeaning their constitutionally protected decisions.

10.       Unsurprisingly, as the number of laws governing abortion care has increased in Virginia, the number of abortion providers has markedly decreased. Between 2009 and 2016, the number of medical facilities providing abortion care declined by more than half. The reduction in providers has made it progressively more difficult and expensive for people seeking abortion care to access it in the Commonwealth. Today, first trimester abortion care is only available in five urban areas, leaving 92 percent of Virginia's counties without a first trimester provider.

11.       Furthermore, only two facilities regularly provide abortion care in the second trimester, which Virginia defines as more than 13 weeks, 6 days after a patient's last menstrual

period ("LMP")[1]—leaving 97 percent of counties without a second trimester provider. Such severely restricted access forces many Virginians to travel several hours or leave the state to obtain healthcare that should be available in their communities.

12.     The decline in access to abortion care in Virginia is hardly accidental. Over several decades, anti-abortion advocates and legislators have intentionally and strategically enacted a series of laws designed to regulate this fundamental, constitutionally protected right out of existence. As one elected official who supported these restrictions noted, "the ultimate goal . . . is to make abortion disappear in America and make people want it that way."[2]

13.     Plaintiffs bring this suit to prevent these layers of burdensome and unjustified restrictions from inflicting further harm. The challenged laws, individually and collectively, have the purpose and effect of placing substantial obstacles in the way of people accessing care by limiting the number of healthcare providers who offer abortion care, and burdening the remaining facilities with arbitrarily enforced regulations. These laws lack any legitimate justification, medical or otherwise, and fail to make abortion meaningfully safer, at the expense of patient autonomy. Where, as in Virginia, a state's laws burden the right to abortion in excess of any purported benefit, those burdens are "undue" and those laws are unconstitutional.

14.     In addition, one of the challenged laws is so vague that it fails to give Plaintiffs adequate notice of how to conform their conduct to the statutory and regulatory requirements in violation of their right to due process, and another subjects Plaintiffs to unreasonably intrusive warrantless inspections.

---

[1] "LMP" denotes the first day of the patient's last menstrual period.  It is the standard measure of gestational age used by medical professionals.
[2] Interview by Peter Shinn, President, Pro-Life Unity, with Virginia Attorney General Ken Cuccinelli (May 9, 2012), http://prolifeunity.com/index.php/article/pro-life_unity_interview_with_virginia_attorney_general_ken_cuccinelli/.

15.     Plaintiffs seek both declaratory and injunctive relief from the unconstitutional requirements imposed by the challenged statutes and regulations on the grounds that they violate Plaintiffs' rights, and the rights of their patients, guaranteed by the Fourth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

16.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343.

17.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202; by Rules 57 and 65 of the Federal Rules of Civil Procedure; and by the general legal and equitable powers of this Court.

18.     Venue is appropriate under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this division and many of the Defendants, who are sued in their official capacities, carry out their official duties in offices located in this division.

## PARTIES

**I.     Plaintiffs**

19.     Plaintiff Falls Church Medical Center, LLC d/b/a Falls Church Healthcare Center ("Falls Church") is a community-oriented women's healthcare center located in Falls Church, Virginia that has provided family and gynecological medical care, including first trimester abortion services up to 13 weeks, 6 days LMP, since 2002. It is a member of the National Abortion Federation ("NAF"), the professional organization of abortion providers, and is licensed and inspected by the Virginia Department of Health ("VDH"). Falls Church sues on its own behalf and on behalf of its patients, physicians, and staff, including advanced practice clinicians.

20.    Plaintiff Whole Woman's Health Alliance is a nonprofit organization committed to providing holistic reproductive care for its patients. It operates Whole Woman's Health of Charlottesville ("Whole Woman's Health"), a healthcare facility located in Charlottesville, Virginia that provides first trimester abortion services up to 13 weeks, 6 days LMP. Whole Woman's Health started providing medication abortion in October 2017 and aspiration abortion in March 2018. It is a member of NAF and is licensed and inspected by VDH. Whole Woman's Health Alliance sues on its own behalf and on behalf of its patients, physicians, and staff.

21.    Plaintiff All Women's Richmond, Inc. d/b/a A Capital Women's Health Clinic ("A Capital Women's") is a healthcare facility located in Richmond, Virginia that has provided reproductive healthcare, including first trimester abortion services up to 13 weeks, 6 days LMP, since 2001. A Capital Women's is a member of NAF and is licensed and inspected by VDH. A Capital Women's sues on its own behalf and on behalf of its patients, physicians, and staff.

22.    Plaintiff Virginia League for Planned Parenthood ("VLPP") is a nonprofit corporation incorporated in Virginia that operates health centers providing a wide range of services, including family planning and other reproductive healthcare. VLPP has provided abortion services in Virginia for more than twenty years. It provides abortion services at its health center in Richmond up to 13 weeks, 6 days LMP; at its health center in Hampton (which provides only medication abortion) up to 10 weeks LMP; and at its "Outpatient Surgical Hospital" (or "Surgical Center")[3] in Virginia Beach into the second trimester. VLPP also provides procedures into the second trimester at a hospital-owned Surgical Center in Richmond. VLPP is licensed and inspected

---

[3] "Surgical Center" is the commonly used term that refers to "Outpatient Surgical Hospital," as regulated by 12 Va. Admin. Code §§ 5-410-10–160, -1150–1380. The terms are used interchangeably throughout the Complaint.

by VDH. VLPP sues on its own behalf and on behalf of its patients, physicians, and staff, including advanced practice clinicians.

23.     Plaintiff Jane Doe, M.D., is a physician licensed to practice medicine in the Commonwealth of Virginia and is board-certified in obstetrics and gynecology.  She currently provides a full range of obstetric services to her patients, including pre-viability abortion care during the first and second trimesters of pregnancy. Dr. Doe is appearing as a plaintiff in this action in her individual capacity, and she sues on behalf of herself and her patients.

## II.     Defendants

24.     Defendant M. Norman Oliver, M.D., M.A., is the Virginia Health Commissioner and is sued in his official capacity. He supervises and manages VDH in accordance with the policies, rules, and regulations of the Virginia Board of Health ("VBH"), for which he serves as the statutory executive officer. VDH is a statutorily created Virginia executive branch department with a principal office in the City of Richmond, Virginia, and is responsible for performing duties required of it by the Virginia Health Commissioner. VDH is responsible, in part, for enforcing the Licensing Regulations, 12 Va. Admin. Code § 5-412 *et seq*., promulgated pursuant to the Licensing Statute, Va. Code Ann. § 32.1-127(B)(1). *See* Va. Code Ann. §§ 32.1-16, -19(A).

25.     Defendant Robert Payne is the Acting Director of VDH's Office of Licensure and Certification and is sued in his official capacity. He is responsible, in part, for enforcing the Licensing Regulations.

26.     Defendant Faye O. Prichard is the Chairperson of VBH and is sued in her official capacity. VBH is a statutorily created Virginia executive branch agency, with a principal office in the City of Richmond, Virginia. It is the agency responsible for promulgating and enforcing the Licensing Regulations at issue. Va. Code Ann. §§ 32.1-12, -127(A).

27.     Defendant Theophani Stamos is the Commonwealth's Attorney for Arlington County and the City of Falls Church, and is sued in her official capacity. She is responsible for enforcing the challenged Criminalization Laws, Va. Code Ann. §§ 18.2-71, 32.1-27(A), -136.

28.     Defendant Robert Tracci is the Commonwealth's Attorney for Albemarle County, and is sued in his official capacity. He is responsible for enforcing the challenged Criminalization Laws, Va. Code Ann. §§ 18.2-71, 32.1-27(A), -136.

29.     Defendant Shannon L. Taylor is the Commonwealth's Attorney for Henrico County, and is sued in her official capacity. She is responsible for enforcing the challenged Criminalization Laws, Va. Code Ann. §§ 18.2-71, 32.1-27(A), -136.

30.     Defendant Anton Bell is the Commonwealth's Attorney for the City of Hampton, and is sued in his official capacity. He is responsible for enforcing the challenged Criminalization Laws, Va. Code Ann. §§ 18.2-71, 32.1-27(A), -136.

31.     Defendant Michael N. Herring is the Commonwealth's Attorney for the City of Richmond, and is sued in his official capacity. He is responsible for enforcing the challenged Criminalization Laws, Va. Code Ann. §§ 18.2-71, 32.1-27(A), -136.

32.     Defendant Colin Stolle is the Commonwealth's Attorney for the City of Virginia Beach, and is sued in his official capacity. He is responsible for enforcing the challenged Criminalization Laws, Va. Code Ann. §§ 18.2-71, 32.1-27(A), -136.

## FACTUAL ALLEGATIONS

### I.     Abortion is an Essential Component of Basic Healthcare

33.     Legal abortion is a common, safe, and critical component of basic healthcare.

34.     Nearly one in four women in the United States will obtain an abortion by the age of 45.

35.     There is no typical abortion patient. Nationally, approximately 39 percent of abortion patients are white; 28 percent are Black; 25 percent are Hispanic; 6 percent are Asian or Pacific Islander; and 3 percent identify with other racial or ethnic classifications.

36.     Sixty percent of abortion patients are in their twenties, and a quarter are in their thirties.

37.     Abortion patients are religiously affiliated—30 percent are Protestant, 24 percent are Catholic, and 8 percent identify with another religion.

38.     Many abortion patients (59 percent) have had at least one previous birth.

39.     Three-quarters of abortion patients in the United States are low-income, with nearly half living below the federal poverty level.

40.     As of 2016, Virginia is home to over four million women, nearly two million of whom are of reproductive age.

41.     Like people who obtain abortions across the country, Virginia abortion patients span demographic categories and have some commonalities. According to the most recent data collected by the Centers for Disease Control and Prevention ("CDC"), most abortion patients in Virginia were in their twenties (59 percent) and thirties (29 percent); over 60 percent had previously given birth. Black women made up a disproportionately high percentage (over 44 percent) of those who obtained abortions in Virginia.

**A.      Methods of Providing Abortion Care**

42.     There are two basic methods of providing abortion care: by oral ingestion of medication or by procedure. Both are routinely and safely provided in an outpatient, office-based setting nationwide.

43.     As defined by Virginia law, the first trimester lasts until 13 weeks, 6 days LMP.

44.     In the first trimester of pregnancy, medication abortion, available up to 10 weeks LMP, typically involves taking two medications—mifepristone (brand name Mifeprex) and misoprostol (brand name Cytotec)—a day or two apart. Medication abortion usually involves the patient ingesting the first medication at the healthcare facility, and then the second medication 24 to 48 hours later at a location of their choice. The pregnancy is passed outside the facility, in an experience similar to a miscarriage.

45.     In the first and early second trimester, abortion by procedure typically involves the use of gentle suction passed through the vaginal canal to empty the uterus ("aspiration abortion"). Other names for this procedure include suction curettage and dilation and curettage.

46.     Aspiration abortion is a straightforward, brief procedure, which typically takes approximately five minutes, and does not require any incision. An analgesic such as ibuprofen, an anxiolytic such as Valium, a local anesthetic, and/or minimal sedation may be used during or prior to the procedure. The absence of incision and the introduction of instruments through a body cavity also means that aspiration abortion is a safe procedure that does not need to be performed in an operating room with a sterile field.

47.     At approximately 15 to 16 weeks LMP, depending on the provider and the patient, abortion providers may start using the dilation and evacuation method or "D&E." At this point, aspiration alone may no longer be sufficient, and providers use additional instruments to perform the abortion safely. Under current evidence-based medical standards, D&E is the safest and most common abortion procedure after approximately 15 weeks LMP.

