**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

FALLS CHURCH MEDICAL CENTER,    )
LLC d/b/a FALLS CHURCH          )
HEALTHCARE CENTER, *et al.*,    )
                                )
       Plaintiffs,      )
                                )
v.                              )    Civil Action No. 3:18cv428–HEH
                                )
M. NORMAN OLIVER, VIRGINIA      )
HEALTH COMMISSIONER, *et al.*,  )
                                )
       Defendants.      )

<u>**MEMORANDUM OPINION**</u>
**(Cross-Motions for Summary Judgment)**

## I.   INTRODUCTION

This action challenges the constitutionality of the statutes and regulations

governing health care providers who offer abortion care or services in Virginia.  Seeking

declaratory and injunctive relief, Plaintiffs[1] argue that the challenged statutes and

regulations pose a substantial obstacle to the availability of abortion services for Virginia

women, in violation of the Fourteenth Amendment to the United States Constitution.

This case is presently before the Court on Motions for Summary Judgment filed by both

Plaintiffs and Defendants.[2]  All parties have filed memoranda supporting their respective

---

[1] Plaintiffs in this case include Falls Church Medical Center, LLC; Whole Woman's Health Alliance; Virginia League for Planned Parenthood; and Dr. Jane Doe.  Dr. Jane Doe will be referred to as Dr. Doe and the other Plaintiffs as "abortion providers."  Where appropriate, the Plaintiffs collectively will simply be referred to as "Plaintiffs."

[2] The named Defendants include almost all associated regulatory agencies with jurisdiction over abortion services, as well as commonwealth's attorneys in jurisdictions where facilities providing

positions, accompanied by pertinent exhibits. The Court heard oral argument on April 8, 2019 and ordered supplemental briefing on several issues.

In support of their Motion for Partial Summary Judgment on Counts III and IV of the Amended Complaint, Plaintiffs offer the deposition testimony of multiple physicians and medical experts who opine that contemporary abortion procedures are extremely safe, and, as a result, complications necessitating advanced medical care are rare, even with respect to second trimester abortions.[3] Therefore, those procedures can be conducted by trained medical professionals other than licensed physicians. Defendants, on the other hand, seek summary judgment on Counts I–IV and VII and VIII of the Amended Complaint. Similarly, Defendants offer expert testimony to contend that while serious complications are admittedly rare, when they do occur, particularly with respect to second trimester procedures, they are most effectively addressed in a hospital setting by a physician.

---

such services are located. Defendants are M. Norman Oliver, Virginia Health Commissioner; Robert Payne, Acting Director of the Virginia Department of Health's Office of Licensure and Certification; Faye O. Prichard, Chairperson of the Virginia Board of Health; Theophani Stamos, Commonwealth's Attorney for Arlington County and the City of Falls Church; Robert Tracci, Commonwealth's Attorney for Albermarle County; Anton Bell, Commonwealth's Attorney for the City of Hampton; Michael N. Herring, Commonwealth's Attorney for the City of Richmond; and Colin Stolle, Commonwealth's Attorney for the City of Virginia Beach. Each individual Defendant has been sued in his or her official capacity, as well as their employees, agents, and successors. They will be collectively referred to as "Defendants."

[3] While the statutory language at issue in this case is somewhat antiquated, this Court is neither inclined nor empowered to engraft amendatory language. Therefore, for the purpose of constitutional review, this Court will limit the term "second trimester abortion" to pre-viability procedures. *See Virginia. v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988); *see also Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2303 (2016).

## II.   BACKGROUND

Distilled to their essence, Plaintiffs' individual counts in the Amended Complaint are largely premised on the United States Supreme Court's analysis in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).  In *Whole Woman's Health*, the Court restated with approval the time-honored standard for judicial review of allegedly burdensome abortion regulations that the Court originally articulated in *Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833 (1992).  Justice Breyer, speaking for the Court in *Whole Woman's Health*, described that standard as follows:

> [A] plurality of the Court [in *Casey*] concluded that there "exists" an "undue burden" on a woman's right to decide to have an abortion, and consequently a provision of law is constitutionally invalid, if the "*purpose or effect*" of the provision "*is to place a substantial obstacle* in the path of a woman seeking an abortion before the fetus attains viability." [] The plurality [of the Court in *Casey*] added that "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on that right."

136 S. Ct. at 2300 (quoting *Casey*, 505 U.S. at 878) (emphasis in original).

Informed by *Casey*, the Court in *Whole Woman's Health* also cautioned that "a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877).  The rule announced in *Casey*, however, requires that courts "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* (citing *Casey*, 505 U.S. at 887–98).

3

The claims advanced by Plaintiffs in this case are closely moored to the foregoing analytical framework articulated in *Casey* and *Whole Woman's Health*. Plaintiffs urge the Court to find that, in their view, the needless and antiquated administrative and legislative burdens on abortion providers in Virginia are constitutionally offensive obstacles to a woman's right to seek an abortion. Plaintiffs charge that

> Virginia has adopted an array of unnecessary and discriminatory laws, some over four decades old, that target the provision of abortion care without any meaningful improvement to safety or health, or any benefits— let alone benefits that outweigh burdens. Instead, these laws serve only to negatively impact Virginians' access to reproductive healthcare.

(Am. Compl. ¶ 65, ECF No. 41.)

According to Plaintiffs, the resulting mandate prescribed a wide array of restrictive regulations, which dictate strict standards for construction, staffing, equipment, enhanced training, infection prevention, and facility security. (*Id.* ¶ 68.) In addition, the Virginia Board of Health promulgated a host of regulations that govern first trimester abortion facilities, including increased record keeping, additional personnel and staffing requirements, restrictions on employment of physicians not licensed to practice in the Commonwealth of Virginia, periodic inspections by the Virginia Department of Health, including allowing such inspectors to review patient records, and requiring staff to provide certain medical information to patients prior to administering an abortion. (*Id.* ¶ 69.)

Further, according to Plaintiffs, Va. Code Ann. § 18.2-73, enacted in 1975, working in conjunction with other regulations, requires that lawful abortions performed during the second trimester of pregnancy must be carried out in a licensed hospital that

qualifies and meets the regulatory requirements of an outpatient surgical hospital. (*Id.* ¶ 72.) Also adopted in 1975, Va. Code Ann. § 18.2-72, the so-called "Physician-Only Law," exempts licensed physicians from Virginia's general criminal ban on abortion—Va. Code Ann. § 18.2-71, sometimes referred to as Virginia's felony abortion statute. Plaintiffs contend that the Physician-Only Law unjustifiably limits "the pool of abortion providers, even while advanced practice clinicians ("APCs")—including licensed nurse practitioners, CNMs [certified nurse midwives], and physician assistants— safely and routinely provide abortion care, including medication and aspiration abortion, in other states throughout the country." (*Id.* ¶ 73.)