48.     D&E is also a quick procedure, typically lasting under 10 minutes. Depending on the patient and the method of cervical preparation, abortion providers can perform D&E as a one-

or two-day procedure. D&E is routinely and safely provided in outpatient, office-based settings nationwide, and generally involves no more than moderate sedation.

49.     Induction is the only medically proven alternative to aspiration abortion and D&E available throughout the second trimester. As the name implies, induction abortion involves medications that cause the uterus to contract and the patient to undergo labor. Second trimester induction abortions are very uncommon in the United States because they usually take place in hospitals or similar facilities, last between 8 and 36 hours, and entail contractions and the process of labor, which can be painful and require strong medications, sedatives, or anesthesia. There is also a significant cost difference between an inpatient procedure requiring multiple days of hospitalization and an outpatient procedure such as a D&E.

50.     Induction abortions were the norm when Virginia devised its second trimester Hospital Requirement. They have since been almost entirely superseded by the D&E method—a major innovation in abortion care because it can be performed in an office-based, outpatient setting without an overnight hospital stay; is less painful for the patient and of shorter duration; poses fewer health risks; and is significantly less expensive than an induction abortion.

**B.      Abortion is an Extremely Safe Medical Procedure**

51.     Since abortion became legal, clinicians have gained decades of experience, and techniques and methods have evolved. Today, as the U.S. Supreme Court has recognized, abortion is "extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure." *Whole Woman's Health*, 136 S. Ct. at 2311.

52.     Leading medical authorities, including the American College of Obstetricians and Gynecologists ("ACOG"), the American Medical Association ("AMA"), the American Academy of Family Physicians, the American Academy of Pediatrics, and the American Osteopathic

Association have all concluded that abortion is one of the safest procedures in contemporary medical practice.

53.     In a recent comprehensive report on the safety and quality of abortion care, the National Academies of Science, Engineering, and Medicine—nongovernmental entities established by Congress and by charter to provide independent, objective analysis and advice to address the nation's complex scientific problems and public policies—concluded that aspiration and medication abortions "rarely result in complications" and do so at rates of "no more than a fraction of a percent."

54.     One of the most comprehensive studies to date found that major complications (defined as requiring hospital admission, surgery, or blood transfusion) from abortions by any method at a clinic, physician's office, or other legally recognized facility occurred in less than one-quarter of one percent (0.23 percent) of cases. By comparison, vasectomy, a minor surgical procedure that, like abortion, is frequently performed in a physician's office as a part of reproductive healthcare, has a two percent prevalence of complications, more than double that of abortion, and a 0.2 to 0.8 percent prevalence of major complications requiring hospitalization, up to five times higher than abortion.

55.     Abortion is as safe, if not safer, than many common and safe outpatient, office-based procedures that may be performed in OB/GYN offices in Virginia. For example, abortion is comparable or lower in risk than endometrial ablation (removing the lining of the uterus); removal of pre-cancerous cells on the cervix through a Loop Electrosurgical Excision Procedure ("LEEP"); hysteroscopy (scoping of the cervix and uterus); colposcopy with cervical biopsy (scoping of the cervix and vaginal walls); and diagnostic dilation and curettage. All of these procedures are performed in office-based, outpatient settings that are exempt from additional regulation by VDH.

56.     In fact, medical offices offering office-based procedures with far greater risks than abortion—including colonoscopies, penicillin injections, and surgical or dental procedures requiring sedation—are neither licensed, regulated, nor inspected by VDH. *See, e.g.*, *Whole Woman's Health*, 136 S. Ct. at 2315 ("Colonoscopy, a procedure that typically takes place outside a hospital (or surgical center) setting, has a mortality rate 10 times higher than an abortion.").

57.     In states that do not require that abortions be performed in a highly regulated environment, complication rates do not materially differ between abortions performed in a regulated environment, such as hospitals, and less regulated environments, like physician's offices.

58.     Medication abortion is also safer than commonly used medications including aspirin, acetaminophen (Tylenol), and sildenafil (Viagra).

59.     Abortion is also far safer than carrying a pregnancy to term. According to the CDC, 144 in 10,000 women who gave birth in a hospital in the United States in 2014 experienced unexpected outcomes of labor and delivery that resulted in significant short- or long-term consequences. The risks include acute renal failure, shock, sepsis, heart failure or arrest during surgery or procedure, eclampsia, and anesthesia complications.

60.     Nationally, approximately 700 women die of pregnancy-related causes, and more than 50,000 have severe pregnancy complications, each year. The risk of death associated with childbirth is approximately 14 times higher than that associated with abortion.

61.     The CDC reports that there are 0.62 deaths per 100,000 legal abortions, a fatality rate of 0.0006 percent.

62.     In contrast, according to the most recent state data, the maternal mortality ratio in Virginia was 36.3 deaths per 100,000 live births in 2013.[4]

_____

[4] Va. Dep't of Health, Office of the Chief Medical Examiner Annual Report 2016, at 24 (2018), http://www.vdh.virginia.gov/content/uploads/sites/18/2018/03/OCME-2016-Annual-Report.pdf.

63.     The Commonwealth has also recognized that Black women in Virginia and in the United States "suffer the greatest burden of pregnancy-associated death;" the mortality ratio for Black women is double that of white women. Poor and rural Virginians who lack access to care also disproportionately experience negative health outcomes associated with pregnancy.

64.     Despite these facts, physicians and licensed certified nurse midwives ("CNMs") may deliver babies in birthing centers and private homes that are not subject to *any* licensure, regulation, inspection, or oversight by VDH, while abortion providers and clinics are subject to onerous, medically unnecessary regulations and requirements under Virginia law.

## II.     The Commonwealth is Denying Virginians Their Constitutional Right to Access Abortion

65.     Virginia has adopted an array of unnecessary and discriminatory laws, some over four decades old, that target the provision of abortion care without any meaningful improvement to safety or health, or any other benefits—let alone benefits that outweigh burdens. Instead, these laws serve only to negatively impact Virginians' access to reproductive healthcare.

### A.     The Challenged Statutes and Regulations

66.     ***Licensing Statute and Regulations***: The Licensing Scheme—a centerpiece of Virginia's framework targeting abortion providers—exemplifies the burdens the Commonwealth imposes on abortion care through regulations that purport to protect women's health, but do nothing more than co-opt the regulatory system for punitive ends.

67.     In March 2011, the Legislature amended an existing statute governing the regulation of "hospitals, nursing homes, and certified nursing facilities" by adding a sentence requiring VBH to regulate any medical facility that provides as few as five first trimester abortions in a month as a type of "hospital." Va. Code Ann. § 32.1-127(B)(1).

68.     This Licensing Statute singles out abortion facilities and mandates that VBH promulgate regulations setting minimum licensure standards across a range of categories in which regulation of first trimester abortion clinics is inappropriate, specifically:

a.      construction and maintenance of facilities "to ensure the environmental protection and the life safety of its patients, employees, and the public";

b.      operation, staffing and equipment;

c.      qualifications and training of staff, "except those professionals licensed or certified by the Department of Health Professions";

d.      "conditions under which a hospital or nursing home may provide medical and nursing services to patients in their places of residence"; and

e.      "policies related to infection prevention, disaster preparedness, and facility security." Va. Code Ann. § 32.1-127(B)(1).

69.     Accordingly, pursuant to the Licensing Statute, VBH promulgated sweeping regulatory requirements with which physician's offices, healthcare centers, and clinics of any size that provide first trimester abortions must comply as a condition of obtaining and maintaining an "abortion facility" license. The Licensing Regulations include, but are not limited to:

a.      a myriad of detailed, complicated requirements governing virtually all areas of facility operations, including detailed written policies on management, administration, corporate governance, recordkeeping, personnel, staffing requirements, and reporting;

b.      extensive, specific obligations governing the provision of medical care, including mandating specific information that the provider must share before providing an abortion, regardless of the provider's medical expertise and assessment;

c.      forbidding qualified, trained healthcare providers licensed in Virginia from providing abortion care, whether medication or aspiration, simply because they are not physicians licensed in the Commonwealth;

d.      requiring that facilities grant unfettered access to VDH's Office of Licensure and Certification ("OLC") inspectors for unannounced, unlimited, warrantless inspections, and allowing them to interview any person under the facility's control, direction, or supervision;

e.      permitting OLC inspectors to review "any requested records," including patient files, and requiring redaction of patient names and addresses only if the records are removed from the premises; and

f.      establishing denial of entry to an inspector as sufficient cause for immediate license revocation or suspension without any process or hearing. 12 Va. Admin. Code § 5-412 *et seq*.

70.    The Licensing Regulations include a myriad of other provisions, and mandate compliance with all of them, as a condition of licensure, unless a waiver is applied for and obtained. Consequently, Plaintiffs challenge the entire body of regulations in this lawsuit.

71.    The owners, administrators, healthcare providers (including Dr. Doe), and other staff of a doctor's office or healthcare center found to be providing five or more abortions "per month" without a license may be subject to criminal penalties and civil fines, Va. Code Ann. §§ 32.1-27, -136, as well as disciplinary actions, including loss of professional licensure.

72.    ***Hospital Requirement:*** While the Licensing Scheme applies only to facilities in which first trimester abortion care is provided, providers of abortion care to Virginians later in pregnancy are targeted by other burdensome restrictions. The Hospital Requirement—a statute

17

enacted in 1975—mandates that abortion during the second trimester of pregnancy be performed in a licensed hospital. Va. Code Ann. § 18.2-73. While the meaning of "hospital" is unclear from the statute, VDH has, at a minimum, required facilities to comply with the regulations for "Outpatient Surgical Hospitals," which include onerous physical plant and other requirements that are wholly inappropriate for abortion. 12 Va. Admin. Code §§ 5-410-10–160, -1150–1380.

73.     *Physician-Only Law:* Also dating back to 1975, the Physician-Only Law exempts only licensed physicians from Virginia's general criminal ban on abortion. The Physician-Only Law has remained in the Code of Virginia, unjustifiably limiting the pool of abortion providers, even while advanced practice clinicians ("APCs")—including licensed nurse practitioners, CNMs, and physician assistants—safely and routinely provide abortion care, including medication and aspiration abortion, in other states throughout the country. *See* Va. Code Ann. § 18.2-72. The Licensing Regulations contain analogous provisions. 12 Va. Admin. Code §§ 5-412-190(B), -260(B).

74.     *Two-Trip Mandatory Delay Law:* In addition to the laws that limit who can provide abortion care and how they can provide it, Virginia impermissibly burdens people seeking abortion care by imposing a Two-Trip Mandatory Delay Law. The law requires a pregnant person seeking an abortion to undergo a mandatory ultrasound and then delay their abortion for at least 24 hours, unless they live at least 100 miles from where the abortion is to be performed, in which case the delay is reduced to two hours. Apart from that exception, this requirement mandates two separate trips to a facility: one for an ultrasound and the second for an abortion. The law also requires providers to verbally offer patients the chance to view the ultrasound image, receive a printed copy, and listen to fetal heart tones, and then to obtain written certification of whether the patient declined or accepted. Va. Code Ann. § 18.2-76(B)–(C).