Plaintiffs' constitutional challenges to the regulatory and statutory provisions at issue were originally framed in an eight-count Amended Complaint; however, only seven counts remain, six of which are presently challenged by at least one of the parties under Federal Rule of Civil Procedure 56.[4] The parties have challenged the following counts in their cross-motions for summary judgment: Counts I through IV are each prefaced with the general heading of "Substantive Due Process – Rights to Liberty and Privacy." Count I focuses on the so-called "Licensing Statute," Va. Code Ann. § 32.1-127(B)(1) in

---

[4] Count VI was previously dismissed by the Court for its failure to state a viable independent claim. Count V of the Amended Complaint is still before the Court, but neither party has challenged it in their respective summary judgment motions. Count V focuses on Va. Code Ann. § 18.2-76, sometimes referred to as the "Two-Trip Mandatory Delay Law." This statute requires a woman seeking abortion care in Virginia to undergo a mandatory ultrasound and then delay the abortion procedure for at least 24 hours, unless she resides at least 100 miles from the facility where the abortion is to be performed, in which case the delay is reduced to two hours.

conjunction with what Plaintiffs refer to as Virginia's "Criminalization Laws."[5] Section 32.1-127(B)(1) requires that any facility "in which five or more first trimester abortions per month are performed . . . be classified as a category of 'hospital,'" Va. Code Ann. § 32.1-127(B)(1), thereby triggering a host of regulatory requirements. Count II targets Virginia's Licensing Regulations for first trimester abortion facilities, 12 Va. Admin. Code § 5-412, *et seq.*, and the Criminalization Laws, which Plaintiffs contend impose an undue burden on Virginia women's fundamental right to have an abortion prior to viability. Count III focuses on Va. Code Ann. § 18.2-73, referred to as the "Hospital Requirement," in conjunction with Virginia's Licensing Regulations for hospitals, 12 Va. Admin. Code § 5-410, *et seq.*,[6] as a condition of licensure of an abortion provider, and the Criminalization Laws. Count IV challenges Va. Code Ann. § 18.2-72 that only permits licensed physicians to lawfully perform abortion procedures.

---

[5] Plaintiffs collectively refer to three separate sections of the Virginia Code as the "Criminalization Laws." (Am Compl. ¶ 4f.) These sections include Va. Code Ann. §§ 18.2-71, §32.1-27(A), and §32.1-136. Section 18.2-71 makes it a Class 4 felony for any person to intentionally administer an abortion or destroy an unborn child. *See* Va. Code Ann. § 18.2-71. Section 27(A) provides criminal penalties for individuals who violate regulations promulgated by the Virginia State Board of Health. *See* Va. Code Ann. § 32.1-27(A). Section 136 makes it a Class 6 felony to operate an unlicensed hospital. *See* Va. Code Ann. § 32.1-136.

[6] Defendants question Plaintiffs' standing to challenge these licensing regulations. Defendants contend that all Plaintiffs meet these regulatory requirements and, therefore, Plaintiffs do not potentially suffer any adverse impact from the statute's regulatory content. This is a tenable argument with respect to the first trimester abortions, but the text of Count III appears to focus on the inability of Plaintiffs' facilities to perform second trimester abortion procedures.

Plaintiffs' overarching argument is that the burdens imposed by the regulatory regimen at issue adversely affects their ability to provide adequate service to their patients. At this stage of the proceedings, Plaintiffs have demonstrated a sufficiently concrete and particularized injury to advance their claims. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000); *see also Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019).

In Count VII, Plaintiffs allege that the Hospital Requirement is unconstitutionally vague and violates "due process as guaranteed by the Fourteenth Amendment to the U.S. Constitution because it fails to define the terms 'hospital' and 'second trimester of pregnancy.'" (Am. Comp. ¶ 266.)  Finally, Count VIII of the Amended Complaint alleges that Virginia's Licensing Regulations violate the Fourth Amendment by subjecting Plaintiffs to "biennial unannounced, warrantless inspections . . . ." (*Id.* ¶ 268.) The regulatory provision in question in Count VIII, 12 Va. Admin. Code § 5-412-90, authorizes agents of the Virginia Department of Health to enter abortion facilities for the purpose of conducting inspections. "Such entries and inspections shall be made with the permission of the owner or person in charge, unless an inspection warrant is obtained after denial of entry from an appropriate circuit court." 12 Va. Admin. Code § 5-412-90. It further provides that "[i]f the owner, or person in charge, refuses entry, this [refusal] shall be sufficient cause for immediate revocation or suspension of the license." *Id.* Such license suspension shall be indefinite in duration, until the commissioner "determines that the conditions upon which suspension was based have been corrected and the interest of the public will not be jeopardized by resumption of operation." 12 Va. Admin. Code § 5-412-130(C).

In their respective motions for summary judgment, Plaintiffs seek judgment only on Counts III and IV of their Amended Complaint.  Defendants seek summary judgment on Counts I–IV as well as Counts VII and VIII.  In fashioning any remedies that are appropriate in this case, the Court's hand will be guided by the wisdom of the Supreme Court in *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320 (2006). "Generally

speaking, when confronting a constitutional flaw in a statute, we try to limit the solution

to the problem.  We prefer . . . to enjoin only the unconstitutional applications of a statute

while leaving other applications in force, or to sever its problematic portions while

leaving the remainder intact." *Id.* at 328–29 (internal citations omitted).  This Court will

hue closely to this sage principle unless the invalidation of any single element of a statute

or regulation affects its constitutionality in its entirety.

## III.   STANDARD OF REVIEW

The standard for review of cross-motions for summary judgment is well-settled in

the Fourth Circuit:

> On cross-motions for summary judgment, a district court should "rule upon
> each party's motion separately and determine whether summary judgment
> is appropriate as to each under the [Federal Rule of Civil Procedure] 56
> standard."  Summary judgment is appropriate only if the record shows
> "there is no genuine issue as to any material fact and that the movant is
> entitled to judgment as a matter of law."

*Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (alteration in

original) (first quoting *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins.

Co.*, 176 F.3d 794, 797 (4th Cir. 1999), and then quoting Fed. R. Civ. P. 56(c)).

The relevant inquiry in the summary judgment analysis is "whether the evidence

presents a sufficient disagreement to require submission to a [trier of fact] or whether it is

so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 251–52 (1986).  Once a motion for summary judgment is properly

made and supported, the opposing party has the burden of showing that a genuine factual

dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

585–86 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). A material fact is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A genuine issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the non-moving party, is sufficient to allow a reasonable trier of fact to return a verdict in the party's favor. *Id.*

To defeat an otherwise properly supported motion for summary judgment, the non-moving party must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another" or "the mere existence of a scintilla of evidence" concerning a material fact. *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997) (first quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985), and then quoting *Anderson*, 477 U.S. at 252). Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate . . . ." *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing *Anderson* 477 U.S. at 252). "Thus, if the evidence is 'merely colorable' or 'not sufficiently probative,' it may not be adequate to oppose entry of summary judgment." *Id.* (citing *Anderson*, 477 U.S. at 249–50). Of course, the Court cannot weigh the evidence or make credibility determinations in its

summary judgment analysis. *See Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

## IV.   DISCUSSION

This Court's analysis of the parties' cross-motions for summary judgment begins by restating the seminal language of *Roe v. Wade* describing abortion in early pregnancy as relatively safe, but not without risk.  410 U.S. 113, 149 (1973).  The Court in *Roe* stated:

> The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient.  This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of after-care, and to adequate provision for any complication or emergency that might arise. . . . Thus, the State retains a definite interest in protecting the woman's own health and safety when an abortion is proposed at a late stage of pregnancy.

*Id.* at 150.