75.     Another statutory provision requires people seeking abortion care to listen to unnecessary so-called "informed consent" information about the procedure, in person or over the telephone, and then wait at least 24 hours before obtaining an abortion. The statute further requires providers to offer and describe additional state-published written materials containing numerous inaccuracies and misleading statements to patients, who may then choose whether to accept the offer to review the materials. If they accept, the patient must wait at least 24 hours after receiving the materials before they may have the abortion, or if they choose to have the materials mailed, they must wait at least 72 hours. Va. Code Ann. § 18.2-76(A), (D).

76.     *Criminalization Laws*: Virginia is one of the few states that, more than 45 years after *Roe,* has retained a statute criminalizing abortion. Under Va. Code Ann. § 18.2-71 (the "**Felony Abortion Statute**"), anyone—including a medical professional—who administers or uses means to produce an abortion commits a Class 4 Felony punishable by up to 10 years in state prison and a monetary fine of up to $100,000. The Physician-Only Law and Hospital Requirement are among the few narrow exceptions to the Felony Abortion Statute. Dr. Doe is subject to criminal prosecution under the Felony Abortion Statute for providing abortion care at any time after the first trimester of pregnancy unless such care is provided in a licensed hospital.

77.     Included in the Criminalization Laws are provisions that further subject licensed "abortion facilities" to potential criminal and civil penalties for failing to correct in a manner acceptable to OLC any violation of the Licensing Regulations—which mandate that licensed facilities comply with all applicable state, federal, and local laws and regulations, as well as the facility's own policies and procedures. 12 Va. Admin. Code §§ 5-412-110(C), -130(A), -140(A)(2)–(3).

78.     Dr. Doe is subject to potential civil and criminal penalties for providing five or more first trimester abortions per month in a medical facility that is not a licensed by VDH as an abortion facility or hospital. 12 Va. Admin. Code § 5-412-20; Va. Code Ann. § 32.1-27. The Licensing Scheme has restricted, and will continue to restrict, the number and type of facilities in which Dr. Doe may practice in her chosen area of specialty, abortion care.

79.     Plaintiffs challenge the Physician-Only Law, the Hospital Requirement, and the Licensing Scheme in conjunction with the Criminalization Laws.

**B.      Virginia has a Long History of Unconstitutionally Restricting Abortion Access**

80.     The Licensing Scheme, Hospital Requirement, Physician-Only Law, Two-Trip Mandatory Delay Law, and Criminalization Laws feature prominently in Virginia's long history of restricting abortion while targeting, marginalizing, and impeding the healthcare professionals who provide abortion care as well as the patients who seek it.

81.     Virginia declared abortion a crime in 1848, when it enacted the first version of the Felony Abortion Statute. As early as 1969, prior to *Roe*, Virginia legislators resisted calls from the medical profession to remove abortion from the criminal code and place it into a public health regulatory framework.

82.     Even after *Roe* established that the U.S. Constitution protects abortion as a fundamental right, Virginia retained the Felony Abortion Statute, which makes performing an abortion a felony by default, amending it only enough to exempt providers from penalties in select circumstances.

83.     The Hospital Requirement for second trimester abortions and the Physician-Only Law—two of those limited exceptions to the Felony Abortion Statute—date back to 1975.

84.     At that time, the primary method for second trimester abortion required doctors to induce labor by injecting medications into the patient's amniotic fluid. Labor occurred up to 72 hours later, with timing of onset difficult to predict. Patients would go through the full labor process, which entailed close monitoring and significant pain control through medication or anesthesia. Surgical removal of the retained placenta after labor was often necessary—subjecting patients to another surgical procedure—and complications including hemorrhage, heavy bleeding, and infection were not infrequent. Reflecting the nature and risks of this induction method, in 1975, the American Public Health Association ("APHA") and ACOG recommended that second trimester abortion take place in a hospital.

85.     The Hospital Requirement, however, is no longer relevant nor appropriate as induction abortion is now rare, having been almost completely superseded by D&E—the safest and most common method of abortion beginning early in the second trimester. D&E is a straightforward, extremely safe outpatient procedure that is routinely provided in an office-based setting.

86.     In 1998, the Commonwealth adopted a ban on a safe method of second trimester abortion that had no exception for when the patient's health was at risk. The law was not only harmful to patients, but also vaguely worded—placing abortion providers in the untenable position of not knowing which additional types of care were criminalized. Federal courts blocked the ban on these grounds. *Richmond Med. Ctr. for Women v. Gilmore*, 55 F. Supp. 2d 441 (E.D. Va. 1999), *aff'd per curiam*, 224 F.3d 337 (4th Cir. 2000). Undaunted, Virginia enacted a new ban on the same safe procedure in 2003, leading to six years of litigation before a federal court upheld the law based on a narrow interpretation that it believed would not unduly harm women. *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165 (4th Cir. 2009).

87.    In the early 2000s, the Legislature continued to impose additional layers of unnecessary abortion restrictions that intruded on patients' autonomous decision-making on top of the existing array.

88.    For example, in 2001, legislators passed several restrictions, including the provision in the Two-Trip Mandatory Delay Law requiring that at least 24 hours prior to an abortion, providers share rigid categories of so-called "informed consent" information with patients and offer them materials produced by the state that have consistently been filled with false, misleading, and inaccurate information about abortion. Va. Code Ann. § 18.2-76.

89.    Punitive regulation of outpatient abortion facilities began in earnest in March 2011, when the Legislature passed the Licensing Statute, in the form of S.B. 924, which initially addressed infection prevention and disaster preparedness for hospitals and similar medical facilities. After S.B. 924 passed the Senate, the House tacked on a floor amendment, adding to the bill a sentence categorizing "facilities in which five or more first trimester abortions per month are performed" as a type of "hospital" for purposes of one paragraph instructing VBH to promulgate regulations setting minimum standards for "hospitals." Va. Code Ann. § 32.1-127(B)(1).

90.    As a House amendment, S.B. 924 went directly to the Senate floor, bypassing the relevant review committee, the Senate Committee on Education and Health, which had repeatedly rejected similar attempts to target abortion providers with medically unnecessary restrictions. The Senate accepted the amendment by a vote of 20-20, with the tie broken by Lieutenant Governor Bill Bolling. It was signed by Governor Bob McDonnell and enacted in March 2011—despite outcry from the medical community and without a single public hearing.

91.    The Licensing Statute radically shifted the framework under which first trimester abortion providers operated in Virginia. S.B. 924 mandated that VBH craft temporary

"emergency" regulations—despite no public health emergency or justification offered for emergency rulemaking—and then, pursuant to the statute's requirements, VBH began the process of promulgating permanent rules governing abortion facilities' construction, maintenance, protocols, equipment, staffing, and nearly every other aspect of their operations.

92.     VDH convened a medical committee to provide input on the regulatory drafting process, with members comprised of OB/GYN department chairs from major hospitals in Virginia. The committee recommended that onerous, unnecessary physical plant requirements contained in the regulations *not* apply to existing abortion clinics, given that they were already providing high-quality, safe care.

93.     VBH ultimately adopted proposed regulations that exempted existing clinics from the onerous, medically unnecessary physical plant requirements in June 2012, but Attorney General Ken Cuccinelli—against medical opinion and expertise—refused to certify the regulations with that exemption. An investigation revealed that members of VBH had opposed the medically unnecessary requirements, but the Attorney General's office exerted pressure on the members to capitulate. Attorney General Cuccinelli also accused VBH members of ignoring his legal advice about how to draft the regulations and exposed them to legal liability by refusing to provide counsel for any ensuing litigation. VBH subsequently re-voted on the proposed Licensing Regulations, adopting a version without a waiver for existing clinics in September 2012.

94.     One month later, Virginia Health Commissioner Dr. Karen Remley, who opposed the onerous regulations, resigned. In her resignation letter, Dr. Remley stated, "Unfortunately, how specific sections of the Virginia Code pertaining to the development and enforcement of these

regulations have been and continue to be interpreted has created an environment in which my ability to fulfill my duties is compromised and in good faith I can no longer serve in my role."[5]

95.   Piling on, in 2012, the Legislature added a provision to the Two-Trip Mandatory Delay Law, which requires providers to perform an ultrasound on a pregnant person seeking an abortion at least 24 hours in advance, forcing those seeking abortions to take two separate trips to a medical facility. Va. Code Ann. § 18.2-76. The added provision also required providers to verbally offer patients the chance to view the ultrasound image and listen to fetal heart tones.

96.   Governor McDonnell signed the final Licensing Regulations in June 2013. All existing abortion clinics were required to file renovation or relocation plans that complied with the infeasible physical plant requirements as a condition of obtaining or renewing a license, or else face immediate closure.

97.   Some clinics closed, including Hillcrest Clinic in Norfolk, which shuttered in April 2013 after concluding it could not afford to comply with the pending regulations, which architects estimated would cost $500,000. Hillcrest had been open for 40 years, since 1973—the year *Roe* was decided. Other clinics echoed similar fears of closure based on prohibitive costs.

98.   On the verge of a public health crisis in which many more abortion clinics were likely to close, Governor Terry McAuliffe took office in January 2014 and ordered VBH to re-examine the 2013 Licensing Regulations and solicit public comment.

99.   Another highly contested public process ensued, with an influential group of state legislators and anti-abortion advocates insisting that the regulations were needed to protect women's health and safety. They argued that the Licensing Statute required VBH to maintain the burdensome provisions in their current form, given its mandate for VBH to set "minimum

---

[5] Kathryn Smith, *Va. Health Chief Resigns*, Politico (Oct. 18, 2012, 4:30 PM), https://www.politico.com/story/2012/10/va-health-chief-resigns-over-abortion-regs-082597.

standards" across multiple areas of operation. On the other side, public health advocates asserted that the Licensing Statute itself created the problem by requiring a form of regulation that was wholly inappropriate for first trimester abortion providers.

100.    After multiple rounds of hearings and comments, VBH approved amendments to the regulations in 2016 in a purported effort to comply with *Whole Woman's Health*. VBH determined, based on advice from the Attorney General, that additional amendments were "necessary" to ensure the constitutionality of the regulations in light of that decision. VBH accordingly eliminated the requirement that facilities comply with certain provisions of the Guidelines for Design and Construction of Hospitals and Outpatient Facilities issued by the Facilities Guidelines Institute (the "FGI Guidelines"), a set of onerous physical plant requirements with no medical benefits for abortion.[6]

101.    Governor McAuliffe signed the amended regulations and they became effective in March 2017—nearly six years after the Licensing Statute became law. While the amendments rolled back some of the most egregious parts of the regulations, the statutorily mandated Licensing Scheme remains, as a whole, medically unnecessary and unduly burdensome.

102.    Although not challenged here, the Commonwealth's forced parental involvement laws and funding restrictions prohibiting medical insurance coverage for abortion care exacerbate the effects of the Licensing Scheme, the Hospital Requirement, the Physician-Only Law, the Two-Trip Mandatory Delay Law, and the interlinked Criminalization Laws, all of which serve to increase the financial, logistical, and emotional burdens that pregnant people, in particular low-

---

[6] *See* Va. Dep't of Health, Final Regulation Agency Background Document 1–2, 8–9, 25–27 (Nov. 4, 2016), http://townhall.virginia.gov/L/GetFile.cfm?File=58\4295\7763\AgencyStatement_VDH_7763_v1.pdf.

income patients, face when seeking to exercise their constitutional right to receive abortion care. The ensuing facts must be viewed in that context.

### III. Virginia's Licensing Scheme, Hospital Requirement, and Physician-Only Law Target Access to Abortion Care with No Corresponding Benefit

### A. There is No Legitimate Medical Reason to Regulate Abortion Differently Than Any Other Comparable Medical Procedure

103. Imposing a multitude of specifically targeted regulations—governing management, personnel, recordkeeping, counseling, testing, equipment, and everything in between—does not make abortion, one of the safest medical procedures with very low complication rates, any safer. The challenged laws unnecessarily pile on and create a scheme of double regulation that applies only to abortion providers.