The State, however, may not place a substantial obstacle in the path of a woman's choice to exercise her substantive due process right to abortion care.  But as *Casey* counsels, courts must assess the burdens that a law imposes against the benefits that the law confers.  505 U.S. at 887.  Moreover, while this Court must review the legislative fact-finding of the Virginia General Assembly under a differential standard, it must not "place dispositive weight on [the legislature's] findings." *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007).

Counts I–IV of the Amended Complaint appear to be the epicenter of the controversy in this case.  However, because both Plaintiffs and Defendants have moved

for summary judgment with respect to Counts III and IV, the Court will address those counts first. The Court will then address Counts I and II, to then be followed by Counts VII and VIII.

### A. Counts III and IV: The Hospital Requirement and Physician-Only Law

Count III challenges the requirement that second trimester abortions be "performed in a hospital licensed by the State Department of Health or operated by the Department of Behavioral Health and Developmental Services." Va. Code Ann. § 18.2-73. In addition, the statute permits such procedures to be performed by a licensed physician during the second trimester and prior to the third trimester. *Id.* Count IV is closely allied with Count III, but focuses on Va. Code Ann. § 18.2-72, which states that

> [I]t shall be lawful for any physician licensed by the Board of Medicine to practice medicine and surgery, to terminate or attempt to terminate a human pregnancy or aid or assist in the termination of a human pregnancy by performing an abortion or causing a miscarriage on any woman during the first trimester of pregnancy.

Va. Code Ann. § 18.2-72. If an abortive procedure conducted in Virginia does not conform with either of the exceptions provided for in § 18.2-72 and § 18-2.73, then that conduct is punishable as a Class 4 felony under Va. Code Ann. § 18.2-71.[7] Plaintiffs argue that these superannuated regulations are unconstitutional.

---

[7] Defendants point out that the penalty provisions have been in place for 44 years, "yet Plaintiffs have identified only four instances where an illegal abortion was prosecuted at all, and only one of those cases related to the failure to perform an abortion in a hospital . . . ." (Defs.' Mem. Supp. Mot. Summ. J. 14, ECF No. 85.) Absence of active enforcement, however, does not mean that prosecutors do not have the discretion to enforce the statute if they deem appropriate.

Common to both Counts III and IV is the issue of whether the Hospital Requirement and Physician-Only Law, both individually and collectively, place an undue burden on regional access to second trimester abortion services and care. Plaintiffs' argument, in significant part, focuses on the paucity of facilities providing second trimester care in certain portions of Virginia. It appears to be undisputed that only two facilities in the Commonwealth of Virginia meet the strict licensing requirements of an outpatient surgical hospital authorized to perform second trimester abortions. The Virginia Beach facility provides second trimester abortions two days per week— Tuesdays and Fridays. The second facility is the Virginia Commonwealth University Medical Center ("VCU") in Richmond. VCU allows second trimester abortion procedures in its operating room one day per week. (Pls.' Mem. Supp. Mot. Partial Summ. J. 10–11, ECF No. 95; Defs.' Mem. Supp. Mot. Summ. J. 5–6.) Plaintiffs add that because VCU is also a trauma center, care of second trimester abortion patients is often delayed because other patients requiring emergency care take priority. Plaintiffs add that these limitations on the VCU facility often require second trimester abortion patients to wait for extended periods of time, and they also put second trimester abortion patients at risk of "being cared for by staff not specialized in abortion care." (Pls.' Mem. Supp. Mot. Partial Summ. J. 10–11.)

In their declarations accompanying Plaintiffs' Reply Memorandum, a number of witnesses reinforce Plaintiffs' contentions. Paulette McElwain ("Ms. McElwain"), President and CEO at Virginia League of Planned Parenthood ("VLPP"), explained that VLPP facilities are experiencing an increased volume of women seeking first trimester

abortions. "Although we try to treat patients before they pass the gestational age cut-off for medication abortion or for a first-trimester procedure, we are currently unable to do so in every case." (Pls.' Reply Mem., Ex. 1 at 1–2, ECF No. 110.)

With respect to the availability of second trimester (pre-viability) abortions, Dr. Shanthi S. Ramesh ("Dr. Ramesh"), a practicing obstetric and gynecological physician, stressed the necessity for additional facilities offering second trimester abortion services. She also testified that if additional facilities offering second trimester services were available, "it would mean more access to second trimester abortion earlier in the second trimester rather than pushing women out until later in the second trimester where, although the risks are low, they do go up every week of gestation." (Pls.' Reply Mem., Ex. 3 at 165.)

On the other hand, Defendants counter that Virginia women seeking pre-viability abortions are, in their view, amply served by the licensed physicians and facilities providing that service. Defendants point out that there are fully staffed facilities located in Falls Church, Charlottesville, Virginia Beach, and Richmond, Virginia (Defs.' Mem. Supp. Mot. Summ. J. 8–10); however, the majority of facilities noted by Defendants provide only first trimester abortion care. While Plaintiffs express concern about the availability of facilities for first trimester abortions, the primary focus of Count III is the availability of pre-viability second trimester abortion services.[8]

---

[8] Defendants also contend that "there are over 100 licensed hospitals in the Commonwealth in which abortions can be legally performed." (Defs.' Mem. Supp. Mot. Summ. J. 4.) Absent from the record, however, is any indication of what, if any, requirements such hospitals have for

An additional consideration in the benefits versus burden equation is whether the potential risk of significant complications in pre-viability second trimester abortion procedures warrants the need for hospitals that provide second trimester abortion care to qualify as outpatient surgical facilities.  Dr. Ramesh testified that the risks of complications are low, but they "go up every week of gestation."  (Pls.' Reply Mem., Ex. 3 at 165.)  Furthermore, in her Rule 26(a)(2)(c) report, Dr. Elizabeth R. Lunsford ("Dr. Lunsford"), a board-certified obstetrician and gynecologist with eight years of experience providing contraceptive, labor and delivery, prenatal, postnatal, ectopic pregnancy, and miscarriage care, offered the following evaluation of potential complications encountered during second trimester abortion procedures.

> As for the requirement that second trimester abortions be performed in a hospital, this is prudent as complications rise progressively with gestational age . . . . Second trimester abortions carry potential for hemorrhage, cervical lacerations, uterine perforation with subsequent injury to bowel, blood vessels and the renal tract, retained products of conception, and infection. . . . At this rate, it is possible for a woman to become exsanguinated (lose all of her blood) within 10 minutes, which would not allow time for transfer to a hospital facility if the procedure was being performed in a clinic setting.  This highlights the necessity of the hospital requirement, ensuring physician access to additional resources and staffing at a hospital in case any unexpected complications rapidly develop.

(Defs.' Reply, Ex. 1 at 17, ECF No. 109.)  This appears to be a material issue in dispute with respect to second trimester procedures.

Plaintiffs contend that the burden imposed by the Hospital Requirement is significantly compounded by the Physician-Only Law.  According to the deposition

---

elective abortion procedures, or whether Virginia women are even able to have an elective abortion procedure in those hospitals.

testimony of Dr. Ramesh and Ms. McElwain, these provisions, in tandem, significantly limit the availability of abortion care in underserved areas of Virginia, citing the City of Hampton as an example. (Pls.' Mem. Opp'n Defs.' Mot. Summ. J., Ex. G at 183, ECF No. 106; Pls.' Mem. Opp'n Defs.' Mot. Summ. J., Ex. B at 24–25.) As mentioned above, only two facilities in Virginia offer second trimester abortions, and they do so on a limited basis. (Pls.' Mem. Opp'n Defs.' Mot. Summ. J., Ex. B at 24, 28.)