104. The doctors, nurses, and medical professionals who provide or assist in the provision of abortion care are already subject to Virginia's generally applicable professional licensure, health, and tort laws and regulations. Medical and healthcare facilities where abortion care is provided are also regulated and supervised by professional organizations.

105. Both before and after the Licensing Scheme was enacted and enforced, abortion providers have been subject to robust regulatory schemes that ensure abortion care—like any other office-based outpatient medical procedure—is provided safely and responsibly.

106. The Virginia Department of Health Professions ("VDHP") has authority, separate and apart from VDH, to regulate the practice of any healthcare provider licensed by a board within VDHP, including Virginia's Boards of Medicine, Nursing and Pharmacy.

107. VDHP assists the Boards of Medicine, Nursing, and Pharmacy with enforcing regulations and related statutes. It has extensive investigatory and enforcement powers, including, but not limited to, the ability to investigate statutory violations; inspect any office or

26

facility operated, owned or employing individuals regulated by any health regulatory board; receive and investigate complaints about practitioners and take disciplinary action; refer practitioners to the Office of the Attorney General for criminal prosecution; and impose monetary penalties. *See* Va. Code Ann. §§ 54.1-2400, -2505, -2506 *et seq.*

108.    The Virginia Board of Medicine also has extensive enforcement powers, including the ability to deny, suspend, or revoke physicians' and advanced practice clinicians' licenses for "unprofessional conduct," which may include, among other things, performing or assisting in the performance of a criminal abortion. Va. Code Ann. §§ 54.1-2400(7), -2915(A)(6).

109.    Detailed requirements are also outlined for the practice of medicine, including minimum standards for patient record management, confidentiality, the practitioner-patient relationship, ethics, informed consent, patient monitoring, discharge policies, administration of anesthesia during office-based surgical procedures, and protocols for controlled substances. *See* 18 Va. Admin. Code § 85-20 *et seq.*

110.    Since the enactment of the Licensing Statute, medical offices providing abortion care have not only been regulated by boards within VDHP (as they were prior to 2011), but also have been subject to VDH's extensive, onerous scheme of medically unnecessary licensure requirements.

111.    However, other physicians' offices and healthcare centers, where comparable or riskier outpatient procedures are regularly performed, are only regulated by boards within VDHP, so long as they do not provide more than four first trimester abortions per month. Only to the extent that physicians administer anesthesia are these offices subjected to limited, additional regulation—by VDHP, not VDH.

112.    Subjecting abortion providers to the Licensing Scheme, Hospital Requirement, and Physician-Only Law, in conjunction with the Criminalization Laws, is thus medically unnecessary, in light of the extensive regulatory scheme that already exists and applies to such facilities and professionals. Facilities in which four or fewer first trimester abortions are performed per month, or where other types of comparable or higher-risk medical care is provided, are not subject to multiple layers of duplicative, medically unnecessary regulation.

**B.     The Licensing Scheme Provides Little to No Medical Benefit**

113.    As mandated by the Licensing Statute, VBH promulgates and enforces the Licensing Regulations, a thicket of extensive administrative and bureaucratic requirements that largely mirror the regulations governing Outpatient Surgical Hospitals. *Compare* 12 Va. Admin. Code § 5-410-10–160, -1150–1380, *with* 12 Va. Admin. Code § 5-412 *et seq.*

114.    The Licensing Scheme, as a whole, is without medical basis, arbitrary, and at odds with statements from professional standard-setting bodies, including the AMA and ACOG. It includes numerous burdensome requirements that are not suited to physicians' offices providing abortion care, which is a safe outpatient procedure, with extremely low complication rates, that does not need to be performed in a sterile field.

115.    The Licensing Scheme, as a whole, reflects a fundamental misunderstanding of abortion procedures and their attendant risks. For example, the regulations contain detailed requirements regarding clinical protocols, required equipment and supplies, medications, and anesthesia, all of which are far more prescriptive and extensive than the corresponding regulations for inpatient hospitals. *Compare, e.g.*, 12 Va. Admin. Code §§ 5-412-220, -250, -260, -270, *with* 12 Va. Admin. Code §§ 5-410-240, -250, -390, -490.

116.    These regulations, however, lack any medical justification because abortion is a straightforward procedure for which no incision is required, and general anesthesia is not used. They are especially inapposite for medication abortion—which entails only the oral administration of medications.

117.    The Licensing Scheme also imposes administrative requirements that are inappropriate for medical practices with a limited number of staff. For example, it requires licensed abortion facilities to establish a governing body to oversee facility management and control, *see* 12 Va. Admin. Code § 5-412-150. The governing body is required to develop a formal organizational plan with written bylaws, a statement of purpose, a mechanism for accountability, functions and duties for the governing body, and a process for selecting clinical staff and granting clinical privileges. The bylaws must also establish guidelines for the relationship between the governing body, administrator, and clinical staff, ignoring that they are frequently one and the same in small medical offices and clinics providing abortion care.

118.    The Licensing Scheme furthermore requires abortion facilities to establish a "quality improvement committee" responsible for the oversight and supervision of the required "ongoing, comprehensive, integrated, self-assessment program of the quality and appropriateness of care or services provided." 12 Va. Admin. Code § 5-412-210. This is not required by the regulations governing inpatient and outpatient hospitals. While a "quality improvement committee" may benefit a large hospital with many staff members who do not often communicate with one another, it is a needless formality in a small medical office, where staff interact on a regular basis and frequently discuss clinic practices, including how to improve the quality of care in ways that are tailored to their services and patients.

119.    These requirements resemble or are more onerous than the requirements for a governing body and bylaws that large hospitals must establish, but are medically unnecessary and inappropriate for medical offices or clinics with limited staff who wear many hats.

120.    The examples of Virginia's medically unnecessary Licensing Scheme described herein are not intended to be exhaustive; rather, there are numerous additional examples of unnecessary regulations that are not specifically described in this Complaint. Plaintiffs challenge the set of regulations as a whole, because they must comply with all of them, in minute detail—or else attempt to obtain a waiver—as a condition of licensure.

121.    In all other areas of extremely safe outpatient medicine, the topics included in the Licensing Scheme are generally left to the healthcare provider's medical expertise, professional judgment, and obligation to adhere to the governing standard of care. Beyond that, the governing standard of care is enforced through generally applicable health facility and healthcare provider regulations, professional self-governance, and tort liability. These limitations predate the Licensing Scheme and operate independently of it. They apply to Plaintiffs' facilities, other licensed "abortion facilities," and any other medical office in which abortion care is or could be provided.

122.    Thus, the Licensing Scheme, as implemented by VBH and enforced by VDH, is unnecessary, duplicative, and provides no demonstrable added medical benefit.

123.    Even if a medical facility succeeds in obtaining a license to provide more than four first trimester abortions per month, license renewal requirements similarly lack medical benefits.

124.    The Licensing Scheme provides that renewal applications, required annually, "shall only be granted after a determination by the OLC that the applicant is in substantial compliance with this chapter." 12 Va. Admin. Code § 5-412-60. In practice, this has resulted in at least one

yearly warrantless inspection of some Plaintiffs to determine compliance with the Licensing Scheme.

125. These inspections, conducted under the OLC Director's supervision, are extremely intrusive and disruptive, and come without probable cause, notice, or an opportunity to object.

126. The inspections permit the Virginia Health Commissioner and/or VBH to deny, suspend, or revoke a license if it determines that an "abortion facility" is in violation of certain laws or of "*any* applicable regulation" or is "permitting, aiding, or abetting the commission of any illegal act in the abortion facility." 12 Va. Admin. Code § 5-412-130.

127. Neither general hospitals nor Outpatient Surgical Hospitals are subject to this level of review for license renewals. Rather, 12 Va. Admin. Code § 5-410-90, which applies to both general inpatient hospitals and Outpatient Surgical Hospitals, provides for annual renewal for licenses "unless cause appears to the contrary."

128. There is no medical basis for treating doctor's offices providing first trimester abortion care more harshly than inpatient hospitals or Outpatient Surgical Hospitals for purposes of license renewals. Such treatment can never be "in substantial conformity" with accepted health and safety standards, as the Licensing Statute purports to require.

**C.      The Hospital Requirement Is Without Medical Justification and Outdated**

129. The Hospital Requirement, in conjunction with the Felony Abortion Statute, makes it a Class 4 Felony punishable by up to 10 years in state prison and up to $100,000 in fines for any person—including a licensed physician like Dr. Doe—to provide an abortion at any time during the patient's second trimester of pregnancy unless in a hospital licensed by VDH or operated by the Department of Behavioral Health and Developmental Services. Va. Code Ann. §§ 18.2-71, 73.

130.    The method of aspiration abortion used for a patient on the final day of the first trimester, defined under the Licensing Regulations as 13 weeks, 6 days LMP, is in nearly all cases the same method as that used one day later in pregnancy, at 14 weeks LMP. Yet the Hospital Requirement arbitrarily requires the latter procedure to be performed in an inpatient hospital or Outpatient Surgical Hospital, with no corresponding medical benefits.

131.    While the statute does not specify what type of hospital licensure is mandated, the only two facilities that currently provide abortion care after 13 weeks, 6 days LMP are Surgical Centers. Abortion facilities are not permitted to provide second trimester procedures.

132.    VLPP provides second trimester abortion services at its Surgical Center in Virginia Beach, as well as at a hospital-owned Surgical Center in Richmond.

133.    VLPP initially obtained its Virginia Beach Surgical Center license to provide services other than abortion. To be licensed as a Surgical Center, the facility was required to comply with the regulations at 12 Va. Admin. Code §§ 5-410-10–160, -1150–1380. These regulations include, *inter alia*, requirements for Surgical Centers to comply with specific sections of the FGI Guidelines—the very same physical plant requirements that VBH struck from the first trimester Licensing Regulations because they lacked medical benefits and were presumed unconstitutional—which in turn require Surgical Centers to have sterile operating rooms of at least 150 square feet or more, depending on sedation level provided; patient corridors at least five or six feet wide, depending on location; and similarly specific requirements regarding HVAC systems, finishes for ceilings, walls, and floors, and recovery room dimensions and layout, among others.

134.    There is no medically sound justification for requiring all abortions provided after 13 weeks, 6 days LMP to be performed in facilities that are designed, constructed, and operated in the same manner as inpatient hospitals or Outpatient Surgical Hospitals.

135.    The licensed professionals who provide abortion care in Plaintiffs' healthcare centers and clinics are qualified by education, training, and experience to determine whether an abortion may safely be provided in Plaintiffs' existing facilities during the second trimester of pregnancy.

136.    Dr. Doe is similarly qualified by education, training, and experience to determine whether an abortion may safely be provided in a medical office or other type of medical facility during the second trimester of pregnancy. Under the Hospital Requirement, Dr. Doe is subject to potential criminal prosecution for providing abortions to patients at any point past the first trimester of pregnancy in a medical office or facility not licensed by VDH as a "hospital." But for the Hospital Requirement, Dr. Doe would seek to provide abortion care, including care past the first trimester, in a medical office or facility that is not licensed by VDH.

137.    As in the first trimester, second trimester abortions are very safe, with major complications occurring in less than one percent of procedures. No scientific evidence indicates that abortions, including second trimester abortions, performed in an inpatient hospital or Surgical Center are safer than those performed in an appropriate medical office setting.