Relying on the testimony of their medical experts, Plaintiffs also point out that "[i]n Virginia, procedures with risks comparable to or higher than the risks from abortion—including endometrial biopsy, colposcopy, hysteroscopy (scoping of the cervix and uterus), Loop Electrosurgical Excision Procedure ("LEEP") (removing pre-cancerous cells from the cervix), and dilation and curettage from miscarriage management—are routinely performed in outpatient clinics and physicians' offices." (Pls.' Mem. Supp. Mot. Partial Summ. J. 8.)

Plaintiffs' medical experts are also of the opinion that APCs "are fully capable of performing the two most common forms of abortion—medication and aspiration abortion—in Virginia as they do elsewhere." (*Id.* at 5.) Dr. Lunsford testified in her deposition that APCs provide medical care with complication rates as low as physicians. (Defs.' Mem. Supp. Mot. Summ. J., Ex. 13 at 310:2–6.) She further testified that APCs can prescribe almost every medication that a licensed physician could prescribe. (*Id.* at 310:11–20.) Dr.Lunsford also opined that there is no medical reason why an APC could not be trained to provide first trimester abortions. (*Id.*) The capability of APCs to perform first trimester abortions does not appear to be in serious dispute, but that does not

necessarily mean that restrictions on APCs performing such procedures is an unconstitutional burden. *See June Med. Sers., L.L.C. v. Gee*, 905 F.3d 787, 803 (5th Cir. 2018).

As this Court noted in its Memorandum Opinion addressing Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), if waged by Plaintiffs as a facial challenge, their argument with respect to APCs could face a formidable arsenal of countervailing authority. As the Court in *Casey* reiterated, "[o]ur cases reflect the fact that the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals . . . ." 505 U.S. at 885. This position was restated by the Supreme Court in *Mazurek v. Armstrong*, 520 U.S. 968, 974 (1997). Plaintiffs' challenge, however, is more narrowly focused to the specific application of the Physician-Only Law to access abortion care in the Commonwealth of Virginia.

Both parties agree that the constitutionality of the abortion restrictions at issue in this case must be reviewed by applying the undue burden test articulated by the Supreme Court in *Casey*. The Court in *Casey* reaffirmed a woman's right to terminate a pregnancy prior to viability. It also recognized a state's legitimate interest in ensuring that abortion is performed under circumstances that ensure the maximum safety for the patient. *Roe v. Wade*, 410 U.S. 113, 150. The Court in *Casey*, however, emphasized that "a statute which, while furthering . . . [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Casey*, 505 U.S. at 877. The Court defined an undue burden as "shorthand for the conclusion that a state regulation has the purpose or effect of

16

placing a substantial obstacle in the path of a woman seeking an abortion of a non-viable fetus." *Id.* The *Casey* Court also observed that "the incidental effect of making it more difficult or more expensive to procure an abortion", standing alone, is generally insufficient to invalid an abortion regulation. *Id.* at 874. As with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion. *Id.* at 878.

As Plaintiffs point out, reviewing courts have an "independent, constitutional duty" to closely review a state's assertions concerning the benefits of abortion restrictions. *Whole Woman's Health*, 136 S. Ct. at 2310 (quoting *Gonzales*, 550 U.S. at 165). Applying the teachings of *Casey*, the Court in *Whole Woman's Health* restated that "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id.* (quoting *Casey*, 505 U.S. at 878).

Focusing more closely on the issue of availability of licensed physicians to serve Virginia women seeking pre-viability abortions, Defendants take issue with Plaintiffs' assessment. In her deposition testimony, Rosemary Codding ("Ms. Codding"), Director of the Falls Church Health Care Center ("Falls Church facility"), indicated that her staff included four physicians who perform medication and aspiration procedures. Ms. Codding further testified that the Falls Church facility had no waiting list and that most women seeking an abortion are seen within 24 hours. (Pls.' Mem. Opp'n Defs.' Mot. Summ. J., Ex. E at 41:15–42:1; 95:16–22.)

17

Amy H. Miller ("Ms. Miller"), representing Whole Woman's Health Alliance,
testified in her deposition that their Charlottesville facility has physicians available to
provide abortion services. Plaintiff Dr. Doe is among them. Like the Falls Church
facility, the Charlottesville facility has no waiting list. (Pls.' Notice Submission of Exs.,
Ex. I at 15:7–9, 50:9–11, ECF No. 107.)

Ms. McElwain, President of VLPP, described her organization as providing health
care to approximately 3,000 patients in the Richmond area. (Pls.' Mem. Opp'n Defs.'
Mot. Summ. J., Ex. B at 99:19–100:22.) According to Ms. McElwin, VLPP has four
staff physicians to perform first and second trimester abortions—two in Richmond and
two in Virginia Beach. First trimester medication abortions are offered Monday through
Friday at each VLPP facility. (Pls.' Mem. Opp'n Defs.' Mot. Summ. J. 2.) The
Richmond VLPP facility provides first trimester surgical abortions up to two and a half
days a week. (*Id.*) Second trimester surgical abortions are available on Fridays at VCU
in Richmond. (*Id.*) In Virginia Beach, VLPP physicians perform first and second
trimester surgical abortions on Tuesdays and Fridays. (*Id.*)

Assuming, without deciding, that the number and geographic distribution of
facilities providing abortion care are sufficient without posing a significant undue burden,
the record evidence fails to demonstrate a scarcity of physicians available to perform first
or second trimester abortion procedures at any of Plaintiffs' clinical facilities. Each
appears to be amply staffed. Plaintiffs argue, however, perhaps persuasively, that such
procedures could be capably performed by APCs or other nurse practitioners. Plaintiffs
contend that "[a]bortion is one of the safest medical procedures available today." (Pls.'

18

Mem. Supp. Mot. Partial Summ. J. 3.) They further explained that there are two basic abortion methods—oral medication and surgical abortion procedure. (*Id.*) Abortion by medication is typically available in the first trimester of pregnancy. It culminates in an experience similar to a miscarriage, which typically occurs after the patient leaves the clinic. It can be performed up to ten weeks after the first day of the patient's last menstrual period and usually entails taking two medications. (*Id.*) There appears to be no controversy between the parties that APCs are competent and capable of performing first trimester abortions less expensively in a non-hospital setting.

Turning to surgical abortion, there are two forms—aspiration, and dilation and evacuation. (*Id.* at 4.) These two procedures can be utilized in the first and early second trimester of pregnancy. Surgical abortions need not be performed in a sterile operating room. (*Id.*) It is reasonable to assume that providing abortion services offered by APCs would be less expensive, but the present record evidence fails to support the argument that there are insufficient physicians available to perform pre-viability second trimester procedures in existing abortion clinics.

On the other hand, the burden imposed by the Physician-Only Law must be weighed against the potential benefit to the abortion patient who experiences complications. As Dr. Lunsford explained during her deposition, some APCs with adequate training could capably perform first trimester abortions, but "I don't believe their training would support them managing complications." (Defs.' Mem. Supp. Mot. Summ. J., Ex. 13.) *See W. Ala. Women's Ctr. v. Donald E. Williamson*, 900 F.3d 1310

(11th Cir. 2018) (describing the great technical skills required in performing dilation and evacuation abortions and the possible complications that can arise).