138.    Major medical associations, including ACOG and the APHA, reject the notion that all second trimester abortions should be performed in hospitals or Surgical Centers.

139.    Throughout the country, second trimester abortions are safely and regularly performed in doctors' office and health center settings that do not meet Surgical Center requirements.

140.    The Surgical Center requirements for the size of operating and recovery rooms and the width of corridors and doorways are unnecessary for the safe provision of second trimester abortion care, which requires neither large medical teams nor extensive equipment, and does not

involve the use of deep sedation or general anesthesia. The excess space mandated by Virginia law does not provide a health benefit to patients.

141.    In addition, many of the FGI Guidelines, including those for operating rooms and sterile corridors, are geared toward maintaining a sterile operating environment such as would be appropriate for a procedure involving an incision that exposes sterile tissue. But abortion does not require a sterile field, because an incision is not required—the procedure is "performed through the natural opening of the birth canal, which is itself not sterile." *Whole Woman's Health*, 136 S. Ct. at 2316. Thus, physical facility requirements aimed at maintaining a sterile field are unnecessary and provide no medical benefit.

142.    Virginia also requires Surgical Centers (like other hospitals) to go through a lengthy Certificate of Public Need ("COPN") process before licensure. 12 Va. Admin. Code § 5-220-20. The application process takes up to seven months to complete and must be done in accordance with a scheduled 190-day review period;[7] if an applicant fails to submit a completed application at least 40 days before a scheduled review period, it cannot be reviewed in that period and the applicant must wait another several months to submit their forms. 12 Va. Admin. Code §§ 5-220-200, -230. The application fee alone is up to $20,000, depending on the estimated cost of the project. 12 Va. Admin. Code § 5-220-180. The fee does not include legal, architectural, and engineering consultation fees.

143.    The COPN application process also includes a formal comment process and at least one public hearing. 12 Va. Admin. Code § 5-220-230. Over three months after an application is submitted, any individual "seeking to be made a party to the case" may request an

---

[7] *See Certificate of Public Need Program*, Va. Dep't of Health, http://www.vdh.virginia.gov/licensure-and-certification/the-certificate-of-public-need-program/ (last visited June 16, 2018).

informal fact-finding conference "for good cause," which is expansively defined and opens the door to involvement by abortion opponents.

144.    This restrictive, expensive, time-consuming, and potentially politicized process is inappropriate in the context of abortion care, as the policy objectives COPN laws were designed to achieve are simply inapplicable. COPN laws are chiefly concerned with curbing supplier-induced demand, yet abortion providers cannot artificially increase demand for their services; abortions can only be provided to pregnant individuals who have made the highly personal decision to terminate their pregnancies. COPN laws are also commonly understood to curb the "medical arms race" between providers in a given area, where medical facilities stockpile unnecessarily expensive, cutting-edge technology to compete for doctors and patients. Unlike many other more complicated medical interventions, abortion is a simple, safe medical procedure that does not require any complicated equipment.

145.    Further, in Virginia, procedures with comparable or higher risks are routinely performed in outpatient, non-Surgical Center clinical and physician's office settings, including, among others, vasectomy, colonoscopy, surgery to remove fibroids, and endometrial ablation.

146.    Limiting the provision of abortion care after 13 weeks, 6 days LMP to facilities that meet the standards for inpatient hospitals or Outpatient Surgical Hospitals has not enhanced the safety of abortion procedures in Virginia or otherwise furthered the Commonwealth's interest in protecting women's health.

147.    The Hospital Requirement also contains no exception for cases in which a pregnant person needs an immediate abortion because their health is at risk. This puts Dr. Doe at risk of criminal prosecution for providing urgent, medically necessary health care to her patients.

148.    In addition to its disregard for patients' health, the Hospital Requirement contains impermissibly vague language that invites confusion and arbitrary enforcement. Although it applies to "second trimester" abortions, that term is not defined.

149.    The Hospital Requirement also does not define the term "hospital." Yet, Virginia statutes and regulations reference at least three types of hospitals, including general hospitals, special hospitals, and Outpatient Surgical Hospitals, each of which is subject to specific licensing requirements.

150.    As neither the Felony Abortion Statute nor the Hospital Requirement contain a scienter requirement, Dr. Doe would be subject to criminal prosecution for a Class 4 Felony for providing abortion care to a patient at any time after the first trimester of pregnancy in a medical facility that is not a "hospital" licensed by VDH, regardless of the circumstances in which such care was provided, and even if she mistakenly believed the facility to be a licensed "hospital."

151.    Prior to 2013, the definition of "Outpatient Surgical Hospitals" in the hospital regulations explicitly included "outpatient abortion clinics," but was not enforced against any physician's offices providing first trimester abortion care.

152.    In 2013, when the separate Licensing Regulations for first trimester clinics were adopted, the term "outpatient abortion clinics" was stricken from the definition of "Outpatient Surgical Hospitals."

153.    Consequently, it is unclear what type of "hospital" licensure satisfies the statutory requirement for second trimester abortions.

154.    Adding to the confusion, the Supreme Court has found that second trimester hospital requirements are unconstitutional. The Court in *Simopoulos v. Virginia*, 462 U.S. 506 (1983), however, declined to strike down the Hospital Requirement *because* it believed outpatient

abortion facilities in which second trimester abortion care was provided qualified as "outpatient hospitals" under the Code of Virginia—and were therefore subject to less stringent regulations than inpatient hospitals.

155.    The ruling in *Simopoulos* rests on a regulatory definition that saved the statute from unconstitutionality, but which no longer exists.

### D.    Virginia's Physician-Only Law is Outdated and Not Based on Evidence

156.    The Physician-Only Law exempts abortions provided by licensed physicians from Virginia's general criminalization of abortion. Provision of abortion care in violation of this law is a Class 4 Felony punishable by up to 10 years in state prison and up to $100,000 in civil fines. Because of these restrictions, APCs such as CNMs, physician assistants, and licensed nurse practitioners do not provide abortion care in Virginia, regardless of their education, training, and experience. *See* Va. Code Ann. §§ 18.2-71, -72, 32.1-27(A), -136; 12 Va. Admin. Code §§ 5-412-190, -260.

157.    The Physician-Only Law unnecessarily restricts who may provide abortion care in Virginia by: (a) limiting the number and type of clinicians that Plaintiffs and other medical facilities that provide abortion care may employ; and (b) diverging from mainstream medical practice to prohibit safe and effective abortion care provided by APCs.

158.    Medication and aspiration abortions in the United States can be, and are, safely and effectively provided by clinicians with a variety of credentials, with very low rates of complication.

159.    Indeed, APCs in Virginia—including at some of Plaintiffs' health centers—regularly provide care that is comparable to, or riskier than, abortion, including but not limited to intrauterine device insertions and removals, endometrial biopsy (which involves inserting a sterile tube through a patient's cervix into the uterus and suctioning a small piece of tissue from the

uterine lining), and colposcopy (the use of instruments to magnify the cervix and, when appropriate, remove tissue for biopsy).

160.    CNMs provide labor and delivery services to patients who decide to give birth in their homes. Va. Code Ann. § 54.1-2957.03.

161.    Other care provided by APCs at some of Plaintiffs' health centers in Virginia includes family planning; well visits; pap smears; STI screening and treatment; breast exams; gender-confirming hormone replacement therapy; LEEP (loop electrosurgical excision procedure, in which a small electrical wire loop is used to remove abnormal cells from the cervix); cervical and vaginal biopsy; birth control implant placement and removal; and primary care services, including managing patients with multiple health conditions.

162.    If a patient is experiencing a miscarriage, or has retained tissue in their uterus following an abortion, APCs in Virginia—including at some of Plaintiffs' health centers—can and do safely provide misoprostol and/or mifepristone to facilitate the evacuation of the uterus. There is no medical justification for prohibiting APCs from performing aspiration procedures and prescribing medication for abortion while allowing them to use the same procedures and medications in the context of miscarriage care.

163.    The provision of healthcare by APCs allows for improved efficiency and the allocation of healthcare resources where they can best be utilized, and provides patients with more choices about their care.

164.    Expanding the provision of abortion care to APCs would also significantly increase access to abortion throughout the Commonwealth. For example, if the Physician-Only Law were lifted, some of Plaintiffs' health centers would be able to go from providing abortions only one day a week to providing services three to five days a week.

165.    There is no statistically significant benefit, as measured by complication rates, failure rates, or any other outcome, when aspiration abortions are performed by physicians as compared to APCs. Indeed, peer-reviewed studies uniformly conclude that APCs can safely and effectively provide both aspiration and medication abortion, and leading medical and public health authorities agree.

166.    Several Plaintiff health centers serve as training sites for APCs. Comprehensive training is available on a wide range of required skills, from pelvic exams to sonogram techniques. APCs are also trained in many aspects of abortion care, apart from actually providing abortions. Even though APCs could seamlessly learn to provide both aspiration and medication abortions as part of their training, they are barred from doing so in Virginia because of the Physician-Only Law and the Criminalization Laws.

167.    Arbitrarily limiting the types of qualified, trained healthcare professionals who may provide abortion care in Virginia does nothing to advance patient health and safety, but rather serves only to restrict the availability of abortion providers and access to abortion in the Commonwealth.

**E.    Virginia's Medically Unjustified Laws Impose Heavy Burdens on Access to Abortion**

168.    The Licensing Scheme, Hospital Requirement, and Physician-Only Law, individually and collectively, and in conjunction with the Criminalization Laws, have no basis in protecting patient health. Instead, they impose heavy burdens on access to abortion care in Virginia.

169.    To meet the byzantine requirements of the challenged laws, abortion providers, including Dr. Doe, must needlessly divert both time and money away from patient care and toward compliance with laws that serve only to harass and burden providers of abortion care and their

patients; subject pregnant people to medically unnecessary requirements that negatively impact their healthcare experience; and cause delay or forgoing of care. These laws have led some providers to stop providing abortion care altogether.

170.    The Licensing Statute is arbitrarily burdensome. Healthcare providers who perform four or fewer abortions per month may provide abortion care in an office-based setting, subject only to the robust professional and state oversight already described—just as all first trimester abortion providers were regulated before the Licensing Scheme went into effect in 2012.

171.    By mandating a separate scheme based solely on the provision of one additional abortion per month, the Licensing Statute arbitrarily subjects medical practices in which healthcare providers perform five abortions per month to regulations that closely resemble those applied to general hospitals. In some instances, these requirements are even more onerous—even though hospital-style regulations are inapposite for first trimester abortions, which are straightforward, brief outpatient procedures that do not need to be performed in a sterile field. *Compare* 12 Va. Admin. Code § 5-412 *et seq.*, *with* 12 Va. Admin. Code § 5-410 *et seq*.

172.    Providers of abortion care, including Dr. Doe, have had to drastically alter their practices to ensure compliance with the Licensing Scheme.

173.    Plaintiffs, including Dr. Doe, have been forced to spend inordinate amounts of time focused on compliance with the regulations, fulfilling burdensome, unnecessary administrative and bureaucratic obligations that divert them away from providing high-quality, patient-centered care.

174.    Licensed abortion facilities are required to develop, implement, and maintain documentation for 16 different subcategories of policies and procedures, an unnecessary

requirement that is not medically justified, but places enormous burdens on clinic staff, including Dr. Doe, who are further diverted from focusing on patient care.

175.    For example, at A Capital Women's, at least one-third of the clinic administrator's time is devoted to ensuring compliance with administrative requirements imposed by the Licensing Regulations. VDH requirements consume every staff member's time and affect all aspects of clinic operations.