Applying the burden versus benefits analysis to the record at hand, this Court finds that there is no genuine issue of material fact as to whether the Physician-Only Law poses a *substantial* burden on a woman's access to first trimester abortion care. Conversely, the present record is sufficient for this Court to conclude, beyond peradventure, that there is no genuine issue that potential complications in performing second trimester abortions may arise that may warrant the judgment and skills that a physician can best provide. As the Supreme Court recognized in *Roe v. Wade*, states have "a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." 410 U.S. at 150. As the Court further explained in *Roe*, "the State retains a definite interest in protecting the woman's own health and safety when an abortion is proposed at a later stage of pregnancy." *Id.* This appears to be particularly true with respect to pre-viability second trimester abortions. Plaintiffs have failed to produce or plausibly forecast evidence indicating that the Physician-Only Law places a substantial obstacle in the path of a woman's access to safe pre-viability second trimester abortion care.

Therefore, based on the foregoing analysis, the Court will deny Plaintiffs' and Defendants' Motions for Summary Judgment as to Count III. Regarding Count IV, the Court will grant Plaintiffs' Motion for Partial Summary Judgment in part—that is, as it pertains to first trimester abortions—and deny it regarding second trimester abortions.

20

Accordingly, Defendants' Motion for Summary Judgment on Count IV will be denied as to first trimester abortions and granted as to second trimester abortions.

B. Counts I and II: The Licensing Statute and Licensing Regulations

Next, the Court turns to the questions raised in Counts I and II, which focus on the Licensing Statute, Va. Code Ann. § 32.1-127(B)(1), and the Licensing Regulations set forth in 12 Va. Admin. Code § 5-412, *et seq*. The statute at issue in Count I prescribes the minimum standards for medical facilities, including hospitals. In pertinent part, it defines "facilities in which five or more first trimester abortions per month are performed . . . as a category of 'hospital.'" Va. Code Ann. § 32.1-127(B)(1)(v). The Licensing Regulations, the focus of Count II, prescribe the minimum standards that first trimester abortion facilities must meet in order to receive licensure. Because many of the issues and evidence pertinent to Counts III and IV are likewise relevant to Counts I and II, the Court draws on the analysis already discussed above.

Particularly enlightening to Counts I and II is the deposition of Dr. M. Norman Oliver ("Dr. Oliver"), who serves as the Commissioner of the Virginia Department of Health ("VDH"). Dr. Oliver testified that neither medication nor aspiration abortions involve surgery. (Notice, Ex. Q at 143.) When asked whether it is necessary to create regulations and minimum standards for medical facilities or physicians' offices that provide five or more first trimester abortions per month in order to protect the health of the woman and insure high quality care, the Commissioner gave the following answer: "[I]n my own personal opinion, abortion services are outpatient services that do not need to be regulated in the same way as, say, surgical procedures." (*Id.* at 175–76.)

Dr. Oliver was next asked whether these minimum standards for medical facilities, which form the basis of Counts I and II of the Amended Complaint, further the health and safety of women in Virginia. Dr. Oliver again expressed his personal view: "I think it restricts access to abortion care . . . I can't tell you how detrimental it is, but I don't feel that it's in the interest of women." (*Id.* at 200.)

Another integral component of the burden analysis is the Licensing Statute, Va. Code Ann. § 32.1-127(B)(1), mentioned by Dr. Oliver above and its relation to the Licensing Regulations. Plaintiffs argue that as a result of being classified as a hospital pursuant to § 32.1-127(B)(1), first trimester abortion facilities are needlessly subjected to oppressive regulatory requirements, such as record keeping, equipment, personnel, and compliance requirements. Plaintiffs add that a number of the Defendants' own expert witnesses conceded that facility licensure has not made first trimester abortion safer in Virginia. (Pls.' Mem. Opp'n Defs.' Mot. Summ. J. 21–22.) Furthermore, a number of Plaintiffs' witnesses are of the opinion that the Licensing Statute and Regulations were adopted to curtail access to legal abortion care. (*Id.*) Conspicuously apparent is the fact that, since the statute was adopted by the Virginia General Assembly, there has been a significant reduction in the number of abortion care facilities in Virginia. (*Id.* at 22.) Whether there is a direct causal effect between the Licensing Statute and Regulations and the closure of these abortion care facilities is a genuine dispute of fact.

Defendants offer minimal evidentiary opposition to Plaintiffs' contention that the regulatory scheme at issue fails to enhance the safety of first trimester abortions. Defendants focus their opposition on the lack of any cogent evidence that the Licensing

Statute and Regulations, while clearly inconvenient to abortion providers, has actually "impose[d] any burden on the right of women to choose a pre-viability abortion." (Defs.' Mem. Supp. Mot. Summ. J. 23.) Defendants also point out that irrespective of the Licensing Statute, the Virginia Board of Health is empowered to adopt similar regulations. (*Id.*)

Plaintiffs have clearly demonstrated that the regulatory requirements mandated pursuant to Va. Code Ann. § 32.1-127(B)(1) and 12 Va. Admin. Code 5-412 *et seq.* are not medically necessary to ensure safe first trimester abortion care. However, the opinion evidence of abortion providers that the regulations significantly burden women seeking first trimester abortion care is thin, particularly when squared with other evidence that most facilities offering such services have a minimal waiting period. (*Id.* at 4–5.) The actual burden imposed by § 32.1-127(B)(1) and 12 Va. Admin. Code 5-412 *et seq.* is a material fact in dispute.

Plaintiffs also advance a plausible argument that regulatory burdens may limit the availability of pre-viability second trimester abortions in portions of Virginia. Unlike first trimester abortions, pre-viability second trimester abortions must be performed in an outpatient surgical center. Still, the record at hand is inadequate for the Court to determine the number of women who have been significantly burdened by limited availability of such services. Several of Plaintiffs' witnesses described clinics as full to capacity at times, but not all women were seeking abortion care. (Defs.' Mem. Opp'n Pls.' Mot. Partial Summ. J., Ex. 7 at 62–63, ECF No. 105.) However, some of Plaintiffs' deponents also conceded on cross-examination that they had not consulted with any

23

Virginia-based women before forming their opinion on the burden resulting from the alleged limited availability. (Defs.' Mem. Opp'n Pls.' Mot. Partial Summ. J., Ex. 11 at 96–97.) Furthermore, this Court cannot assess the number of women residing in the Commonwealth who choose to seek such abortion care or services in nearby adjoining states or the District of Columbia. Accordingly, the absence of a more complete evidentiary record at this point in the litigation, coupled with the multiple disputes enumerated above, counsels this Court against granting Defendants' Motion for Summary Judgment on Counts I and II.[9]

C. Count VII: Plaintiffs' Challenge the Hospital Requirement as being Unconstitutionally Vague

In Count VII of the Amended Complaint, Plaintiffs state that the "Hospital Requirement, in conjunction with the Criminalization Laws, is unconstitutionally vague and violates Plaintiffs' rights to due process as guaranteed by the Fourteenth Amendment to the U.S. Constitution . . . ." (Am. Compl. ¶ 266.) Plaintiffs contend that Count VII should proceed to trial because disputed facts exist regarding the Hospital Requirement's vagueness (Pls.' Mem. Opp'n Defs.' Mot. Summ. J. 16), while Defendants argue that Count VII is without merit (Defs.' Mem. Supp. Mot. Summ. J. 13.) Noting that Count VII raises a legal question, the mere fact that the parties dispute whether the statute is vague does not prevent the Court from resolving the question at this stage. *See United*

---

[9] In the event that this Court were to find that certain regulations *do* impose an undue burden on the access to abortive procedures, Defendants contend that various statutes and regulations require the severance of individual, offending regulations, rather than striking the entire regulatory scheme. Addressing this question is premature and the Court will await a more complete record to determine if the regulatory scheme is in fact unduly burdensome.