176.    As a consequence, these restrictions reduce the time that clinic staff, including Dr. Doe, can devote to individual attention, conversation, and emotional support for patients, all of which are meaningful burdens that the Supreme Court recognized in *Whole Woman's Health*, 136 S. Ct. at 2318.

177.    The onerous Licensing Scheme further burdens patients' access to abortion by limiting the pool of providers willing to take on the substantial administrative, compliance, and inspection requirements imposed by the scheme. These costly and burdensome mandates, along with the stigma surrounding the provision of abortion care, severely limit the number and availability of abortion providers in Virginia, which in turn forces people seeking abortion care to travel greater distances and wait longer to obtain abortions in the Commonwealth.[8] For example, Dr. Doe may only provide comprehensive reproductive health care, which includes more than four first-trimester abortions per month, in facilities subject to the Licensing Scheme. This severely and arbitrarily limits the number and geographic location of facilities in which Dr. Doe may engage in her chosen profession in the Commonwealth, and requires her to comply with burdensome and medically unnecessary requirements that stigmatize and take time and attention away from her patients.

---

[8] *See, e.g.*, Rachel K. Jones et al., *Differences in Abortion Service Delivery in Hostile, Middle-ground, and Supportive States in 2014*, 28 Women's Health Issues 212 (2018).

178.    Further, Dr. Doe seeks to provide more than four first trimester abortions in a medical office or facility not licensed by VDH as a "hospital" or "abortion facility." But for the Licensing Scheme, Dr. Doe would seek to provide four or more pre-viability first trimester abortion care in a medical office or facility that is not licensed by VDH.

179.    These burdens can result in pregnant people incurring increased risks and costs, experiencing psychological harm, and potentially attempting to self-induce abortions if they cannot get to a clinic.[9] Delay may prevent some patients from accessing the method of abortion they prefer, or being able to obtain an abortion at all.

180.    VDH's warrantless, unannounced inspections compound these significant burdens. Along with Va. Code Ann. §§ 32.1-25 and -125, statutory provisions that now apply to providers of abortion care pursuant to the Licensing Statute, the Licensing Regulations require VDH's OLC representatives to make "periodic unannounced on-site inspections." The abortion facility must make available any records that the inspectors request, including patient records. The facility must also grant inspectors access to interview employees, contractors, agents, and any person under the facility's control, direction or supervision. 12 Va. Admin. Code § 5-412-100.

181.    The Licensing Scheme requires inspection at least once every two years, but contains no limitation on the number or duration of inspections that OLC may perform. In practice, the annual license renewal requirement is often contingent on more frequent inspection.[10]

---

[9] *See, e.g.*, Jenna Jerman et al., *Barriers to Abortion Care and Their Consequences for Patients Traveling for Services: Qualitative Findings from Two States*, 49 Persp. on Sexual and Reprod. Health 95 (2017).

[10] The Licensing Regulations state that annual license renewal applications "shall only be granted after a determination by the OLC that the applicant is in substantial compliance" with Chapter 412, which in practice would likely require at least yearly inspections for most providers. 12 Va. Admin. Code § 5-412-60.

182.    Since 2013, OLC has conducted numerous warrantless inspections of Plaintiffs, as frequently as three times within a one-year period.

183.    The Licensing Regulations state that any "duly designated" VDH employee shall have the right of entry, and if the "owner, or person in charge, refuses entry, this shall be sufficient cause for *immediate revocation or suspension* of the license." 12 Va. Admin. Code § 5-412-90 (emphasis added). Plaintiffs thus exist in a state of constant risk and fear of immediate loss of licensure, without notice or opportunity for a hearing.

184.    Inspectors usually spend multiple days at Plaintiffs' facilities per inspection, and significantly disrupt facility operations during this time. At many of Plaintiffs' facilities, at least one staff person must take time away from patient care to interface with the inspectors during the entire time that they are on site—typically no less than two to three days. Inspectors also intensively question staff members about their roles and facility operations.

185.    Because the Licensing Regulations mandate regulation in broad categories that are unsuited to abortion care, OLC inspectors have used them to cite providers for ostensible violations that are unrelated to safe abortion care.

186.    For example, A Capital Women's was cited for a deficiency when its staff physician had water spots on his lab coat. There is no regulation that specifically addresses this deficiency, but the individual inspectors employed a broad and subjective interpretation of the infection prevention policies and procedures mandated by the Licensing Regulations to cite the clinic.

187.    Even worse than targeting Plaintiffs with selective inspections and pretextual deficiencies, when conducting surprise inspections, OLC inspectors are permitted—and regularly request—to observe abortion procedures. Inspectors of Falls Church, Whole Woman's Health and A Capital Women's have approached patients in the waiting room, seeking their permission to

watch their abortions. Many inspectors will not agree to complete the inspection until they have watched a procedure, and do so in a way that is intrusive to patients.

188.    At Falls Church, when inspectors were unable to find a patient who would allow them to observe their procedure during one of their visits, they returned the next day with the explicit goal of watching a procedure. In instances like these, patients are pressured into ceding their privacy to inspectors, and the medical and facility staff feel unable to advocate for their patients' privacy.

189.    At Falls Church, inspectors have also sat in on patient health educations sessions, during which educators and patients discuss personal healthcare decisions and confidential information.

190.    The Licensing Regulations also require licensed facilities to give inspectors full, unfettered access to unredacted records, without any safeguards limiting access to private, confidential, and/or patient-identifying information on site. The Licensing Regulations require only that patient names and addresses be redacted by the facility prior to removal of records from the premises. 12 Va. Admin. Code § 5-412-100.

191.    Inspectors can demand access to files for abortion patients that have visited the clinic at any time within the past seven years, requiring some Plaintiffs to change their record storage systems to keep files on hand. OLC inspectors also can, and have, examined the patient lists that the physician performing the abortion receives, which contain extensive personal and identifying information. OLC inspectors routinely make photocopies of patient charts and remove them from Plaintiffs' premises. These decisions are often arbitrary and without valid justification. For example, OLC inspectors once made and took a copy of a patient chart because they were displeased with the way the notes were written.

192.    To satisfy the Licensing Regulations, licensed facilities are required to provide patients' sensitive, confidential medical and personal histories, as well as sonogram copies, to OLC inspectors. The Licensing Regulations compel invasions of patient privacy with no corresponding benefit, while threatening facilities that provide abortion care with immediate license suspension or revocation for non-compliance.

193.    Under the Licensing Scheme and the Criminalization Laws, Dr. Doe's ability to provide a meaningful number of first trimester abortions per month is contingent upon the facility in which she practices maintaining its VDH licensure, which is in turn contingent upon that facility's acquiescence to the above described warrantless inspections.

194.    The Physician-Only Law, in conjunction with the Criminalization Laws, also imposes heavy burdens and substantial obstacles on access to abortion by artificially and arbitrarily limiting the pool of providers Plaintiffs may hire in order to offer abortion services. But for the law, some Plaintiffs would expand the days on which they offer abortion care.

195.    With the number of medical facilities providing abortion care in Virginia declining by more than half from 2009 to 2016, and 15 clinics now serving two million women of reproductive age, the majority of women in Virginia live in one of the 92 percent of cities and counties in the Commonwealth without an abortion provider.

196.    As a result, many people seeking abortion care in Virginia must travel long distances to obtain it. Travel can present significant obstacles, especially for low-income people who, in the United States, make up 75 percent of abortion patients. These patients must find or save money for the cost of transportation and other travel-related expenses, and potentially take unpaid time off work and forego needed income to make the trip. Many must obtain child care and incur the attendant costs.

197.    Logistical costs are all in addition to the expense of the care itself, as Virginia prohibits insurance coverage for abortion care through state Medicaid and all plans purchased on the state exchange. Va. Code Ann. §§ 32.1-325(A)(7), 38.2-3451.

198.    The Hospital Requirement, in conjunction with the Felony Abortion Statute, severely limits access to second trimester abortion in Virginia. Because of the expensive, burdensome, and medically unnecessary licensing requirements, patients seeking second trimester abortion care in Virginia are limited to only two Surgical Centers in the Commonwealth, in Virginia Beach and Richmond. This has significantly limited the availability of procedures past 13 weeks, 6 days LMP in Virginia.

199.    Due to the Hospital Requirement, a patient who is at 14 weeks LMP must travel to Richmond or Virginia Beach for an aspiration abortion. However, a patient with a pregnancy dated one day earlier at 13 weeks, 6 days LMP would be able to get a nearly identical aspiration abortion procedure at an abortion clinic.

200.    The Hospital Requirement also impedes Dr. Doe's ability to earn a living in her chosen profession. There are no licensed hospitals in Dr. Doe's community in which she may provide comprehensive abortion care to patients after 13 weeks, 6 days LMP. Despite her education, training, and experience qualifying her to provide such care outside a licensed hospital, Dr. Doe must regularly refer patients seeking second trimester abortion care to one of the two facilities providing second trimester abortions in Virginia, or to a facility outside the Commonwealth.

201.    Moreover, requiring a second trimester abortion procedure to be done in a Surgical Center can add significantly to the cost, even if an identical procedure would otherwise be provided more cheaply in an office-based setting. At the Richmond hospital-owned Surgical Center, for

example, a procedure at 14 weeks LMP costs over $1,400, whereas a first trimester abortion up to 13 weeks, 6 days LMP in an abortion facility costs between $360 and $635 in Virginia.

202.    This arbitrary mandate is medically unjustified, costly, and burdensome to pregnant people.

203.    Low-income people are especially affected by the Hospital Requirement, as the costs of travel to obtain a second trimester procedure can be significant for patients who live far away. People without means already face burdens in saving enough money to afford a first trimester procedure. For patients who struggle to afford a first trimester procedure, a second trimester procedure could be completely out of reach.

204.    The scarcity of second trimester providers is particularly burdensome for people residing in Southwest Virginia. If a patient misses their opportunity to access abortion care in the first trimester at a licensed facility in Roanoke, they must travel to either Richmond or Virginia Beach—or to another state—for a second trimester abortion, at significantly increased travel distance and cost.

205.    Traveling to Richmond or Virginia Beach to access care often doubles the time spent in transit.

206.    Moreover, residents of Southwest Virginia are more likely than other Virginians to be living in poverty. As a result, they are less likely to be able to shoulder the attendant costs of accessing abortion care, including finding transportation, child care, and arranging time off from work or school. Plaintiffs currently unable to provide abortions past 13 weeks, 6 days LMP would provide such care but for the Hospital Requirement. This additional capacity would decrease delay and wait times and increase access to care across the Commonwealth.

207.    Further, the Hospital Requirement contains no exception for cases in which a patient needs an immediate abortion because their health is at risk. Accordingly, a pregnant person facing that circumstance in their second trimester must suffer serious health harms, even if they present to a clinic with trained staff ready to care for them, because providing a second trimester abortion outside a hospital would subject the provider to potential felony prosecution. For that reason alone, the Hospital Requirement, in conjunction with the Felony Abortion Statute, imposes heavy and impermissible burdens.

### IV.     The Two-Trip Mandatory Delay Law Provides No Benefits, Imposes Substantial Obstacles to Abortion Access, and Demeans People Seeking Abortion

#### A.      Mandating an Unnecessary Trip to Obtain an Ultrasound 24 Hours Before an Abortion, and Receive Information that Serves No Purpose, Lacks Any Benefit

208.    Virginians seeking abortion care are forced to undergo a mandatory ultrasound and then delay their abortion at least 24 hours, unless they live at least 100 miles from the facility where the abortion is to be performed, in which case the delay is reduced to two hours. Va. Code Ann. § 18.2-76(B). For any patient who lives less than 100 miles from the health center where the abortion is to be performed, this imposes a medically unnecessary trip to obtain the ultrasound.