*States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (explaining that a question of

statutory vagueness is a "pure question of law" (citing *Hodge v. Talkin*, 799 F.3d 1145,

1171 (D.C. Cir. 2015))).

"Our first step in interpreting a statute is to determine whether the language at

issue has a plain and unambiguous meaning with regard to the particular dispute in the

case. Our inquiry must cease if the statutory language is unambiguous and 'the statutory

scheme is coherent and consistent.'" *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)

(quoting *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 240 (1989)).  As a matter

of law, "[a] statute is impermissibly vague if it either (1) 'fails to provide people of

ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or

(2) 'authorizes or even encourages arbitrary and discriminatory enforcement.'" *United*

*States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012) (quoting *Hill v. Colorado*, 530 U.S.

703, 732 (2000)).  Evaluating a statute against these standards does not require, "perfect

clarity and precise guidance," *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989);

rather, a court considers whether the statute's prohibitions "are set out in terms that the

ordinary person exercising ordinary common sense can sufficiently understand" and

abide by them. *Shrader*, 675 F.3d at 310 (quoting *U.S. Civil Serv. Comm'n v. Nat'l Ass'n*

*of Letter Carriers*, 413 U.S. 548, 579 (1973)).

As stated above, Virginia law criminalizes the provision of an abortion as a Class

4 felony. *See* Va. Code Ann. 18.2-71.  The law, however, provides multiple exceptions,

such as an exception for licensed physicians who administer first trimester abortions, *see*

Va. Code Ann. § 18.2-72, as well as an exception for abortions after the second trimester

where the mother's life is at risk, *see* Va. Code § 18.2-74.  The Hospital Requirement,

§ 18.2-73, which Plaintiffs challenge as being vague, provides an exception to § 18.2-71

for licensed physicians who conduct second trimester abortions in a licensed hospital.  It

states:

> Notwithstanding any of the provisions of § 18.2-71 and in addition to the
> provisions of § 18.2-72, it shall be *lawful* for any physician licensed by the
> Board of Medicine to practice medicine and surgery, to terminate or
> attempt to terminate a human pregnancy or aid or assist in the termination
> of a human pregnancy by performing an abortion or causing a miscarriage
> on any woman during the *second trimester* of pregnancy and prior to the
> third trimester of pregnancy provided such procedure is performed in a
> *hospital* licensed by the State Department of Health or operated by the
> Department of Behavioral Health and Developmental Services.

Va. Code Ann. § 18.2-73 (emphasis added).  Plaintiffs contend this statute is vague

because it fails to define two terms: "hospital" and "second trimester."  "In most

instances, '[s]tatutory definitions control the meaning of statutory words.'"  *United States*

*v. Goforth*, 546 F.3d 712, 714 (4th Cir. 2008) (quoting *Lawson v. Suwannee Fruit & S.S.*

*Co.*, 336 U.S. 198, 201 (1949)).  In the event that a statutory term is not defined by

statute, then a reviewing court looks to other sources for clarity.  *See id.*  Consequently,

because these terms are not defined by § 18.2-73, the Court must look to other areas of

Virginia law.

The Code of Virginia defines "hospital" as follows:

> "Hospital" means any facility licensed pursuant to this article in which the
> primary function is the provision of diagnosis, of treatment, and of medical
> and nursing services, surgical or nonsurgical, for two or more nonrelated
> individuals, including hospitals known by varying nomenclature or
> designation such as children's hospitals, sanatoriums, sanitariums and
> general, acute, rehabilitation, chronic disease, short-term, long-term,
> outpatient surgical, and inpatient or outpatient maternity hospitals.

Va. Code Ann. § 32.1-123.  In *Simopoulos v. Virginia*, the U.S. Supreme Court applied

this statutory definition of hospital to Va. Code Ann. § 18.2-73.  *See* 462 U.S. 506, 512

n.4 (1983) ("There is no basis for assuming that the [Supreme Court of Virginia]

interpreted 'hospital' in § 18.2-73 any differently from its interpretation in title 32.1 and

specifically in § 32.1-123.1").[10]  Accordingly, and consistent with the U.S. Supreme

Court, this Court will apply the definition of "hospital" in § 32.1-123 to determine if

§ 18.2-73 is vague.

Regarding "second trimester," the term is not explicitly defined by a Virginia

statute.  However, the term's meaning can be ascertained by looking to Virginia's

Administrative Code, which states that "[a]bortions performed in abortion facilities shall

be performed only on patients who are within the first trimester of pregnancy *meaning 13*

*weeks and 6 days after last menstrual period* or based on an appropriate clinical estimate

by a licensed health care provider."  12 Va. Admin. Code § 5-412-230(A).[11]

Accordingly, it logically follows that the second trimester of pregnancy, as defined under

Virginia law, begins at 14 weeks after last menstrual period.

---

[10] In *Simopoulos*, the U.S. Supreme Court referred to the statute as "32.1-123.1," merely to indicate that "hospital" was defined in the first subparagraph of § 32.-1-123 (1979).

[11] The Amended Complaint applies this same language, stating that "only two facilities regularly provide abortion care in the second trimester, which Virginia defines as more than 13 weeks, 6 days after a patient's last menstrual period . . . ."  (Am. Compl. ¶ 11.)  Thus, it appears that Plaintiffs' pleading contradicts itself by referencing a Virginia definition for "second trimester" in paragraph 11, while subsequently claiming that the term is not defined in paragraph 266.  The Court need not resolve this contradiction to resolve the matter at hand.

Applying Virginia's definitions of "hospital" and "second trimester," Plaintiffs' facilities are properly classified as hospitals because they provide medical services to two or more non-related individuals.[12] *See* Va. Code Ann. § 32.1-123. Therefore, because their facilities are classified as hospitals, Plaintiffs' facilities can provide second trimester abortions—that is, an abortion 14 weeks after a woman's last menstrual period and before the third trimester—without triggering Virginia's felony abortion statute. *See* Va. Code Ann. §§ 18.2-71, 18.2-73. However, whether applicable state regulations permit Plaintiffs to provide second trimester abortions is an entirely different question. *Compare* Va. Code Ann. §§ 18.2-71, 18.2-73 *with* 12 Va. Admin. Code § 5-412-230(A).