209.    The combined mandatory ultrasound, 24-hour delay, and two-trip requirements have no legitimate justification and offer no benefits, health-related or otherwise. Indeed, the statute itself acknowledges that the 24-hour delay is medically unnecessary, as it exempts patients who live at least 100 miles from their procedure location from the 24-hour requirement.

210.    Virginia does not impose any such two-trip mandatory delay on any other procedures, including medical procedures that pose far greater risks than abortion, including other reproductive healthcare procedures like vasectomy. This arbitrary requirement provides no benefit to patient health and safety.

211.    Even apart from the delay, mandating an ultrasound is inappropriate because an ultrasound is not always necessary. Some providers use other methods of determining pregnancy and gestational age, including but not limited to blood tests or pelvic exams. Thus, requiring providers to always administer ultrasounds prevents them from exercising their individual professional judgment and clinical expertise in determining the best approach for their patient.

212.    Requiring an ultrasound at least 24 hours before providing abortion care is also unnecessary because many providers perform another ultrasound in conjunction with provision of abortion services. Even if the patient already obtained an ultrasound from their obstetrician, it may not contain the documentation the Commonwealth requires to satisfy the Two-Trip Mandatory Delay Law. The clinic must then perform a second ultrasound. Such situations provide no health benefits to the patient, nor otherwise advance any valid state interest.

213.    Similarly, the Two-Trip Mandatory Delay Law requires the ultrasound to be performed by a professional working under the supervision of a physician licensed in Virginia. *See* Va. Code Ann. § 18.2-76(B). There is no medical benefit to requiring people who have traveled from another state and have already received an ultrasound to undergo another ultrasound performed in accord with that mandate. Rather, this requirement serves only to increase the patient's overall cost and delay.

214.    The Two-Trip Mandatory Delay Law also requires the provider who performs the mandatory ultrasound to verbally offer the patient an opportunity to view the ultrasound, receive a printed copy, and hear the fetal heart tones. It further requires the provider to obtain from the patient written certification that the opportunity was offered and whether it was accepted, with a very narrow exception for survivors of rape or incest who reported violations to law-enforcement authorities. *See* Va. Code Ann. § 18.2-76(B)–(C).

215.    While such information is not always problematic, the mandate contains no exception for when a provider would elect to change the extent or nature of their offer, in order to prevent physical or psychological harm to a patient. Forcing providers, including Dr. Doe, to place patients in a position where they may suffer harm violates therapeutic privilege, a medical tenet that permits doctors to tailor informed consent information in a way that averts patient harm.

216.    Should Dr. Doe decide to exercise therapeutic privilege by exempting a patient from the ultrasound requirement or mandatory 24-hour delay requirements, or otherwise fail to comply with those provisions of the Two-Trip Mandatory Delay Law, she would be subject to civil fines. Va. Code Ann. § 18.2-76(G).

217.    The Two-Trip Mandatory Delay Law additionally subjects patients to unnecessary and in some cases inaccurate state-mandated information, followed by a delay before they may obtain abortion care. *See* Va. Code Ann. § 18.2-76 (A), (D). The law first requires providers to give the patient certain verbal information, by phone or in person, at least 24 hours before the procedure; and second, requires providers to offer additional printed information, also 24 hours in advance, that the patient can choose to view.

218.    The mandate lacks benefits, medical or otherwise. There is no medical benefit to requiring providers to give patients rigid categories of information that are dictated by the state, and offer additional materials containing inaccurate information, to obtain informed consent. This mandate is in addition to, and separate from, the personalized discussion providers are trained to have with patients prior to a procedure, a practice which is consistent with the standard of care.

219.    The offer of additional materials is also without legitimate justification, as the Commonwealth's publications contain numerous erroneous, inaccurate, and misleading

statements, on topics that include pregnancy generally, abortion safety, and protocols for medication abortion.

220.    Specialists in embryological and fetal development who reviewed Virginia's informed consent materials as part of a larger multi-state study found multiple inaccuracies.[11] Specifically, over 41 percent of statements regarding the first trimester of pregnancy were determined to be medically inaccurate and over 22 percent of the statements made in the fetal development materials ("Fetal Development—Understanding the Stages") overall were found to be medically inaccurate.

221.    Factual inaccuracies are not limited to VDH's fetal development materials. VDH has also drafted, created and disseminated materials entitled "Abortion—Making an Informed Decision" that contain numerous inaccuracies and misleading statements.

222.    Examples of false or misleading statements include, but are not limited to, inaccurate descriptions of two methods of medication abortion: RU-486 (mifepristone) and methotrexate.

223.    According to the materials, RU-486 "must be taken very early in pregnancy; before the seventh week and no later than the ninth week" and "the woman must return to the doctor's office in 36 to 48 hours to receive a second drug, either orally or vaginally." Both statements are inconsistent with current evidence-based medical practice and contradicted by the FDA-label information for Mifeprex (the brand name for mifepristone). Medication abortion can be safely performed through the *tenth* week of pregnancy, and patients can safely take the second medication, misoprostol, *24 to 48 hours buccally* (in the cheek pouch) at *a location of their choosing*.

---

[11] *See* Cynthia Daniels et al., *Virginia*, Informed Consent Project (2016), http://informedconsentproject.com/states/virginia/.

224.    The materials similarly contain inaccurate and misleading statements about methotrexate, stating that if methotrexate is used, the patient "returns to see the doctor within four to seven days to complete the abortion." This is inaccurate and inconsistent with current evidence-based medical practice, as, like with mifepristone, the second medication may be taken at a location of the patient's choosing.

225.    The materials also provide an incomplete, misleading description of the Two-Trip Mandatory Delay Law itself, stating that "[b]y law, th[e] ultrasound must be performed at least 24 hours before the procedure," but failing to inform people that if they must travel 100 or more miles to reach the provider's facility, the required delay between the ultrasound and the procedure is reduced to two hours.

226.    Finally, the materials state that "a woman choosing to carry a child to full term . . . can usually expect to experience a safe and healthy process." Misleadingly, no such statement is made about women undergoing abortions, despite that nationwide, childbirth is 14 times more likely than abortion to result in death.

227.    Despite these myriad inaccuracies (and others not enumerated herein), the Two-Trip Mandatory Delay Law requires physicians, including Dr. Doe, to offer these materials to every patient seeking an abortion. There is no medical benefit to providing patients with false, irrelevant, or misleading statements about abortion. Yet, Dr. Doe is subject to civil fines for failing to offer these materials to her patients. Va. Code Ann. § 18.2-76(G).

228.    Consistent with their ethical duty and legal obligations, prior to inducing or performing an abortion, Plaintiffs and their staff ensure that their patients receive the information necessary for them to fully understand the risks and benefits of abortion care, and the alternatives to abortion, so they can give informed and voluntary consent if they decide to terminate their

pregnancy. In addition, Plaintiffs and their staff offer their patients multiple opportunities to ask questions and discuss any concerns prior to providing abortion care.

229.    Plaintiffs and their staff also screen abortion patients to ensure that they are sure of their decision before care is provided. The overwhelming majority of patients are certain of their decision by the time they arrive at the health center. And if patients are not sure about their decision, Plaintiffs' clinicians and their staff advise them to take more time to reach a firm decision.

230.    There is also no benefit to subjecting people seeking abortion care to unnecessary, state-mandated categories of information, followed by a 24-hour waiting period, because they may theoretically change their mind about having an abortion. Patients seeking abortion are capable of making the decision to terminate a pregnancy without additional time for reflection. Research demonstrates that most patients are sure about their decision to have an abortion, and strongly prefer to obtain an earlier abortion, without delay.

231.    Accordingly, Virginia maintains not one, but two statutory mandates for patients to receive unnecessary information and then wait 24 hours before obtaining an abortion: the ultrasound mandate and the informed consent mandate. The extent to which each is unnecessary is only exacerbated by the fact that they are duplicative.

**B.      The Two-Trip Mandatory Delay Law Imposes Unjustified Burdens on Access and Shames People Seeking Abortion Care with No Corresponding Benefits**

232.    The Two-Trip Mandatory Delay Law imposes significant and unnecessary burdens on access to abortion care for Virginians.

233.    For example, requiring a patient to receive an ultrasound and state-mandated informed consent information at least 24 hours before receiving abortion care forces them to shoulder costs associated with visiting a clinic or other ultrasound facility two times—once for the ultrasound, and again for the procedure or medications. Such costs may include, but are not limited

to, travel, child care, and time away from family, work, or educational obligations. Multiple absences from work or class can be detrimental to employment and education. For hourly workers, having to go to the clinic on two separate days means two days of missed wages, and may even lead to job loss.

234.    People of color, those who live in rural areas, and low-income people are disproportionately affected by these increased burdens. Traveling to an urban center or another state may pose extreme difficulties for low-income, undocumented, or rural pregnant people who lack access to public transportation or their own household vehicle. On top of this, the 24-hour delay can require either an overnight stay or two lengthy trips to obtain abortion care. By requiring patients to make an additional, medically unnecessary trip to a provider that is likely not easily accessible, the Two-Trip Mandatory Delay Law compounds the burdens for low-income people, who will have to double the (likely unpaid) time they take off work, seek and pay for childcare, and/or shoulder the cost of transportation and lodging just to access healthcare.

235.    These burdens are particularly severe for residents of Southwest Virginia. The closest Virginia abortion provider is in Roanoke, which is a six- to seven-hour round-trip drive for many residents of this area. Although some people living in Southwest Virginia would qualify for the 100-mile exception to the 24-hour ultrasound delay requirement, most do not. Accordingly, they must make two trips to the clinic and incur the attendant costs and additional burdens, or else attempt to obtain an ultrasound elsewhere, with the risk that it will not contain the state-mandated documentation, in which case they will be required to undergo yet another ultrasound followed by an additional mandatory 24-hour delay.

236.    Moreover, the delay that ensues as a result of the Two-Trip Mandatory Delay Law is often significantly longer than 24 hours (sometimes as much as a few weeks) because

coordinating time off from work or school, arranging child care, and finding transportation for a second visit to the clinic can be difficult, particularly for low-income people.

237.    Making necessary arrangements for two separate trips to receive the ultrasound and the abortion also makes it more difficult for those pregnant people who desire to keep their decision to have an abortion private. This exposes people who are seeking abortions in dangerous situations, such as those in abusive relationships or victims of unreported rape or incest, to a greater risk of violence or other harms.

238.    Although abortion is an extremely safe procedure, the risk of complications increases as gestational age advances; thus, forcing pregnant people to delay abortion care is detrimental to their health and exposes them to greater risks with no medical justification.

239.    Patients may also experience psychological, financial, and emotional harms from being forced to remain pregnant against their will. In addition to the anxiety many patients experience from unnecessary, state-imposed delay, some patients are unable to access the abortion method that they prefer. For example, delay can mean a pregnant person becomes ineligible for a medication abortion, which is only available up to 10 weeks LMP.

240.    Delay can also mean that some pregnant people become ineligible for a first trimester abortion (available up to 13 weeks, 6 days LMP), and are instead forced to travel significantly further distances and incur substantially higher costs to obtain a second trimester abortion at one of the two facilities that offer this care in Virginia.