While it is not a felony for Plaintiffs to provide second trimester abortions in their abortion facilities, the State Board of Health, by regulation, does not permit second trimester abortions to be performed in those facilities. *See* 12 Va. Admin. Code § 5-412-230(A) ("Abortions performed in abortion facilities shall be performed *only* on patients who are within the first trimester of pregnancy meaning 13 weeks and 6 days after last menstrual period or based on an appropriate clinical estimate by a licensed health care provider." (emphasis added)). As previously stated, second trimester abortions must be administered in an outpatient surgical hospital. *See* 12 Va. Admin. Code § 5-412-40 ("Facilities licensed as either a general hospital or an outpatient surgical hospital by the department are not subject to the provisions of this chapter.").

---

[12] Classifying Plaintiffs' facilities as hospitals is also consistent with the Licensing Statute, § 32.1-127(B)(1), which states that "facilities in which five or more first trimester abortions per month are performed shall be classified as a category of 'hospital.'" Va. Code Ann. § 32.1-127(B)(1).

Therefore, reading the Hospital Requirement and the Licensing Regulations together, it is not a felony for Plaintiffs to provide second trimester abortions in their facilities, *but* they risk a loss of licensure if they do so.  In addition, failure to abide by the Licensing Regulations may result in criminal misdemeanor charges.  *See* Va. Code Ann. § 32.1-27(A).  As a matter of law, the Court finds that § 18.2-73's language is not vague, and that persons of ordinary intelligence can understand its distinction and thereby avoid potential civil and criminal penalties.

Plaintiffs' arguments to the contrary are unavailing.  First, Plaintiffs suggest that these "contradictory statutory definitions and regulations" indicate that Plaintiffs' first trimester abortion facilities do not qualify as hospitals.  (Pls.' Suppl. Mem. 2, ECF No. 121.)  To the extent that this argument even addresses whether § 18.2-73 is unconstitutionally vague, Plaintiffs offer no binding authority which definitively supports their position.

Second, Plaintiffs argue that § 32.1-124 exempts their facilities from being classified as a "hospital" because modern abortive procedures are generally not considered to be surgical procedures.[13]  Again, to the extent this argument addresses the vagueness of § 18.2-73, the argument fails because the statutory definition of "surgery" cited by Plaintiffs does not apply to Title 32.1 as it is explicitly restricted in that

---

[13] Section 32.1-124 states in relevant part that "[t]he provisions of §§ 32.1-123 through 32.1-136 shall not be applicable to . . . an office of one or more physicians or surgeons unless such office is used principally for performing *surgery* . . . ." Va. Code Ann. § 32.1-124(v) (emphasis added).

subsection.[14] *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("The definition

of words in isolation, however, is not necessarily controlling in statutory construction

. . . . Interpretation of a word or phrase depends upon reading the whole statutory text,

considering the purpose and context of the statute, and consulting any precedents or

authorities that inform the analysis."); *see also Lawson,* 336 U.S. at 201 (stating that a

statutory definition is not controlling if it would create "obvious incongruities in the

[statutory] language," that would disrupt the legislature's purpose).

Here, if the Court were to apply Plaintiffs' definition of surgery, an incongruity

would exist between § 32.1-124(v) and § 18.2-73 and § 32.1-127(B)(1). That is, if the

Court were to adopt Plaintiffs' view, then the Code of Virginia would explicitly classify

Plaintiffs' facilities as "hospitals" (§ 32.1-127(B)(1)) while simultaneously codifying an

exception that exempts them from this classification (§ 32.1-124(v)). The Court does not

adopt this view. Therefore, the Court finds that § 32.1-124 and § 54.1-2400.01:1 are

---

[14] Section 54.1-2400.01:1 states in relevant part:

> *For the purposes of this subtitle*, except as used in Chapter 38 (§ 54.1-3800 et seq.) related to veterinary medicine, "surgery" means the structural alteration of the human body by the incision or cutting into of tissue for the purpose of diagnostic or therapeutic treatment of conditions or disease processes by any instrument causing localized alteration or transposition of live human tissue, but does not include the following: procedures for the removal of superficial foreign bodies from the human body, punctures, injections, dry needling, acupuncture, or removal of dead tissue. *For the purposes of this section*, incision shall not mean the scraping or brushing of live tissue.

Va. Code Ann. § 54.1-2400.01:1 (emphasis added).
    Plaintiffs argue that the Court should interpret the term "surgery," as expressed in § 32.1-124(v)'s exemption, consistent with the above definition, which, as the dominoes fall, would make § 32.1-123's definition of "hospital" inapplicable to Plaintiffs' facilities. However, this definition's explicit language, which is emphasized above, prevents the Court from extending its definition of "surgery" to Title 32.1 of the Virginia Code.

inapplicable in the immediate application.  In addition, the Court finds that the general

exemption contained in § 32.1-124(v) is not sufficient to overcome the specific language

contained in § 32.1-127(B)(1).  *See D.B. v. Cardall*, 826 F.3d 721, 736 (4th Cir. 2016)

("To overcome the presumption that a specific statutory provision controls a general one,

[the legislature's] contrary intent must be "clear." (citing *Crawford Fitting Co. v. J.T.*

*Gibbons, Inc.*, 482 U.S. 437, 445 (1987)).

Consequently, the Court finds that the plain language of § 18.2-73 is clear and

does not violate the Due Process Clause of the Fourteenth Amendment.  Furthermore, the

Court finds that persons of ordinary intelligence are capable of understanding the

exception that § 18.2-73 provides and distinguishing between the potential criminal and

civil penalties that may be incurred if Plaintiffs, or other individuals, provide second

trimester abortions in a way that is inconsistent with § 18.2-73 and applicable state

regulations.  Therefore, Defendants' Motion for Summary Judgment on Count VII of the

Amended Complaint will be granted.

D. Count VIII: Plaintiffs' Fourth Amendment Challenge

Count VIII alleges that Virginia's Licensing Regulations run afoul of the Fourth

Amendment by requiring "biennial unannounced, warrantless inspections of Plaintiffs'

facilities under threat of license suspension or revocation, in the absence of probable

cause to believe that any violation has occurred."  (Am. Compl. ¶ 268.)  Defendants

counter that there is no Fourth Amendment violation because Plaintiffs must "consent to

the entry of [Virginia Department of Health] inspectors prior to entry . . . ."  (Defs.'

Mem. Supp. Mot. Summ. J. 15.)  The General Assembly has codified the terms under

31

which the Virginia Department of Health may enter property to perform health inspections to ensure compliance with Virginia law under Va. Code. Ann. § 32.1-25. According to that section, the State Health Commissioner, or his designee, enjoy a right of entry to perform an inspection "[u]pon presentation of appropriate credentials and upon consent of the owner or custodian." Va. Code Ann. § 32.1-25.  If entry is denied, the statute provides that the inspector "may apply to an appropriate circuit court for an inspection warrant" to authorize the search.  (*Id.*)

Pursuant to § 32.1-25, related regulations under 12 Va. Admin. Code § 5-412-90 grant the Virginia Department of Health's "duly designated employee[s]" a right of entry to abortion facilities for the purpose of conducting inspections.  12 Va. Admin. Code § 5-412-90.  "Such entries and inspections shall be made *with the permission of the owner or person in charge, unless an inspection warrant is obtained* after denial of entry from an appropriate circuit court." *Id.* (emphasis added).  Central to Plaintiffs' Fourth Amendment challenge, the regulation further states, "If the owner, or person in charge, refuses entry, this [refusal] *shall be sufficient cause for immediate revocation or suspension of the license.*" *Id.* (emphasis added).  Importantly, VDH performs biennial, unannounced inspections of Plaintiffs' facilities.  (*See* Am. Compl. ¶ 268.)