241.    For some pregnant people, the delay imposed by the Two-Trip Mandatory Delay Law may result in them not being able to obtain abortion care at all.

## V.  The Harsh Criminal Penalties that Virginia Imposes in Conjunction with the Challenged Laws Punish Healthcare Professionals and Patients

242.    Multiple layers of criminalization of abortion place heavy burdens on abortion providers, staff, and their patients.

243.    The only circumstances in which abortion care is permitted in Virginia are exceptions to the underlying Felony Abortion Statute, Va. Code Ann. § 18.2-71, which otherwise makes the provision of abortion care punishable by up to 10 years in state prison and $100,000 in fines. Other examples of Class 4 Felonies in Virginia include recruiting another person to participate in an act of terrorism, Va. Code Ann. § 18.2-46.5(C); arson, Va. Code Ann. § 18.2-82; shooting a firearm in a malicious manner that endangers people's lives, Va. Code Ann. § 18.2-279, and having sexual relations with 13- to 14-year-old children, Va. Code Ann. § 18.2-63(A).

244.    The Felony Abortion Statute directly targets physicians, like Dr. Doe, who provide abortion care.

245.    The potential penalties for violating the Felony Abortion Statute—for example, by providing a second trimester abortion in a clinic—are thus not only prohibitively burdensome, but also vastly disproportionate to the severity of the offense as compared to other Class 4 Felonies.

246.    Providing any kind of abortion care outside of the legal framework, even violating components of the Licensing Scheme and failing to correct them to the satisfaction of OLC, is also punishable as a criminal offense. Va. Code Ann. §§ 32.1-27(A), -136; 12 Va. Admin. Code § 5-412-110.

247.    These harsh penalties have a chilling effect on the willingness of qualified healthcare professionals to provide abortion care in Virginia, exacerbating the significant obstacles Virginians face in accessing legal abortion care.

### VI.    The Challenged Laws Cumulatively Impose an Undue Burden on Virginians' Access to Abortion Care

248.    Together, the challenged laws impose burdens that are exponentially greater than the burdens imposed by any single law operating in isolation. Furthermore, the burdens are inextricably linked to each other. While each law is itself an undue burden or otherwise unconstitutional, the cumulative impact of the challenged laws and regulations is to impose an undue burden that cannot be mitigated by striking down single laws in a piecemeal fashion.

249.    The challenged regime cumulatively imposes on Virginians seeking abortion care numerous unnecessary restrictions that, among other burdens, delay their access to care, increase the financial costs they bear to access abortion care, reduce the individualized attention that they receive from providers, and increase health risks associated with otherwise safe care.

250.    Virginia's abortion restrictions are demeaning, unnecessary, and discriminate against and stigmatize Virginians who seek abortion care, and the clinicians who offer it, including Dr. Doe.

251.    The challenged regime's multiple and overlapping restrictions have no benefit, and under threat of criminal penalties, impose expensive and time-consuming requirements on both providers and patients, which some patients may seek to overcome by traveling out of their community, and even out of the Commonwealth altogether, to exercise their constitutionally protected right to access safe abortion care—if they are able to overcome Virginia's byzantine maze of barriers at all.

## CLAIMS FOR RELIEF

### COUNT I
### (Substantive Due Process – Rights to Liberty and Privacy – Licensing Statute)

252.   The allegations of paragraphs 1 through 251 are incorporated as though fully set forth herein.

253.   The Licensing Statute stating that "facilities in which five or more first trimester abortions per month are performed shall be classified as a category of 'hospital,'" as codified in Va. Code Ann. § 32.1-127(B)(1), in conjunction with the Criminalization Laws, violates Plaintiffs' patients' right to liberty as guaranteed by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, because it imposes an undue burden on the fundamental right to choose abortion before viability.

## COUNT II
### (Substantive Due Process – Rights to Liberty and Privacy – Licensing Regulations)

254.   The allegations in paragraphs 1 through 251 are incorporated as though fully set forth herein.

255.   In their entirety as a condition of licensure, the Licensing Regulations, 12 Va. Admin. Code § 5-412 *et seq.*, in conjunction with the Criminalization Laws, violate Plaintiffs' patients' rights to liberty as guaranteed by the Fourteenth Amendment to the U.S. Constitution because they impose an undue burden on the fundamental right to choose an abortion prior to viability.

## COUNT III
### (Substantive Due Process – Rights to Liberty and Privacy – Hospital Requirement)

256.   The allegations in paragraphs 1 through 251 are incorporated as though fully set forth herein.

257.   The Hospital Requirement, Va. Code Ann. § 18.2-73, including the hospital licensing regulations as a condition of licensure, 12 Va. Admin. Code § 5-410 *et seq.*, in conjunction with the Criminalization Laws, violates Plaintiffs' patients' rights to liberty and

privacy as guaranteed by the Fourteenth Amendment to the U.S. Constitution because it imposes an undue burden on the fundamental right to choose an abortion prior to viability.

258.    The Hospital Requirement, including the hospital licensing regulations as a condition of licensure, in conjunction with the Criminalization Laws, violates Plaintiffs' patients' rights to liberty and privacy under the Fourteenth Amendment to the U.S. Constitution by failing to include an exception to preserve the health of a patient who requires a second trimester abortion but cannot reach one of the Commonwealth's two facilities regularly providing second trimester abortion care.

## COUNT IV
### (Substantive Due Process – Rights to Liberty and Privacy – Physician-Only Law)

259.    The allegations in paragraphs 1 through 251 are incorporated as though fully set forth herein.

260.    The Physician-Only Law, Va. Code Ann. § 18.2-72, in conjunction with the Criminalization Laws, violates Plaintiffs' patients' rights to liberty and privacy as guaranteed by the Fourteenth Amendment to the U.S. Constitution because it imposes an undue burden on the fundamental right to choose an abortion prior to viability.

## COUNT V
### (Substantive Due Process – Rights to Liberty and Privacy – Two-Trip Mandatory Delay Law)

261.    The allegations in paragraphs 1 through 251 are incorporated as though fully set forth herein.

262.    The Two-Trip Mandatory Delay Law, Va. Code Ann. § 18.2-76, violates Plaintiffs' patients' rights to liberty and privacy as guaranteed by the Fourteenth Amendment to the U.S. Constitution because it imposes an undue burden on the fundamental right to choose an abortion prior to viability.

## COUNT VI
### (Substantive Due Process – Cumulative Burden)

263.    The allegations of paragraphs 1 through 251 are incorporated as though fully set forth herein.

264.    The above-described Licensing Statute, Licensing Regulations, Hospital Requirement, Physician-Only Law, and/or Two-Trip Mandatory Delay Law, in conjunction with the Criminalization Laws and the above-described related health statutes and regulations, cumulatively violate Plaintiffs' patients' rights to liberty and privacy as guaranteed by the Fourteenth Amendment of the U.S. Constitution because they have the unlawful purpose and effect of imposing an undue burden on the fundamental right to choose abortion before viability.

## COUNT VII
### (Due Process – Vagueness – Hospital Requirement)

265.    The allegations of paragraphs 1 through 251 are incorporated as though fully set forth herein.

266.    The Hospital Requirement, in conjunction with the Criminalization Laws, is unconstitutionally vague and violates Plaintiffs' rights to due process as guaranteed by the Fourteenth Amendment to the U.S. Constitution because it fails to define the terms "hospital" and "second trimester of pregnancy."

## COUNT VIII
### (Fourth Amendment – Protection Against Unreasonable Searches – Licensing Regulations)

267.    The allegations of paragraphs 1 through 251 are incorporated as though fully set forth herein.

268.    The Licensing Regulations violate Plaintiffs' and their patients' right to be free from unreasonable searches under the Fourth Amendment to the U.S. Constitution by requiring VDH to conduct at least biennial unannounced, warrantless inspections of Plaintiffs' facilities under threat

of license suspension or revocation, in the absence of probable cause to believe that any violation

has occurred.

## ATTORNEY'S FEES

269.   Plaintiffs are entitled to an award of reasonable attorney's fees and expenses

pursuant to 42 U.S.C. § 1988.

## REQUESTS FOR RELIEF

Plaintiffs respectfully request that this Court:

1.   Issue a declaratory judgment that individually and/or cumulatively, the following laws

and provisions are unconstitutional:

    a.   The Licensing Statute, Va. Code Ann. § 32.1-127(B)(1) (in its reference to facilities

    in which five or more first trimester abortions per month are performed); the

    entirety of the Licensing Regulations, 12 Va. Admin. Code § 5-412 *et seq*.; the

    Hospital Requirement, Va. Code Ann. § 18.2-73; the Physician-Only Law, Va.

    Code Ann. § 18.2-72; and/or the Two-Trip Mandatory Delay Law, Va. Code Ann.

    § 18.2-76, in conjunction with the Criminalization Laws, on their face and/or as

    applied and enforced by Defendants;

2.    Issue permanent injunctive relief, without bond, restraining Defendants, and their

employees, agents, and successors in office from enforcing any challenged law that is declared

unconstitutional, and other associated Virginia statutes and regulations required to provide full

relief;

3.   Grant Plaintiffs attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988;

and/or

4.   Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated: September 4, 2018

Respectfully submitted,

/s/ D. Sean Trainor
D. Sean Trainor (VSB No. 43260)

Jenny Ma*
Gail M. Deady (VSB No. 82035)
Amy Myrick*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, New York 10038
Phone: (917) 637-3600
Fax:    (917) 637-3666
Email: jma@reprorights.org
Email: gdeady@reprorights.org
Email: amyrick@reprorights.org

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4061
Phone: (202) 383-5300
Fax: (202) 383-5414
Email: dstrainor@omm.com

Nathaniel Asher*
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Phone: (212) 326-2000
Fax: (212) 326-2061
Email: nasher@omm.com

*Attorneys for Plaintiffs Falls Church Medical Center, LLC;
Whole Woman's Health Alliance; All Women's Richmond, Inc.; and Dr. Jane Doe*

Jennifer Sandman*
PLANNED PARENTHOOD FEDERATION OF AMERICA
123 William Street, 9th Floor
New York, New York 10038
Phone: (212) 261-4584
Fax:    (212) 247-6811
Email: jennifer.sandman@ppfa.org

*Attorney for Plaintiff Virginia League for Planned Parenthood*

Claire G. Gastanaga (VSB No. 14067)
Eden Heilman**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF VIRGINIA, INC.
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax:     (804)649-2733
Email: claire@acluva.org

*Attorneys for all Plaintiffs*

*Admitted *Pro Hac Vice*.
**Motion for Admission *Pro Hac Vice* to be filed.

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2018, a true and correct copy of the foregoing

Amended Complaint was served on the following counsel for Defendants via the Eastern District

of Virginia's Electronic Filing System:

> Matthew R. McGuire
> Deputy Solicitor General
> Office of the Attorney General
> 202 North Ninth Street
> Richmond, VA 23219
> mmcguire@oag.state.va.us
>
> Emily M. Scott
> Hirschler Fleischer PC
> 2100 E Cary St.
> P.O. Box 500
> Richmond, VA 23218-0500
> escott@hf-law.com

Dated: September 4, 2018

By:  *s/D. Sean Trainor*

D. Sean Trainor (VSB No. 43260)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006-4061
Phone: (202) 383-5300
Fax:    (202) 383-5414
Email: dstrainor@omm.com

*Attorney for Plaintiffs Falls Church Medical
Center, LLC; Whole Woman's Health
Alliance; All Women's Richmond, Inc.; and
Dr. Jane Doe*