"The Fourth Amendment prohibits unreasonable searches, and searches conducted without a warrant are per se unreasonable unless a valid exception to the warrant requirement is applicable.  Voluntary consent to a search is such an exception." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).  "This rule 'applies to commercial premises as well as to

homes.'" *City of Los Angeles v. Patel*, ___ U.S. ___, 135 S. Ct. 2443, 2452 (2015)

(citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978)). Due to the risk of

revocation or suspension of licensure as a result of refusing entry to inspectors under 12

Va. Admin. Code § 5-412-90, Plaintiffs contend that they are effectively coerced to

consent to warrantless VDH inspections.

Defendants argue that the Court should award summary judgment on Count VIII

because Plaintiffs consent to VDH inspections. According to Defendants, the undisputed

facts show that under the relevant Virginia statute and regulation, Plaintiffs must consent

in order for VDH inspectors to gain entry to their facilities absent a warrant. (Defs.'

Mem. Supp. Mot. Summ. J. 16–17.) Further, they cite testimony from corporate

representatives of select Plaintiffs describing the extent to which clinic representatives

understand the regulations and facilitate VDH inspections. (*Id.* at 17–18.)

With respect to the risk of revocation or suspension of licensure under § 5-412-90,

Defendants contend that "there is no record evidence suggesting that any of the Plaintiff

facilities only consented to the Department's inspection due to fear of license

revocation." (*Id.* at 18.) Moreover, they indicate that Plaintiffs have not identified a

single situation in which a facility's license has been impacted due to refusal of entry.

(*Id.* at 18–19.)

To the contrary, Plaintiffs argue that a genuine issue of material fact exists with

respect to whether Plaintiffs voluntarily consent to regulatory inspections, given the

statutory risk to licensure if they refuse access to inspectors. (Pls.' Mem. Opp'n Defs.'

Mot. Summ. J. 27–29.) According to Plaintiffs, although the regulation does not provide

for the immediate revocation or suspension of a license, the potential remains under the statute as written. (*Id.* at 28.) They cite several instances in which corporate representatives for select Plaintiffs maintain that they consent to inspections in order to avoid the risk of license revocation. (*Id.*) Further, they argue that Defendants have ignored testimony by VDH and OLC officials, which Plaintiffs construe as evidence that officials do not believe they need consent in order to enter Plaintiffs' facilities. (*Id.* at 28–29.)

As the Supreme Court highlighted in *Casey* and *Whole Woman's Health*, states have a legitimate interest in ensuring that abortion care, like other medical services, are performed "under circumstances that insure maximum safety for the patient." *Whole Woman's Health*, 136 S. Ct. at 2309; *Casey*, 505 U.S. at 877. In order to maintain this standard, some level of regulatory oversight is necessary. The State Board of Medicine has a statutory obligation to ensure that medical procedures are administered competently and under sanitary conditions. *See* Va. Code Ann. § 32.1-25. Compliance with such regulatory oversight is a common condition of licensure to perform medical related services. *See* Va. Code Ann. § 32.1-25.

While Plaintiffs broadly question the constitutionality of the entire regulatory compliance regime, their sight is focused primarily on the required consent to inspection provision, which they allege is coercive and unduly burdensome. Obviously to prevail on Count VIII, Plaintiffs must demonstrate more than mere inconvenience and discontent.

Although the Commonwealth has a compelling interest in regulating abortion care, that function must be carried out in a constitutionally permissible manner. Whether it has done so in practice must await the development of a more complete factual record at trial.

Defendants also raise an issue as to Plaintiffs' standing to assert the Fourth Amendment rights of their patients, to which Plaintiffs lodge their objection. (Defs.' Mem. Supp. Mot. Summ. J. 19; Pls.' Mem. Opp'n Defs.' Mot. Summ. J. 29.) While Plaintiffs' right to assert their patients' Fourth Amendment rights may raise an arguable question, Plaintiffs clearly have a protectable expectation of privacy as to their premises and required patient records. Accordingly, the Court will deny Defendants' Motion for Summary Judgment as to Count VIII.

## V.   SUMMARY

In reviewing the parties' well-crafted Motions for Summary Judgment, this Court is mindful of the significance of the controversy before it. It also acknowledges that the constitutionality of a woman's right to seek a pre-viability abortion is a settled constitutional issue. In this case, Plaintiffs seek abrogation of legislation adopted by the Virginia General Assembly. While it is this Court's constitutional duty to review the statutes at issue, it must do so cautiously, according respect but not deference to the legislative branch. Therefore, in its analysis of the parties' Motions, any doubt as to the adequacy of the evidence will be resolved in favor of deferring final judgment until trial. There are, however, a number of individual issues on which there is no genuine issue of material fact.

After reviewing both Motions individually, along with supporting exhibits, the Court draws the following conclusions: With respect to Count I, the Licensing Statute, the overwhelming weight of the evidence supports the contention that the regulatory regime necessitated under the Licensing Statute, Va. Code Ann. § 32.1-127, is unnecessary and provides minimal medical benefits with respect to first trimester abortions. In fact, it may limit access to second trimester care as well. The present record, however, is less clear as to the extent of the burden to women seeking abortions in Virginia as a result of the Licensing Statute. This appears to be a material fact genuinely in dispute. Furthermore, for these same reasons, the Court will await a more complete evidentiary record as to whether the Licensing Regulations, as challenged under Count II, present an undue burden for Virginia women who seek an abortion in the first and second trimesters. Consequently, Defendants' Motion for Summary Judgment on Counts I and II will be denied.

The requirement that second trimester abortions be performed in licensed hospitals is challenged in Count III. Given the potential complications that can be encountered in second trimester procedures, unlike first trimester abortions, this appears to be a factual issue clearly in dispute.[15] Similarly, the burden on reasonable access to second trimester abortion services and care, with only two facilities available, is sufficiently debatable to be a fact genuinely at issue. Both Plaintiffs' and Defendants' Motions for Summary Judgment with respect to Count III will be denied.

---

[15] Although not clearly at issue, the record would not support a hospital requirement for first trimester procedures.

After a careful review of the experts' opinions from both sides, a consensus appears to have evolved that first trimester abortions, which typically require only medication, do not require the onsite presence of a licensed physician and is consequently unduly burdensome. As the Supreme Court has often restated, "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Casey*, 505 U.S. at 878. The undisputed evidence appears to support this finding.

Conversely, several of the physician witnesses described serious complications that can arise in the later stages of second trimester abortions, amply justifying the requirement of Va. Code Ann. § 18.2-72 that only physicians perform second trimester abortions.

Accordingly, Plaintiffs' Motion for Summary Judgment on Count IV will be granted with respect to first trimester abortions and denied as to second trimester abortions. The Defendants' Motion for Summary Judgment on Count IV will be denied as to first trimester abortions and granted as to second trimester abortions.

Regarding Plaintiffs' contention under Count VII that Va. Code Ann. § 18.2-73 is vague to the point of being unconstitutional, the Court finds this is not supported, and therefore, Defendants' Motion for Summary as to Count VII will be granted. And finally, for the reasons already discussed, Defendants' Motion for Summary Judgment on Count VIII will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: May 6, 2019
Richmond, Virginia