## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

FALLS CHURCH MEDICAL CENTER, )
LLC d/b/a FALLS CHURCH )
HEALTHCARE CENTER, *et al.*, )
                       )
      Plaintiffs, )
                        )
v. )   Civil Action No. 3:18cv428–HEH
                        )
M. NORMAN OLIVER, VIRGINIA )
HEALTH COMMISSIONER, *et al.*, )
                        )
      Defendants. )

### MEMORANDUM OPINION
### (Post-Trial Judgment)

## I.   INTRODUCTION

For more than five decades, the Supreme Court has recognized that within the
right to privacy exists a woman's right to make decisions regarding the circumstances
surrounding when and with whom she will bear a child—or whether she chooses to bear
a child at all. *See, e.g., Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833 (1992);
*Roe v. Wade*, 410 U.S. 113 (1973); *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Griswold v.
Connecticut*, 381 U.S. 479 (1965).  In the landmark decision of *Roe v. Wade*, the
Supreme Court established that women have a "fundamental right grounded in the
Fourteenth Amendment to end a pregnancy by aborting the life of the fetus." *Greenville
Women's Clinic v. Bryant*, 222 F.3d 157, 165 (4th Cir. 2000) (citing *Roe*, 410 U.S. at
153–56).  That right "involv[es] the most intimate and personal choices a person may

make in a lifetime," choices that are central to the individual autonomy and liberty protected by the Fourteenth Amendment. *Casey*, 505 U.S. at 851.

However, the Supreme Court has also recognized that "[a]bortion is a unique act," and one that is "fraught with consequences . . . for the woman who must live with the implications of her decision; for the persons who perform and assist in the procedure; [and] for the spouse, family, and society which must confront the knowledge that these procedures exist . . . ." *Id.* at 852. As a result, the right to choose to have an abortion is not unfettered. In addition to a woman's personal liberty interest, the state has profound interests in protecting potential life and protecting the health and safety of women. *Id.* at 878. The state, therefore, may take measures to further these interests so long as it does not create a substantial obstacle that unduly burdens a woman's right to choose. *Id.*

At issue in this case is whether Virginia statutes and regulations unduly burden the right of Virginia women, under the Fourteenth Amendment, to choose to have an abortion. This Court is fully cognizant of the unique nature of the abortion right and its controversial history. Accordingly, the Court acknowledges that "[m]en and women of good conscience can disagree, and . . . some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage." *Id.* at 850. However, even though some "individuals find abortion offensive to [the] most basic principles of morality," it is the duty of this Court to neutrally evaluate and determine whether the challenged Virginia statutes and regulations violate the Fourteenth Amendment. *Id.* Thus, as it would with any other matter, this Court will faithfully interpret and apply the law and not, "mandate [its] own moral code." *Id.* Within the

2

boundaries of the law, this Court recognizes that the ultimate tribunal is the conscience of women contemplating an abortion.

## II.   BACKGROUND

### A. THE PARTIES

Plaintiffs in this case include Falls Church Medical Center, LLC; Whole Woman's Health Alliance; Virginia League for Planned Parenthood; and Dr. Jane Doe.[1]  Each is a Virginia health care provider that provides elective abortion care in addition to other gynecological and family planning services.  Collectively, Plaintiffs challenge the constitutionality of several Virginia statutes and regulations that govern the provision of abortion care throughout the Commonwealth.  They contend that these interrelated statutes and regulations effectively place a constitutionally prohibited undue burden on Virginia women who have decided to terminate their pregnancies through abortion.  The named Defendants include almost all of Virginia's regulatory agencies that have jurisdiction over abortion services, as well as commonwealths' attorneys in jurisdictions where facilities provide these services.[2]

---

[1] Dr. Jane Doe will be referred to as "Dr. Doe" and the other Plaintiffs as "abortion providers." Where appropriate, the Plaintiffs collectively will simply be referred to as "Plaintiffs."

[2] The named Defendants are M. Norman Oliver, Virginia Health Commissioner; Robert Payne, Acting Director of the Virginia Department of Health's Office of Licensure and Certification; Faye O. Prichard, Chairperson of the Virginia Board of Health; Theophani Stamos, Commonwealth's Attorney for Arlington County and the City of Falls Church; Robert Tracci, Commonwealth's Attorney for Albermarle County; Anton Bell, Commonwealth's Attorney for the City of Hampton; Michael N. Herring, Commonwealth's Attorney for the City of Richmond; and Colin Stolle, Commonwealth's Attorney for the City of Virginia Beach. Each individual Defendant has been sued in his or her official capacity, as well as their employees, agents, and successors. They will be collectively referred to as "Defendants."

3

## B. THE CHALLENGED LAWS

In the Amended Complaint filed by Plaintiffs in this case, they charge that

Virginia has adopted an array of unnecessary and discriminatory laws, some over four decades old, that target the provision of abortion care without any meaningful improvement to safety or health, or any other benefits—let alone benefits that outweigh burdens. Instead, these laws serve only to negatively impact Virginians' access to reproductive healthcare.

(Am. Compl. ¶ 65, ECF No. 41.) Plaintiffs maintain that the wide array of restrictive regulations and statutory provisions governing abortion care in Virginia are a constitutionally offensive obstacle to a woman's right to seek an abortion.

This Court conducted an eight-day bench trial, at the beginning of which only six counts remained of Plaintiffs' Amended Complaint.[3] Each of these six counts challenges an individual component of Virginia's legal framework that collectively governs the administration of pre-viability first and second trimester abortions throughout the Commonwealth. Plaintiffs' counts are as follows:

Count I focuses on Va. Code Ann. § 32.1-127(B)(1) (the "Licensing Statute"), which classifies any facility "in which five or more first trimester abortions per month are performed" as a category of "hospital." Va. Code Ann. § 32.1-127(B)(1). Pursuant to this classification, the Licensing Statute requires the Virginia Board of Health ("Board of Health") to establish and promulgate minimum standards for the licensing of facilities.

---

[3] At the onset of trial, Plaintiffs' remaining Counts included Counts I–V and Count VIII. In the Court's Memorandum Opinion issued on September 26, 2018, the Court dismissed the facial challenges alleged in Counts III and IV. (ECF No. 52.) For the sake of clarity, this Court has continued to use Plaintiffs' numbering convention from the Amended Complaint.

4

These regulations encapsulate requirements for "hospitals" across the following

categories:

> (i) the construction and maintenance of hospitals . . . to ensure the environmental protection and the life safety of its patients, employees, and the public; (ii) the operation, staffing and equipping of hospitals . . . ; (iii) qualifications and training of staff of hospitals . . . except those professionals licensed or certified by the Department of Health Professions; (iv) conditions under which a hospital . . . may provide medical and nursing services to patients in their places of residence; and (v) policies related to infection prevention, disaster preparedness, and facility security of hospitals . . . .

*Id.*

Count II challenges Virginia's "Regulations for Licensure of Abortion

Facilities," 12 Va. Admin. Code § 5-412, *et seq.* (hereinafter "VAC") (the

"Licensing Regulations"), which are the direct result of the Licensing Statute.

Plaintiffs also challenge the associated laws that criminalize the violation of state

regulations.[4] The Licensing Regulations contain 37 individual regulations;

Plaintiffs challenge this chapter in its entirety and contend that these 37

regulations collectively impose an undue burden on Virginia women's access to

abortion care.

---

[4] In their Amended Complaint, Plaintiffs collectively refer to three separate sections of the Virginia Code as the "Criminalization Laws." (Am. Compl. ¶ 4f.) These sections include Va. Code Ann. §§ 18.2-71, 32.1-27(A), and 32.1-136. Section 18.2-71 makes it a Class 4 felony, absent certain exemptions, for any person to intentionally administer an abortion or destroy an unborn child. *See* Va. Code Ann. § 18.2-71. Section 32.1-27(A) provides criminal penalties for individuals who violate regulations promulgated by the Virginia Board of Health. *See* Va. Code Ann. § 32.1-27(A). In relevant part, § 32.1-136 makes it a Class 6 felony to operate an unlicensed hospital. *See* Va. Code Ann. § 32.1-136.

Count III focuses on what is commonly referred to as Virginia's "Hospital Requirement," Va. Code Ann. § 18.2-73, and the associated regulations that require all second trimester abortions be performed in general hospitals or outpatient surgical hospitals. By providing an exception to Virginia's statute that criminalizes abortions, Va. Code Ann. § 18.2-71, the Hospital Requirement makes it lawful for a licensed physician to provide a second trimester abortion so long as the procedure is conducted in a hospital licensed by the Virginia Department of Health ("VDH"). *See* Va. Code Ann. § 18.2-73. Notably, however, by function of the regulations, second trimester abortion procedures cannot be conducted in abortion facilities despite the fact that those facilities are classified as a category of "hospital." *See* Va. Code Ann § 32.1-127(B)(1); *see also* 12 VAC § 5-412-230(A) ("Abortions performed in abortion facilities shall be performed only on patients who are within the first trimester of pregnancy meaning 13 weeks and 6 days after last menstrual period or based on an appropriate clinical estimate by a licensed health care provider."); 12 VAC § 5-412-40 (stating that general hospitals and outpatient surgical hospitals are not subject to the Licensing Regulations). Plaintiffs contend that limiting the lawful provision of second trimester abortions to general hospitals and outpatient surgical hospitals places an undue burden on Virginia women's access to this type of abortion care.

Count IV challenges Va. Code Ann. § 18.2-72 (the "Physician-Only law") that permits only physicians licensed by Virginia's Board of Medicine to perform abortion procedures in the Commonwealth lawfully. Plaintiffs contend that this law is unduly burdensome because it limits access to abortion care by precluding other licensed medical

6

professions, namely Nurse Practitioners, Certified Nurse Midwives, and Physicians Assistants, from providing abortions during the first trimester and in the early weeks of the second trimester.

Count V challenges Va. Code Ann. § 18.2-76. Plaintiffs refer to this statute as Virginia's "Two-Trip Mandatory Delay law" because it requires that a woman receive an ultrasound at least 24 hours before an abortion if she lives less than 100 miles from the location where the procedure is performed. Implicitly, this waiting period requires a woman to make two separate trips before she can obtain an abortion—the first to satisfy the ultrasound requirement, and the second for the abortion.[5] While there are exceptions to the mandatory waiting period and the mandatory ultrasound, Plaintiffs contend that, in the vast majority of cases, the statute creates an undue burden by compelling women to undertake unnecessary travel that raises the cost of obtaining the abortion and delaying the actual procedure. Plaintiffs argue that these additional burdens create a substantial obstacle that the women most impacted by the law cannot overcome.

Finally, in Count VIII of Plaintiffs' Amended Complaint, Plaintiffs challenge 12 VAC § 5-412-90, the regulatory provision that authorizes agents of the VDH to enter abortion facilities for the purpose of conducting inspections. The regulation states that "[s]uch entries and inspections shall be made with the permission of the owner or person in charge, unless an inspection warrant is obtained after denial of entry from an

---

[5] A woman need not receive the mandatory ultrasound at the clinic where she will receive the abortion. Therefore, as Defendants argue, the burden of making an additional trip is mitigated by a woman's potential ability to receive the ultrasound at a location that is closer to her home before she makes the trip to the abortion clinic.

appropriate circuit court." 12 VAC § 5-412-90. The regulation further provides that

refusal to allow such entry "shall be sufficient cause for immediate revocation or

suspension of the license." *Id.* Plaintiffs argue that the threat of immediate suspension of

an abortion facility's license is coercive in its effect and violates Plaintiffs' constitutional

rights under the Fourth Amendment.

## III.    STANDARD OF REVIEW

*Roe* and its progeny have clearly established that a woman's constitutional right

to abort a pre-viability fetus is beyond debate at the district court level. *See Whole*

*Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016); *Casey*, 505 U.S. at 879.

Accordingly, the standard that this Court must apply in resolving the current matter is the

*undue burden standard*, which the Supreme Court established in *Casey* and then restated

in *Hellerstedt*. In *Hellerstedt,* the majority opinion stated as follows:

> [T]here "exists" an "undue burden" on a woman's right to decide to have an
> abortion, and consequently a provision of law is constitutionally invalid, if
> the *"purpose or effect"* of the provision *"is to place a substantial obstacle* in
> the path of a woman seeking an abortion before the fetus attains viability."
> The plurality [of the Court] added that "[u]nnecessary health regulations that
> have the purpose or effect of presenting a substantial obstacle to a woman
> seeking an abortion impose an undue burden on that right."

136 S. Ct. at 2300 (quoting *Casey*, 505 U.S. at 878). The Supreme Court instructed that

district courts must weigh the law's benefits against the burdens it imposes to determine

whether the law constitutes an undue burden. *See id.* at 2309–10. In reviewing the

benefits and burdens of a challenged law, the scope of a district court's review begins

with "the [subset] of women upon whom the statute operates," because "[t]he proper

8

focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 894.

This Court also recognizes that, as the Supreme Court stressed in both *Hellerstedt* and *Casey*, the benefits and burdens analysis is both fact and context specific. *See Hellerstedt*, 136 S. Ct. at 2306; *Casey* 505 U.S. at 885. Simply put, "[a]n abortion statute valid as to one set of facts and external circumstances can be invalid as to another." *Planned Parenthood of In. & Ky., Inc. v. Comm'r of In. Dep't of Health*, 896 F.3d 809, 817 (7th Cir. 2018) (citing *Hellerstedt*, 136 S. Ct. at 2306), *petition for cert. docketed*, No. 18-10109 (S. Ct. Feb. 4, 2019).

## IV. DISCUSSION

To fully evaluate the benefits and burdens associated with the challenged laws, and to determine whether they present a substantial obstacle to Virginia women seeking an abortion, the Court must first review how abortions are provided at various stages of pregnancy and the relative safety of these procedures. The Court received extensive evidence on this subject from the parties' expert witnesses over the course of the eight-day trial.

## A. FIRST TRIMESTER ABORTION PROCEDURES

Plaintiffs' medical experts, Dr. Mark Nichols ("Dr. Nichols") and Dr. Shanthi Ramesh ("Dr. Ramesh"), both of whom provide abortion care as part of their regular medical practice, testified regarding the relative safety of various forms of abortions. Dr. Nichols, a professor at Oregon Health & Science University, is board-certified in obstetrics and gynecology ("OB/GYN") and also serves on the Planned Parenthood

9

Federation of America's National Board of Directors. Dr. Ramesh is board-certified in OB/GYN and serves as the Medical Director of the Virginia League of Planned Parenthood ("VLPP"). In this capacity, Dr. Ramesh oversees VLPP's three abortion facilities located in Richmond, Hampton, and Virginia Beach.

Witnesses for the Plaintiffs and Defendants both testified that abortion is a common procedure, and one woman in four will choose to have an abortion during her life. (Trial Tr. 11:22–24; 1272:9–10 (hereinafter "Tr.").) According to Dr. Nichols's testimony, of these abortions, 90 percent occur during the first trimester of pregnancy, which begins at conception and ends at approximately 13–14 weeks from the woman's last menstrual period ("LMP").[6] (*Id.* at 12:6–18; 89:5–9.) Defense expert Dr. Elizabeth Lunsford (Dr. Lunsford") concurred. (*Id.* at 1304:10–13.) Dr. Lunsford, who is board-certified in OB/GYN medicine, practices at the Riverside Hospital in Gloucester, Virginia, sees approximately 60 to 80 patients a week, and performs approximately 100 surgical procedures a year. (*Id.* at 1206:3–10.)

Two different methods of abortion are available during the first trimester. The first method is provided by administering a combination of FDA-approved medications, Mifepristone and Misoprostol. (*Id.* at 13:5–14:6.) Both medications are prescribed simultaneously, and then ingested approximately 24- to 48-hours apart. (*Id.*) The abortion is completed after the woman takes the second medication. (*Id.* at 14:2–10.)

---

[6] Unless otherwise stated, it is presumed that any reference to the gestational age of pregnancy is in terms of weeks measured from a woman's LMP. By regulation, Virginia defines the first trimester as ending at 13 weeks and 6 days LMP. *See* 12 VAC § 5-412-230(A).

The pregnancy ends outside of a clinical setting in a manner similar to a miscarriage, usually while the woman is at home. (*Id.*) This regimen of medication can be prescribed up to ten weeks into the pregnancy. (*Id.* at 13:24–14:1.)

Dr. Ramesh testified that "[m]edication abortion is exceedingly safe. Complications are very rare," and these complications occur in less than one percent of patients. (*Id.* at 234:19–20.) Similarly, Dr. Nichols testified that "[c]omplications . . . occur[] in no more than a fraction of a percent of patients." (*Id.* at 33:15–34:1.)

The second method for providing a first trimester abortion is aspiration. During an aspiration procedure, a plastic tube is inserted into the uterine cavity and suction is applied to remove the pregnancy. (*Id.* at 15:5–12.) Similar to medication abortions, complications during aspiration procedures are very rare. (*Id.* at 16:2.) The most serious complication—uterine perforation[7]—occurs in less than one percent of women, approximately one out of every thousand. (*Id.* at 16:8–10; 34:9–14; 149:6–10.) Dr. Nichols testified that 99 percent of uterine perforations heal without any additional medical intervention; however, the remaining 1 percent of complications require hospitalization and possible surgical intervention. (*Id.* at 1629:2–12.)

Based upon her practice experience at VLPP, Dr. Ramesh testified generally that the practice of abortion care is exceedingly safe and that the rate of complications Virginia women experience is consistent with the national figures. (*Id.* at 223:17–224:1.)

---

[7] Uterine perforation is the piercing of the uterine wall. W.B. SAUNDERS COMPANY, *DORLAND'S ILLUSTRATED MEDICAL DICTIONARY* (28th ed. 1994).

Dr. Lunsford testified that she periodically encounters patients who suffer side effects from medication abortion such as vomiting, diarrhea, and bleeding. (*Id.* at 1225:14–17.) She added that while complications such as infections are rare, they do occasionally occur. (*Id.* at 1231:18–24; 1232:12–15.) With respect to aspiration abortions, "at more advanced gestational ages there's more risk." (*Id.* at 1255:15–19.) She further testified that "as the pregnancy advances, the complications can go up." (*Id.* at 1277:16–17.)

Dr. Mary Catherine Slusher ("Dr. Slusher"), a former member of the Board of Health, generally concurred. Dr. Slusher, who is also board-certified in OB/GYN, was of the opinion that because of potential complications, it is beneficial to have physicians perform abortion procedures. (*Id.* at 1552:9–17.)

## B. SECOND TRIMESTER ABORTION PROCEDURES

As a pregnancy advances with each additional week of gestational age, the risk of a potential complication during an abortion procedure increases statistically. (*Id.* at 35:1–25.) However, even with this increased risk, pre-viability abortions conducted during the second trimester, while not without risk, are fairly safe. (*Id.*)

Aspiration abortions, which are used in the later weeks of the first trimester, are also utilized during the second trimester up to 16 weeks. (*Id.* at 15:19–20.) After 16 weeks LMP, abortions are provided through a procedure known as Dilation and Evacuation, commonly referred to as "D&E." (*Id.* at 16:23–17:15.) During a D&E procedure, a combination of suction and sterile instruments are used to remove the pregnancy from the uterine cavity. (*Id.* at 17:6–7.) Mild or moderate sedation may be

12

used to manage a patient's pain and anxiety. (*Id.* at 17:1–18:2.) Dr. Nichols testified that the risk of uterine perforation during a D&E procedure is also less than 1 percent, approximately 3 per 1,000. (*Id.* at 149:6–9.) Based upon her practice experience at VLPP, Dr. Ramesh confirmed that the rate of complications for second trimester abortions in Virginia women is on par with national figures. (*Id.* at 280:23–281:2.)

While the medical experts offered differing assessments on the potential for complications associated with second trimester procedures, they agreed that the risk increases with the gestational age of the fetus.

## C. BENEFITS AND BURDENS ANALYSIS

### 1. THE VIRGINIA LICENSING STATUTE, LICENSING REGULATIONS, AND THE VIRGINIA HOSPITAL REQUIREMENT

The constellation of regulations and requirements comprising the claims in Counts I, II, and III are challenged individually and collectively. Count I embraces Va. Code Ann. § 32.1-127(B)(1), which vests regulatory authority in the Board of Health over any facility performing five or more first trimester abortions per month.[8] It classifies such facilities as a hospital, triggering the allegedly burdensome regulatory requirements at issue in the counts that follow. In Plaintiffs' view, the impact of the Hospital Requirement challenged in Count III is compounded by the regulations at issue in Count II. 12 VAC § 5-412, *et seq.* While the statutory scheme permits licensed physicians to perform first trimester procedures in a licensed setting, the statutes declare the

---

[8] In reviewing the five procedures per month regulatory threshold, the Fourth Circuit concluded that "drawing the line at those performing five abortions per month is rational. . . . [T]his type of line-drawing is typically a legislative function and is presumed valid." *Bryant*, 222 F.3d at 174.

performance of a second trimester abortion anywhere except a licensed hospital to be a class IV felony. *See* Va. Code Ann. §§ 18.2-71, 73. Plaintiffs maintain that these "Criminalization Laws, violate [their] patients' rights to liberty as guaranteed by [the Due Process Clause of] the Fourteenth Amendment to the U.S. Constitution because they impose an undue burden on the fundamental right to choose an abortion prior to viability." (Am. Compl. ¶ 255.)

The epicenter of Plaintiffs' challenge appears to be the so-called "FGI Guidelines," which are an integral part of the hospital classification under the statutory scheme.[9] These guidelines were promulgated by the Facilities Guidelines Institute which is an "independent, not-for-profit organization dedicated to developing guidance for the planning, design, and construction of hospitals, outpatient facilities, and residential health, care, and support facilities." FACILITIES GUIDELINES INSTITUTE, https://www.fgiguidelines.org/about-FGI/. Compliance with the FGI Guidelines on Design and Construction for Health Care Facilities is mandated by 12 VAC § 5-412-370, Part VII. Based on the hesitant recommendation of the Board of Health, the FGI Guidelines were enacted by the Virginia General Assembly as part of the Commonwealth's licensing and regulations for abortion facilities.[10]

---

[9] Although a literal reading of Count II of the Amended Complaint may encompass aspects of the regulatory regimen other than the FGI Guidelines, the evidence at trial clearly targeted the Guidelines and only mentioned other provisions in passing.

[10] 12 VAC § 5-412-370 reads in pertinent part:

> Abortion facilities shall comply with state and local codes, zoning, and building ordinances and the Virginia Uniform Statewide Building Code (13VAC5-63). In addition, abortion facilities shall comply with Part 1 and Sections 3.1-1 through

14

Dr. Karen Remley ("Dr. Remley"), a physician specializing in pediatric emergency care who served as the Virginia Commissioner of Health from 2008 to 2012, was part of that adoption process. Based on the advice of a panel of OB/GYN experts,[11] the Board of Health initially rejected the adoption of the FGI Guidelines. In 2013, based on the advice of the Virginia Attorney General's Office, the Board of Health chose to incorporate the FGI Guidelines into the statutory scheme regulating abortion clinics. In Dr. Remley's opinion, however, the resulting regulations were not only unduly burdensome on abortion providers (Tr. 607:7–13) but also increased the cost of abortion procedures. (*Id.* at 615:7–616:5.) She testified that she was unaware of any reason to single out abortion clinics for additional regulatory measures. (*Id.* at 613:2–614:9.)

Dr. Norman Oliver ("Dr. Oliver"), the current Virginia Health Commissioner and lead Defendant in this case, testified as a witness for Plaintiffs. Dr. Oliver recounted the history of the adoption of the FGI Guidelines. Before expressing his viewpoint on the guidelines, Dr. Oliver, testifying as a practicing physician, indicated that in his opinion,

---

3.1-8 and Section 3.7 of Part 3 of the 2010 Guidelines for Design and Construction of Health Care Facilities of the Facilities Guidelines Institute, which shall take precedence over the Virginia Uniform Statewide Building Code pursuant to § 32.1-127.001 of the Code of Virginia.

Entities operating as of the effective date of this chapter as identified by the department through submission of Reports of Induced Termination of Pregnancy pursuant to 12VAC5-550-120 or other means and that are now subject to licensure may be licensed in their current buildings if such entities submit a plan with the application for licensure that will bring them into full compliance with this provision within two years from the date of licensure.

[11] The advisory panel was composed of the chairs of the OB/GYN departments of each Virginia medical school. (Tr. 597:22–598:2.)

15

there was no medical necessity for treating abortion clinics as hospitals and that the
licensing regulations were unnecessary. (*Id.* at 869:23–870:2; 874:23–875:16; 867:17–
23.) In his view, facilities in which five or more abortions are provided per month are
subject to more stringent regulations than other facilities offering comparable medical
services. (*Id.* at 831:21–884:15.) He added, however, that he was unaware of any
abortion clinic closing as a result of enforcement of the regulations. (*Id.* at 880:7–10.)
Furthermore, all current abortion facilities have received waivers which require periodic
review. (*Id.* at 908:8–9.)

According to Dr. Oliver, in 2017, in the wake of the Supreme Court decision in
*Hellerstedt*, 136 S. Ct. 2292, the Board of Health amended 12 VAC § 5-412 by removing
the FGI Guidelines requirements. The Court in *Hellerstedt* found the Texas statutory
surgical-center requirement at issue placed an undue burden on women seeking abortion
care. 136 S. Ct. at 2318.

Dr. Oliver testified that in the interim, the Henrico County Circuit Court ruled that
the Board of Health violated the Virginia Administrative Procedures Act in amending the
regulations. (*Id.* at 869:17–22.) According to Dr. Oliver, when the Henrico Circuit Court
struck down the amended regulations, it had the effect of restoring the FGI Guidelines.
(*Id.*) Because Dr. Oliver had concerns about the constitutionality of the physical
requirements necessitated by the FGI Guidelines, he solicited an opinion from the
Attorney General's Office[12] as to their enforceability. After review, the Attorney

---

[12] The Virginia Attorney General is also a Defendant in this case.

16

General's Office advised Dr. Oliver that the guidelines were unconstitutional and should

not be enforced. (*Id.* at 909:4–18.) Consequently, the FGI Guidelines are not presently

being enforced. As Plaintiffs point out, however, this policy of non-enforcement does not

preclude future administrations from resuming enforcement.[13] Dr. Oliver added that the

Governor proposed amendments during the last session of the Virginia General Assembly

to amend the stringent regulations. (*Id.* at 866:11–867:2.)

Dr. Oliver indicated that both first and second trimester abortions could safely be

performed on an outpatient basis in a clinical setting since they are not surgical

procedures. (*Id.* at 867:17–23.) Dr. Oliver further opined that because aspiration and

medication abortions are not surgery—in that they do not involve an incision into the

body—it is not medically necessary for abortion facilities to meet the requirements of

Section 3.7 of the FGI Guidelines governing facilities that provide surgery. (*Id.* at 877:2–

15.)

On the other hand, while Dr. Oliver testified that parts of 12 VAC § 5-412 are

unnecessary, others are critical. For example, as to equipment enabling the facility to

respond to medical emergencies such as cardiac arrest, Dr. Oliver elaborated, "I believe

---

[13] "These regulations . . . require Surgical Centers to have sterile operating rooms of at least 150 square feet or more, depending on sedation level provided; patient corridors at least five or six feet wide, depending on location; and similarly specific requirements regarding HVAC systems, finishes for ceilings, walls, and floors, and recovery room dimensions and layout, among others." (Am. Compl. ¶ 133.) Under Virginia's regulatory regime, VDH has incorporated the FGI Guidelines into both 12 VAC § 5-410 ("Regulations for the Licensure of Hospitals in Virginia") and 12 VAC § 5-412 ("Regulations for Licensure of Abortion Facilities"), which Plaintiffs make apparent. (*See* Am. Compl. ¶ 133 ("These regulations [12 VAC § 5-410, *et seq.*] include . . . requirements for Surgical Centers to comply with specific sections of the FGI Guidelines—the very same physical plant requirements that the Virginia Board of Health struck from the first trimester Licensing Regulations [12 VAC § 5-412-370] . . . .").)

17

doctors' offices, hospitals, clinics should have the ability to deal with someone who has an emergent event, even though emergent events are rare." (*Id.* at 873:11–14.)

The Defendants called Dr. Slusher, a member of the Board of Health from 2012 to 2015, to provide further context on the adoption of the FGI Guidelines and related regulations. In 2012, Dr. Slusher voted to exempt existing abortion facilities from compliance with the FGI regulations. The Board of Health, however, was advised by the Attorney General's Office that exempting those facilities from FGI regulations "was not permissible." (*Id.* at 1558:16–19.) Consequently, she voted for further review of the abortion facilities regulations that included the FGI regulations.

In 2013, Dr. Slusher reversed her position and supported a version that included the regulations. In her view, the 2013 version of the regulations improved the safety and quality of abortion services in Virginia. (*Id.* at 1534:16–22.) She described the Board of Health's adoption of the regulations as a reaction to unsafe practices. (*Id.* at 1535:5–12.) As examples, she cited inaccurate or incomplete recordkeeping, cleanliness, and access, such as staircases too narrow to permit removal of patients on stretchers. (*Id.* at 1536:10–24.) In her opinion, the regulations were needed, and there was no intent on the part of the Board of Health to shut down clinics or affect access. (*Id.* at 1538:22–1539:5.)

To explain the legislative history of the eventual adoption of the regulatory statutes at issue in this case, the defense called Joseph Hilbert ("Mr. Hilbert"), Deputy Commissioner of Governmental and Regulatory Affairs of the VDH. Mr. Hilbert is the agency's regulatory coordinator and reports directly to the Virginia Health Commissioner. In that capacity, he also interacts with the Board of Health and drafts the

18

agenda for their meetings. Mr. Hilbert was asked about legislation adopted by the General Assembly in 2011, specifically Senate Bill 924, which promulgated regulatory requirements for facilities that performed five or more first trimester abortions per month, classifying them as a category of hospital.

The Virginia Health Commissioner and the chief deputy participated in drafting the abortion facility regulations. In crafting their content, the VDH "reviewed documentation from several organizations, including the National Abortion Federation, Planned Parenthood, the World Health Organization, the Centers for Disease Control and Prevention, the Joint Commission on Accreditation of Healthcare Organizations" along with regulations from other states. (*Id.* at 1484:13–22.) The Virginia Health Commissioner also empaneled OB/GYN physicians and the chairs of the OB/GYN departments for the State's teaching hospitals to provide advice on the proposed regulations. In addition, VDH consulted and analyzed abortion clinic regulations for 22 other states who had them in place at the time. The panel reviewed "data and information concerning things such as testing and laboratory services, infection control, quality improvement, staffing and credentialing, administrative disaster preparedness and security, facility design, family planning counseling and data reporting." (*Id.* at 1488:5–18.) VDH also inquired whether the other states had specific regulations governing abortion facilities, whether they regulate them as outpatient hospitals, and how the number of abortion facilities in the state had changed since the time the regulations were adopted.

19

According to Mr. Hilbert, once the proposed regulations were completed, they were presented to the Board of Health, which approved them. One member of the Board of Health made a motion to exempt or grandfather all of the then-existing licensed facilities from the facility design and construction requirements of the regulations. This amendment was adopted. However, when the proposed amendments were presented to the Attorney General's Office for review, they declined certification because the proposed amendments did not comply with the provisions of Va. Code Ann. § 32.1-127.001. This section, according to the Attorney General's Office, required the facility design and construction guidelines of the Code of Virginia to comport with the guidelines published by the Facilities Guidelines Institute. Consequently, the Board of Health adopted revised proposed amendments without the previously agreed upon grandfathering provision. (*Id.* at 1498:24–1500:15.)

On cross-examination, Plaintiffs' counsel amplified the history underlying promulgation of these abortion regulations, which took effect in 2013. Mr. Hilbert testified that prior to enacting emergency regulations in 2011, which evolved into the regulations adopted in 2013, the VDH did not license abortion clinics. (*Id.* at 1504:16–18; 1505:24–1506:1.) He also indicated that prior to the adoption of those regulations, he was unaware of any evidence indicating that women's health and safety was at risk in abortion facilities in Virginia. (*Id.* at 1506:2–9.) Mr. Hilbert also stated on cross-examination that at the time the proposed regulations containing an exemption for pre-existing abortion clinics were under review, the Governor, Attorney General, and Deputy

Secretary of Health and Human Resources harbored pro-life beliefs and supported regulations containing the FGI guidelines. (*Id.* at 1506:10–1509:6.)

Also developed on cross-examination was the fact that, in 2008, the General Assembly had proposed legislation to regulate abortion facilities that provided 25 or more procedures per year. Mr. Hilbert acknowledged that Virginia had sufficient and appropriate safeguards in place at the time to assure the health and safety of women faced with the decision to terminate a pregnancy. In addition, he agreed that another reason underlying the Board of Health's decision to exempt existing clinics was its belief that the legislation would place additional financial burdens on women's health care providers. Furthermore, between the Board of Health's opposition to regulation in 2008, and the Board of Health's support of additional regulation in 2011, the VDH had not been presented with any evidence that women in Virginia were receiving unsafe abortion care. In fact, between 1977 and 1989, there were only two deaths occurring in Virginia as a result of abortion procedures. (*Id.* at 1520:8–12.)

Dr. Ramesh testified that in her opinion, first and second trimester abortion procedures can be performed in a sterile procedure room without the equipment necessary to qualify as a surgical hospital or comply with the FGI Guidelines. (*Id.* at 278:9–25.)

Dr. Nichols saw no demonstrated need or medical benefit to requiring that abortion procedures, particularly in the early stages of pregnancy, be performed in a facility qualifying as a hospital under Virginia law. (*Id.* at 56:9–20; 60:11–17.) In his

21

view, this requirement, along with the attendant FGI specifications, not only affects convenience, but may result in more costs than necessary. (*Id.* at 62:2–12; 64:4–18.)

A number of operators or administrators of abortion clinics testified that the cost of compliance with the FGI Guidelines would be significant. Paulette McElwain ("Ms. McElwain"), CEO for VLPP, estimated that the required renovations would be costly and place her organization in substantial debt. For example, she testified that the cost of renovating a recently purchased facility in Richmond to comply with the FGI requirements was in the vicinity of $3.6 million. (*Id.* at 366:19–24.) Furthermore, VLPP has had to hire a consultant to ensure compliance with the regulations, increasing the costs of procedures by about $100.00. Ms. McElwain believed that if licensing regulations were less onerous, her organization would consider opening additional clinics in the vicinity of Washington, DC and in western portions of Virginia.

Amy Hagstrom-Miller ("Ms. Hagstrom-Miller"), CEO of Whole Woman's Health Alliance, who operates the only reproductive health care facility in the Blue Ridge mountains, described compliance with the FGI Guidelines as cost-prohibitive. (*Id.* at 427:8–19; 431:12–14.) In her opinion, the regulations do not contribute to the safety of health outcomes. (*Id.* at 425:23–25.)

Rosemary Codding ("Ms. Codding"), policy director for Falls Church Healthcare Center, testified that following the adoption of the licensing statute, her facility felt the need to engage an architect and legal counsel to ensure compliance. (*Id.* at 509:15–510:23.) Based on the architect's report, Ms. Codding testified that the cost of compliance would be close to a million dollars and would result in additional costs for

22

women seeking abortion care. (*Id.* at 516:2–15.) "For instance, our entrance doorway was three-fourths of an inch too narrow in relationship to a hospital doorway. It would have meant that we would have had to take out the door frame and rebuild. . . . [T]hat alone would have been in the excess of a $50,000 remodel." (*Id.* at 516:18–24.) In her opinion, there was no public health reported need for the licensing and regulatory statutes in Virginia. (*Id.* at 508:14–18.) When Ms. Codding opened her facility in Falls Church in 2002, there were no facility specifications governing physicians' offices providing abortion care. (*Id.* at 489:12–15.)

The overwhelming preponderance of the evidence has demonstrated that as a direct consequence of the FGI regulations, particularly when coupled with the costs associated with acquiring the necessary Certificate of Public Need (*see* 12 VAC § 5-220-20), abortion providers face a significant monetary burden. These costs in turn are passed on to women seeking abortion services and particularly affect those of lesser income.

The burdensome effect of the FGI Guidelines is an integral part of Plaintiffs' claims in Counts I through III. Any women's health clinic performing five or more first trimester abortions per month must comply with these onerous regulatory requirements. This Court agrees with the Virginia Health Commissioner and the Virginia Attorney General that the FGI Guidelines pose a significant burden on the fundamental right of women to choose an abortion during the early pre-viability stages of pregnancy. The Supreme Court in *Hellerstedt* reached a similar conclusion. 136 S. Ct. at 2315, 2318.

Plaintiffs' challenge to the regulatory regimen embraced in Counts I through III is firmly bolstered by the Supreme Court's decision in *Hellerstedt*. Similar to the

23

immediate case, the Supreme Court in *Hellerstedt* reviewed newly enacted surgical-center requirements governing abortion facilities in the State of Texas. Under the legislation at issue in that case, abortion facilities were required to meet the minimum standards for ambulatory surgical centers. *Id.* at 2314. These requirements, which are similar to those challenged in this case, included detailed specifications relating to the size of the nursing staff, building dimensions, and other building requirements. *Id.* The architectural requirements specified that

> Facilities must include a full surgical suite with an operating room that has "a clear floor area of at least 240 square feet" in which "[t]he minimum clear dimension between built-in cabinets, counters, and shelves shall be 14 feet." . . . There must be a preoperative patient holding room and a postoperative recovery suite. The former "shall be provided and arranged in a one-way traffic pattern so that patients entering from outside the surgical suite can change, gown, and move directly into the restricted corridor of the surgical suite," . . . and the latter "shall be arranged to provide a one-way traffic pattern from the restricted surgical corridor to the postoperative recovery suite, and then to the extended observation rooms or discharge," . . . .

*Id.* at 2314–15 (internal citations omitted).

The district court in *Hellerstedt* concluded that risks in the abortion procedure "are not appreciably lowered for patients who undergo abortions at ambulatory surgical centers as compared to non-surgical center facilities." *Id.* at 2315. On appeal, the Supreme Court found these findings to be well-supported and concluded that the record clearly demonstrated that the surgical-center requirement provided no benefit when complications arose in the context of an abortion procedure. *Id.* at 2315–18. The Court further noted that "abortions taking place in an abortion facility are safe—indeed, safer than numerous procedures that take place outside hospitals . . . ." *Id.* at 2315. "[S]ince

24

the few instances in which serious complications do arise following an abortion almost

always require hospitalization, not treatment at a surgical center, . . . surgical-center

standards will not help in those instances either." *Id.* at 2316 (internal citation omitted).

The Supreme Court also adopted "the [d]istrict [c]ourt's conclusion that the

surgical-center requirement place[d] a substantial obstacle in the path of women seeking

an abortion." *Id.* at 2316. The Court ultimately found the provisions to be

unconstitutional on their face. *Id.* at 2318. The Court in *Hellerstedt* went further and

found that

> [M]any surgical-center requirements are inappropriate as applied to surgical
> abortions. Requiring scrub facilities; maintaining a one-way traffic pattern
> through the facility; having ceiling, wall, and floor finishes; separating soiled
> utility and sterilization rooms; and regulating air pressure, filtration, and
> humidity control can help reduce infection where doctors conduct procedures
> that penetrate the skin.    But abortions typically involve either the
> administration of medicines or procedures performed through the natural
> opening of the birth canal, which is itself not sterile.

*Id.* at 2315–16.

This Court's hand is guided by the Supreme Court analysis in *Hellerstedt*, which

invalidated rigid regulatory requirements similar to those presently before the Court. The

FGI Guidelines mandated by 12 VAC § 5-412-370, an integral part of the hospital

classification under the statutory scheme, serve no valid state interest with respect to first

trimester procedures and, if enforced, would violate the Due Process Clause of the

Fourteenth Amendment. However, the evidence of progressively increasing risks of

complications during surgical second trimester procedures precludes this Court from

finding that the addition of safeguards of the FGI Guidelines are unduly burdensome in that context. *See* 12 VAC § 5-410, *et seq.*

This constitutional infirmity does not invalidate Virginia's entire statutory and regulatory scheme governing abortion procedures. In fashioning an appropriate remedy, this Court is guided by the wisdom of the Supreme Court in *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320 (2006). "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer . . . to enjoin only the unconstitutional applications of a statute . . . [and] to sever its problematic portions while leaving the remainder intact." *Ayotte*, 546 U.S. at 328–29 (citations omitted). "The normal rule is that partial, rather than facial, invalidation is the required course." *Id.* at 329 (quotation marks and citations omitted); *see also Toghill v. Clarke*, 877 F.3d 547, 552 (4th Cir. 2017). Hueing closely to the teachings of the Fourth Circuit, this Court will limit the remedy in this case to invalidating the application of the FGI Guidelines to facilities providing first trimester abortion procedures and leave the balance of 12 VAC § 5-412-370 in full force and effect. As previously noted, the evidence revealed that the risk of complications increases with the progression of gestational development within the second trimester. This Court is unable to determine, based on the record before it, where within the continuum of fetal development the safeguards of the stringent FGI Guidelines are necessary. This public policy issue is best left to the legislative branch of government.

To the extent that Plaintiffs' constitutional challenge encompasses related hospital-specific regulations governing record keeping, minimum staffing, and

employment of only physicians licensed in Virginia, these provisions may be inconvenient, but are not unduly burdensome to women seeking abortion care. Certainly, the Commonwealth of Virginia has an obligation to ensure that physicians performing medical procedures meet its standards of competence and ethics. This oversight is done through licensure.

The second facet of Plaintiffs' challenge to the collective burden imposed by Counts I through III focuses on the requirement that second trimester abortion procedures be conducted in hospitals or facilities that the State has licensed as "hospitals." *See* Va. Code Ann. § 18.2-73; 12 VAC § 5-412-230.[14] An analysis of this issue requires some development of the legal landscape. Two cases decided by the Supreme Court on the same day involving a similar issue reached disparate conclusions. Perhaps the most noteworthy was *Simopoulos v. Virginia*, 462 U.S. 506 (1983). The Court in *Simopoulos* upheld the constitutionality of a similar version of the same statute at issue in this case, Va. Code Ann. § 18.2-73. *Simopoulos*, 462 U.S. at 512, 519. In reaching its conclusion, the Court in *Simopoulos* relied heavily on the findings of the American College of Obstetricians and Gynecologists. That organization concluded that "[a]mbulatory care facilities providing abortion services should meet the same standards of care as those recommended for other surgical procedures performed in the physician's office and outpatient clinic or the free-standing and hospital-based ambulatory setting." *Id.* at 517

---

[14] Title 12 VAC § 5-412-230(A) reads in pertinent part, "[a]bortions performed in abortion facilities shall be performed only on patients who are within the first trimester of pregnancy meaning 13 weeks and 6 days after last menstrual period or based on an appropriate clinical estimate by a licensed health care provider."

(citing AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS (ACOG),

STANDARDS FOR OBSTETRIC-GYNECOLOGIC SERVICES 54 (5th ed. 1982)). In upholding

the constitutionality of § 18.2-73, the Supreme Court emphasized both the importance of

a state's ability to regulate such procedures and the conformance of the regulations with

prevailing medical standards. *Id.* at 516–19.

In *City of Akron v. Akron Center for Reproductive Health, Inc.*, the Court found

Akron's second trimester hospital requirement to be unconstitutional because it prevented

"the performance of abortions in outpatient facilities that are not part of an acute-care,

full-service hospital." 462 U.S. 416, 432 (1983). The Court's analysis in *City of Akron*

proved to be prescient in forecasting the evolving undue burden and benefits analysis.

The Court explained that

> There can be no doubt that [the ordinance's] second-trimester hospitalization
> requirement places a significant obstacle in the path of women seeking an
> abortion. A primary burden created by the requirement is additional cost to
> the woman [seeking abortion care]. The Court of Appeals noted that there
> was testimony that a second-trimester abortion costs more than twice as
> much in a hospital as in a clinic.

*Id.* at 434–35.

The Court further mentioned that increased driving distances could also constitute

an unreasonable burden. *Id.* at 435 ("[A] second-trimester hospitalization requirement

may force women to travel to find available facilities, resulting in both financial expense

and additional health risk."). The Court observed that it was "apparent that a second-

trimester hospitalization requirement may significantly limit a woman's ability to obtain

an abortion." *Id.*

The Court in *City of Akron* ultimately concluded that based on the evolving medical science available in 1983, "[r]equirements that all abortions after 12 weeks of gestation be performed in hospitals increase the expense and inconvenience to the woman without contributing to the safety of the procedure." *Id.* at 436 (citation omitted). It recognized that advances in medical science have provided increasingly safe alternatives to outdated abortion procedures and, consequently, the same level of regulation may not be necessary. *Id.* at 435–39.

It is important to keep in mind that *Simopoulos* was decided 36 years ago and abortion procedures have advanced significantly since then. As Dr. Oliver testified, in his personal view, both first and second trimester abortions can be performed on an outpatient basis, presumably in a clinical setting. "As a medical doctor, my own personal view is that there is no medical necessity for treating abortion facilities as hospitals. . . . I believe that the procedure is not a surgical one. It's very safe and can be performed in an outpatient setting." (Tr. 867:17–23; *see also id.* at 894:16–897:8.) Dr. Oliver further testified that he "[did not] see a need to require that second trimester abortions be performed in the hospital." (*Id.* at 894:22–23.) He explained that he personally believes that the Hospital Requirement restricts access to abortion care in Virginia—a restriction that is not beneficial to women's health. (*Id.* at 896:25–897:8.)

Dr. Nichols testified that the Hospital Requirement was enacted over 40 years ago, in 1975, when second trimester abortion procedures were largely performed by induction, a procedure that is "much more involved" and "has to happen in a hospital." (*Id.* at 18:23–19:2; 68:6–9.) Today, however, the evidence shows that abortion care has

29

advanced significantly, such that requiring second trimester abortions to be performed in a hospital setting "just does not make sense." (*Id.* at 68:4–15.) The record shows that second trimester abortion procedures are now much safer, faster, and have lower complication rates.

Because of the substantial medical advances made since the Supreme Court's decision in *Simopoulos*, the Hospital Requirement, as applied to non-surgical second trimester abortion procedures, is no longer medically necessary. *See City of Akron*, 462 U.S. at 435–39. There is substantial evidence in the record at hand that the requirement that second trimester non-surgical abortion procedures be performed in facilities qualifying as surgical hospitals places a significant burden on women seeking abortion care in Virginia. There are presently only two facilities that regularly perform second trimester abortion procedures. (*Id.* at 537:6–23; 818:18–819:6.) The evidence shows that the Hospital Requirement causes anxiety, delays, and at times, the inability to undergo an abortion procedure at all. (*Id.* at 267:17–21; 288:23–289:1; 818:8–819:6.) Dr. Ramesh described encountering women seeking an abortion during their first trimester who are unable to obtain a procedure for several weeks, placing them in their second trimester and requiring them to travel an additional distance, thereby incurring increased costs. These were significant considerations in *Hellerstedt* and *City of Akron*. *Hellerstedt*, 136 S. Ct. at 2315–18; *City of Akron*, 462 U.S. at 435.

The evidence has revealed minimal medical necessity for requiring non-surgical second trimester abortion procedures to be performed in licensed hospitals. On the other hand, the burden is significant, particularly with respect to costs and availability.

30

Therefore, this Court concludes that the Hospital Requirement is unduly burdensome and in violation of the Due Process Clause, as it applies to non-surgical second trimester abortion procedures up to the point of viability. As such, given the effect of the current statutory and regulatory scheme, enforcement of 12 VAC § 5-412-230(A), the regulation preventing abortion facilities from providing second trimester abortions, will be enjoined as to pre-viability, non-surgical second trimester abortion procedures.

## 2. THE PHYSICIAN-ONLY LAW

Another closely allied element of the regulatory scheme at issue is the so-called Physician-Only law, sometimes referred to as the exemption to Virginia's felony abortion statute. This statutory provision, Va. Code Ann. § 18.2-72, exempts licensed physicians from Virginia's general criminal ban on abortion, codified in Va. Code Ann. § 18.2-71— the obvious effect of which is to preclude non-physicians from conducting such procedures. Plaintiffs contend that this statutory restriction unjustifiably limits the pool of abortion providers and, consequently, access to abortion care.

Plaintiffs further maintain, and provided extensive supporting evidence at trial, that advanced practice clinicians ("APCs"), as well as other similarly trained and licensed health care providers, are capable of providing medication and aspiration abortions, which are routine first trimester procedures. Typically, an APC is a registered nurse with a master's degree and biennially continuing education. (Tr. 167:17–21; 176:4–23.) A first trimester procedure usually requires prescribing medication, which results in the off-site miscarriage of a non-viable fetus, or a procedure referred to as suction aspiration in which uterine contents are removed from the cervix by suction. All physician witnesses

31

testified that complications during first trimester abortions are rare and when they occur, can almost, without exception, be treated by a properly trained APC.[15]

Dr. Nichols testified that there is no medically recognized benefit to prohibiting properly trained APCs from performing first trimester abortions. (*Id.* at 39:13–23.) In his opinion, they are capable of undertaking medication and aspiration abortion procedures up to 15 weeks of LMP. (*Id.* at 42:7–10; 44:11–12; 45:7–12.) Furthermore, APCs' availability to perform first trimester procedures would increase access to abortion care. (*Id.* at 50:15–51:22; 52:17–53:12.)

Dr. Joanne Spetz ("Dr. Spetz"), a professor of health economics at the University of California, San Francisco, was presented as an expert in nursing regulations. She testified that not only are APCs capable of performing first trimester abortion procedures, but, in Virginia, they currently carry out every procedure incident to a medication abortion except physically handing the medication to the patient. (*Id.* at 209:5–210:4.) Dr. Ramesh went further and concluded that APCs are competent to perform both medication and aspiration abortions during the first and second trimester, particularly if a physician is present on the premises. (*Id.* at 236:8–21.)

Dr. Oliver concurred that the training received by nurse practitioners and physicians assistants is adequate to perform aspiration and medication abortions. (*Id.* at

---

[15] In weighing the evidence, the Court acknowledges that a number of the witnesses on each side are affiliated with organizations which either support or oppose abortion rights, or have firmly-held personal viewpoints on these issues. As Judge Niemeyer noted in *Bryant*, "the importance of the deeply divided societal debate over the morality of abortion and the weight of the interests implicated by the decision to have an abortion can hardly be overstated." 222 F.3d at 175.

887:16–18.) He added that the scope of practice of APCs was one of the issues to be reviewed by the Board of Health. (*Id.* at 887:19–24.)

Dr. Lunsford agreed that APCs are qualified to perform medication abortion procedures. She expressed some concern, however, about their ability to deal with potential complications. (*Id.* at 1351:16–25; 1374:1–1375:1.) While admitting that complications are rare, she testified that in her experience, the more advanced the gestational age, the higher the risk of complication. (*Id.* at 1255:15–19; 1277:13–17.)

Persuasive evidence that APCs are capable of performing first trimester abortions without physician oversight is only one consideration in determining the constitutionality of the Physician-Only law. The required analytical framework requires a reviewing court to "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Hellerstedt*, 136 S. Ct. at 2309.

In *Mazurek v. Armstrong*, 520 U.S. 968 (1997), as with the case presently before the Court, at issue was Montana's law restricting performance of abortions to licensed physicians. The group of physicians and physicians assistants challenging the physician-only requirement in that case argued that its purpose was to create a substantial obstacle to women seeking abortions. Central to the plaintiffs' argument in that case was its contention, supported by published research, that comparing the complication rates for first trimester abortions performed by physicians assistants with those for first trimester abortions performed by physicians found no significant difference. *Mazurek*, 520 U.S. at 973. In rejecting plaintiffs' petition for preliminary injunctive relief, the Court in *Mazurek* stated, "we emphasized that our prior cases 'left no doubt that, to ensure the

safety of the abortion procedure, the States may mandate that only physicians perform abortions.'" *Id.* at 974–75 (quoting *Akron*, 462 U.S. at 447).

Since *Mazurek*, the Supreme Court has not retreated from its steadfast position that states have broad latitude to determine what type of medical practitioners may perform abortion procedures absent proof that such restriction would be a substantial obstacle to a woman's access to abortion services. Applying this standard to the case at hand, Plaintiffs' evidence has demonstrated convincingly that APCs are capable of safely performing first trimester abortion procedures, and that the requirement that the procedure be undertaken by a physician is inconvenient, and perhaps for those living in more rural areas, a burden. However, this Court is not convinced that it imposes an undue burden. Representatives from abortion providers testified that most women seeking first trimester abortion procedures can be seen within a week and the procedure completed within two weeks. While the availability of physicians is certainly a factor, equally important is coordinating a procedure with the patient's availability.

Dr. Ramesh testified that if APCs were allowed to perform abortions, it would increase the availability of staff physicians. (Tr. 241:15–243:13.) She testified that if someone called one of her clinics and wished to have a first trimester procedure, the patient's first visit can usually be scheduled "for [her] ultrasound and 24 hour consent within 72 hours. It's around one to two weeks before we're able to see [her] again for [her] actual abortion procedure." (*Id.* at 242:11–19.) With respect to second trimester abortion care, on the average patients wait approximately one to two weeks. Some patients, however, wait as long as three to four weeks between the initial visit and the

34

abortion procedure. If APCs were allowed to perform first trimester procedures, it would

increase the "availability of appointment times that work with our patient[s'] schedules."

(*Id.* at 243:14–15.)

Ms. McElwain testified that in the absence of the Physician-Only law, her

facilities, located in Richmond, Virginia Beach, and Hampton, could provide greater

access to medication and surgical abortions. Currently, women at her facilities

> have very limited access to physician time. And nurse practitioner schedules
> are easier to access. Patients would have access in Richmond seven days a
> week, in Virginia Beach six days a week, and Hampton four days a week to
> medication abortion or to surgical abortion that they don't have access to
> now.

(*Id.* at 389:6–15.) In her facilities, most women seeking an appointment are

accommodated within 72 hours, if possible. At the initial meeting, a staff member

performs an ultrasound and confirms eligibility for first trimester medication procedure.

The staff person also explains what the procedures will entail, reviews the ultrasound

results, and explains any possible complications. The woman does not meet with the

physician until the actual abortion procedure is performed.

Ms. Codding testified that she has no waiting list for abortion appointments at her

Falls Church clinic and most patients are seen within three days. (*Id.* at 544:25–545:3;

551:3–5.) She is also not aware of any waiting lists at any other Virginia clinics. (*Id.* at

551:6–8.) Ms. Codding indicated that she has no difficulty hiring physicians. (*Id.* at

550:17–22.) If APCs could perform abortion procedures, she believed that she could

expand her practice to include more days of the week and perhaps additional locations.

(*Id.* at 502:19–504:7; Pls.' Proposed Findings of Fact ¶ 114, ECF No. 188.) Although her

35

facility provides abortion care five days a week, each of her four physicians have limited periods of availability. (*Id.* at 490:12–492:6.)

This Court is also aware that travel distance is a significant factor for some women seeking abortion care. Dr. Caitlyn Myers ("Dr. Myers"), an economics professor at Middlebury College, testified that 75 percent of women in Virginia of childbearing years live in a community that lacks an abortion provider. (*Id.* at 958:24–959:1.) She testified that when you factor in the availability of abortion providers in other states, the average travel distance to the nearest first trimester abortion provider is approximately 21.4 miles. (*Id.* at 966:2–5.) For women residing in the poorest areas of Virginia, it could be close to 46.9 miles. (*Id.* at 960:14–16.) With respect to second trimester abortion providers, she estimated the average distance to be 41.1 miles. (*Id.* at 976:23–25.)

Dr. Myers summarized her conclusion by noting that she was "certainly not arguing that [distance] would prevent everybody, or even a substantial fraction of women, like the majority of women seeking an abortion from obtaining one." (*Id.* at 969:11–14.) But, in her opinion, it could form a barrier to some women. (*Id.* at 968:20–969:20.)

Dr. Jane Collins ("Dr. Collins"), an expert in gender and poverty studies, agreed with Dr. Myers's impact assessment on the availability of abortion care appointments to low-income women as a result of the Physician-Only law. Dr. Collins, who based her opinion on national poverty data, estimated that 22 percent of the population in Virginia are below the poverty line (*id.* at 771:5–17), and 35.9 percent of households headed by single women are below that threshold. (*Id.* at 772:5–8.) Dr. Collins, however, conceded

36

that she had not interviewed any women in need of such services in formulating her opinion. (*Id.* at 769:4–10.) While it is undoubtedly correct that some women below the poverty line will seek abortion care, this Court cannot assume, based on a theoretical paradigm, that the majority of similarly situated women will do so.

Aside from a seamless line of Supreme Court authority upholding the right of states to determine what medical procedures should be performed by physicians, the evidence has not shown that such a restriction has caused an undue burden on *a significant number of women seeking abortion care. See June Med. Servs., L.L.C. v. Gee*, 905 F.3d 787, 815 (5th Cir. 2018), *petition for cert. docketed*, No. 18–1323 (S. Ct. April 19, 2019). At some abortion clinics, the availability of APCs to actually perform an abortion procedure would certainly facilitate patient care. (Tr. 451:5–6.) This would be particularly true of women approaching the gestational limitation on first trimester procedures. However, based on the record at hand, the number of women facing that situation is unquantified. Plaintiffs' evidence consisted primarily of estimates by experts.

While there appears to be a tenable argument that APCs are capable of performing first trimester abortions less expensively, and even perhaps in a non-hospital setting, permitting them to do so faces a formidable line of countervailing authority beginning with the seminal case of *Roe v. Wade*, 410 U.S. 113. The state "may proscribe any abortion by a person who is not a physician [as defined by state statute]." *Roe*, 410 U.S. at 165. Ten years later in *City of Akron*, 462 U.S. 416, the Supreme Court emphasized that prior case law "left no doubt that, to ensure the safety of the abortion procedure, the States may mandate that only physicians perform abortions." 462 U.S. at 447. The

37

Supreme Court revisited this issue in *Casey* where it reiterated that a physician-only requirement was constitutionally permissible, and not an undue burden, as long as it is not "a substantial obstacle to a woman seeking an abortion. . . . Our cases reflect the fact that the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, even if an objective assessment might suggest that those same tasks could be performed by others." 505 U.S. at 884–85 (citing *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955)).

Therefore, the Court cannot conclude that the Physician-Only law, as it applies to first trimester abortion procedures, is unconstitutional. Whether it is wise public policy is an issue for the Virginia General Assembly to address.

Considering the Physician-Only law as it specifically impacts abortion procedures that are conducted in the second trimester, it is readily apparent that second trimester procedures clearly involve enhanced risks and potential complications. The Seventh Circuit concluded in *Planned Parenthood of Wisconsin, Inc. v. Schimel* that second trimester abortions are 22 to 26 times riskier than first trimester procedures. 806 F.3d 908, 920 (7th Cir. 2015). Physicians are better trained to deal with those complications. Dr. Nichols testified that serious complications are rarely encountered in early stage abortion procedures but are more frequently experienced as the pregnancy advances. (Tr. 15:24–16:10; 106:7–108:7; 148:23–149:23.) Dr. Spetz testified that 16 states and the District of Columbia permit APCs to perform only first trimester procedures. (*Id.* at 202:24–203:2; 203:12–14.) Dr. Oliver, in arguing that APCs are competent to perform first trimester abortions, cautioned that second trimester procedures "may require some

38

additional skill." (*Id.* at 892:17–25.) Dr. Lunsford concurred. (*Id.* at 1255:15–19; 1277:13–17.) At this later stage of pregnancy, the abortion procedure frequently involves a method clinically referred to as D&E or "dismemberment abortion." *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1314 (11th Cir. 2018).

Given the potential risk that can arise in the later stages of second trimester abortions, limiting such procedures to physicians only is well-justified, even though it may impose an increased burden on rural residents, especially those who are living at or near the poverty line. (Tr. 52:23–53:6; 1686:10–18.) However, as the Supreme Court highlighted in *Casey* and *Hellerstedt*, states have a legitimate interest in ensuring that abortion care, like other medical services, are performed "under circumstances that insure maximum safety for the patient." *Hellerstedt*, 136 S. Ct. at 2309 (quoting *Roe*, 410 U.S. at 150); *Casey*, 505 U.S. at 878. The Court in *Casey* held that "[a]s with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion," as long as the regulations do not constitute an undue burden. 505 U.S. at 878. In carrying out its regulatory oversight, the Virginia Board of Medicine has a statutory obligation to ensure that medical procedures are administered competently and under sanitary conditions. *See* Va. Code Ann. § 32.1-25. Moreover, the Supreme Court has afforded states "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007); *Kansas v. Hendricks*, 521 U.S. 346, 360 n.3 (1997).

This Court cannot conclude on the present record that the Physician-Only law, as it applies to second trimester procedures, is either unduly burdensome or improvident when weighed against the State's responsibility for ensuring safe abortion care.

### 3. VIRGINIA'S INFORMED CONSENT STATUTE

In Count V, Plaintiffs challenge the constitutionality of Va. Code Ann. § 18.2-76 (entitled "Informed Written Consent Required; Civil Penalty"). Plaintiffs refer to this statute generally as the "Two-Trip Mandatory Delay law." (*See* Am. Compl. ¶ 4e.) The statute establishes informed consent requirements that medical providers and patients must satisfy prior to an abortion procedure. According to the statute, a physician must "obtain the informed written consent of the pregnant woman" before performing an abortion. Va. Code Ann. § 18.2-76(A). Informed consent is multifaceted under the statute. The statute requires that certain information be provided, including State-published materials that must be offered "in a respectful and understandable manner, without prejudice and intended to give the woman the opportunity to make an informed choice[,]" at least 24 hours prior to an abortion.[16] *Id.* § 18.2-76(D). Alternatively, the

---

[16] According to § 18.2-76(D), the basic information for informed consent must include:

> 1. A full, reasonable and comprehensible medical explanation of the nature, benefits, and risks of and alternatives to the proposed procedures or protocols to be followed in her particular case;
> 2. An instruction that the woman may withdraw her consent at any time prior to the performance of the procedure;
> 3. An offer for the woman to speak with the physician who is to perform the abortion so that he may answer any questions that the woman may have and provide further information concerning the procedures and protocols;
> 4. A statement of the probable gestational age of the fetus at the time the abortion is to be performed and that fetal ultrasound imaging shall be performed prior to the abortion to confirm the gestational age; and

State-published information may be mailed to the woman 72 hours prior to an abortion. *Id.*

While Plaintiffs' constitutional challenge includes the alleged burdens imposed by the required provision of that information, the core of their challenge pertains to the statute's requirement that a woman receive an ultrasound from a qualified medical professional at least 24 hours before the procedure. *Id.* § 18.2-76(B) (the "ultrasound requirement"). The stated purpose of the ultrasound is to determine the gestational age of the pregnancy. *Id.* The individual performing the ultrasound must verbally offer the woman an opportunity to see the ultrasound image, receive a copy of the image, and listen to the fetal heart tones. *Id.* § 18.2-76(C). While she need not accept, the woman must certify in writing that the opportunity was offered and whether she accepted it. *Id.*

The statute contains a limited number of relevant exceptions. The mandatory 24-hour waiting period is reduced to "at least two hours before the abortion," if the woman lives at least 100 miles from the abortion clinic. *Id.* § 18.2-76(B). Also, if the woman is a victim of rape or incest, then she is exempt from the requirement entirely.[17] *Id.*

---

5. An offer to review the printed materials [published by the VDH] . . . .

*Id.* § 18.2-76(D). The materials published by the VDH, to which the 24-hour rule is applicable, include information regarding public and private support via agencies and services available to women who decide to proceed to full term with a pregnancy, descriptions of the probable anatomical and physiological characteristics of a fetus at varying stages of development, descriptions of the types of abortion procedures and their risks, and descriptions of the risks of carrying a pregnancy to full term. *Id.* § 18.2-76(F). The statute further details what the offer to review the materials must include, which is a basic summary of the information available. *Id.* § 18.2-76(D)(5).

[17] This exemption only applies if the underlying incident was reported to law-enforcement authorities. *See* Va. Code Ann. § 18.2-76(B).

41

Finally, if the gestational age of the pregnancy cannot be determined, then the woman must be offered an alternative form of ultrasound imaging, which she may decline. *Id.*

The practical consequence of § 18.2-76 is that the vast majority of women seeking an abortion in Virginia must make two trips in order to comply with the statute[18]—the first trip satisfies the ultrasound requirement, while the second is for the abortion procedure. Additional financial and logistical costs are incurred due to this additional travel. Thus, Plaintiffs' evidence focuses particularly on the burdens these costs place on poor and low-income women for whom they are of greater significance.

Indeed, substantial evidence presented at trial supports the conclusion that the majority of Plaintiffs' patients would be considered poor and low-income. Dr. Collins testified regarding the relationship between poverty and abortion. (Tr. 772:13–23.) According to Dr. Collins, many experts in her field describe persons who are under 100 percent of the federal poverty level as "poor" and persons who are between 100 percent and 200 percent as "low-income." [19] (*Id.* at 770:25–771:2.) Most significantly, based on a review of U.S. Census Bureau data, Dr. Collins testified that "49 percent of women who seek abortion are at or below 100 percent of the federal poverty level. An additional 26 percent are between 100 and 200 percent" of the federal poverty level. (*Id.* at 772:19–

---

[18] Dr. Myers testified that 3 percent of Virginia women live 100 miles or more from the nearest abortion clinic. (Tr. 999:2–4.)

[19] Shortly before trial, the federal poverty level, as established by the United States Department of Health and Human Services, was $12,140 for an individual, with $4,320 added for each additional family member in a household. (*Id.* at 769:22–770:1.)

Case 3:18-cv-00428-HEH   Document 195   Filed 09/30/19   Page 43 of 67 PageID# 10886

22.) Combining these figures demonstrates that three-quarters of women seeking an abortion are either poor or low-income relative to the federal poverty level. (*Id.*) Although these measures were derived from national data, Dr. Collins opined that these figures would apply in Virginia. (*Id.* at 774:4–12.) Dr. Collins's opinion on the relationship between poverty and abortion was reinforced by testimony from Plaintiffs' clinic operators.[20] (*Id.* at 774:15–19.)

Turning to the evidence of the alleged burdens occasioned by § 18.2-76, Plaintiffs' experts testified to the financial and travel burdens imposed by the statute's ultrasound requirement. To illustrate the financial costs associated with this requirement, Dr. Collins used Virginia-specific data to model the cost of an additional round trip for a woman who lives in Mount Jackson, Virginia (Shenandoah County) who must travel 87 miles to an abortion clinic in Charlottesville, Virginia.[21] (*Id.* at 792:15–800:3.) She testified that such a trip would cost $108 based on the costs of gas, childcare, and lost wages at the state minimum wage—expenses that are commonly associated with obtaining an abortion. (*Id.* at 793:20–796:25; 809:1–16.) Dr. Collins's projected

---

[20] Ms. Codding testified that 70 percent of the patients at Falls Church Medical Center face significant financial challenges. (*Id.* at 484:22–23; 485:18–23.) At Whole Woman's Health Charlottesville, more than 60 percent of patients are impoverished and qualify for poverty-level assistance for medical expenses. (*Id.* at 436:18–437:2.) Finally, Dr. Ramesh testified that the overwhelming majority of VLPP patients are below 200 percent of the federal poverty level. (*Id.* at 220:16–25.)

[21] She also modeled the cost of travel to a second trimester abortion provider. Dr. Collins modeled the cost of two additional round trip visits to a second trimester clinic in Richmond, Virginia from Charlottesville, Virginia. Dr. Collins modeled the cost of these additional trips at approximately $123. (*Id.* at 819:20–8:21:12.)

43

expenses are in addition to the cost of the second trip, as well as those associated with the procedure. (*Id.* at 793:9–14.) As stated previously, Plaintiffs emphasize that poor and low-income women are the least able to bear these additional expenses. (*Id.* at 790:22–24.)

Additional logistical burdens cited by Plaintiffs' experts include emotional frustration experienced by women as a result of the required delay, securing leave from work and childcare, general access to reliable transportation, and the potential for the undesired revelation of their intent to obtain an abortion to those in their support network. This may include partners upon whom they rely or who may engage in domestic violence. (*Id.* at 790:8–18; 799:13–20; 805:23–806:4.)

As has already been noted with respect to the burdens imposed by travel distance, Dr. Myers testified that the average woman of child-bearing age in Virginia lives 25.6 miles from the nearest abortion clinic. (*Id.* at 960:8–10.) However, the average woman living in the poorest quartile of Virginia counties must travel roughly 46.9 miles to the nearest in-state abortion provider.[22] (*Id.* at 960:14–16.) Dr. Myers further testified that travel distance to obtain an abortion is directly related to the number of abortions performed. Based on her studies, as travel distance increases, the number of abortions obtained decreases.[23] To exemplify this relationship, Dr. Myers testified that an abortion

---

[22] In terms of traveling to an in-state second trimester abortion provider, Dr. Myers testified that the average woman of child-bearing age in Virginia lives 83.4 miles from a Virginia provider. (*Id.* at 973:6–8.) The average woman from the poorest quartile of Virginia counties lives 99 miles from such a provider. (*Id.* at 973:13–15.)

[23] Dr. Myers testified that if a woman's travel distance to the nearest abortion clinic increases from 0 to 25 miles, there is a 10 percent decrease in the number of abortions. (*Id.* at 943:25–

44

clinic closed in Blacksburg, Virginia in 2015. (*Id.* at 929:19–20; 933:11–25.) Thereafter, the travel distance to the nearest abortion provider for residents of Montgomery County (where Blacksburg is located) increased by 45 miles. (*Id.* at 1019:14–17.) Dr. Myers estimated a 14 percent decrease in abortions obtained by residents of Montgomery County following the closure. (*Id.* at 1019:17–20.)

Plaintiffs' witnesses also testified that delays in obtaining an abortion procedure are a corollary to the expense and travel burdens imposed by the ultrasound requirement. Specifically, they contend that while the statute only requires a 24-hour waiting period, the actual period between the ultrasound and the abortion procedure can extend much longer.

Plaintiffs' experts testified that numerous factors contribute to the length of these delays, including the combination of the ultrasound requirement's waiting period with burdens attributed to other laws challenged in this lawsuit. They further testified that numerous patient-centric reasons play a role, including when a woman realizes that she is pregnant, as well as patient availability and other logistical restrictions. In some instances, according to Plaintiffs, delays extend to multiple weeks, pushing the procedure later into pregnancy, leading some to pursue abortions in other states and others to not return for an abortion at all.

Plaintiffs further contend that many of their patients do not obtain an abortion before crossing gestational cutoffs for less intrusive abortion procedures. Dr. Ramesh

---

944:2.) Dr. Myers further testified that increasing the distance from 0 to 50 miles results in an 18 percent decrease in the number of performed abortions. (*Id.* at 944:4–5.)

sees one patient per week who missed the ten-week cutoff for a medication abortion. (*Id.* at 265:1–7; 277:1–10.) She also sees approximately one to two patients per week who miss the 14-week cutoff for a first trimester abortion. (*Id.*) Six percent of patients at Falls Church Medical Center are turned away after an initial appointment because they cannot schedule a second appointment before the end of the first trimester. (*Id.* at 535:18–23.) Similarly, 50 percent of patients at Whole Woman's Health elect to have a medication abortion. (*Id.* at 443:17–23.) However, of the remaining 50 percent of patients who have an abortion procedure, half (25 percent) would choose to have a medication abortion but for missing the ten-week cutoff. (*Id.*) Thus, according to Plaintiffs, the ultrasound requirement contributes to patients' failure to meet gestational cutoffs that would otherwise allow a preferred less-intrusive abortion procedure.

In connection with the delays, Dr. Myers also testified that since 2012, the year the current form of § 18.2-76 went into effect, Virginia's declining abortion rate has outpaced the decline in the national abortion rate. (*Id.* at 1003:20–1004:2.) She offered this data as a basis for her opinion that the ultrasound requirement is likely to cause some women to delay or forego an abortion. (*Id.* at 922:12–14.)

Finally, Plaintiffs' witnesses testified that there is no medical benefit to the ultrasound requirement or the additional informed consent information that must be offered to patients. Dr. Nichols, as well as Dr. Oliver in his personal capacity, testified that there is no medical benefit to a 24-hour waiting period following an ultrasound. (*Id.* at 71:8–72:21; 898:20–899:5.) Dr. Thomas Cunningham, a bioethicist, further testified that merely offering state-required information to women assumes that the information

46

may be material to that person but that it may not be appropriate under certain conditions. (*Id.* at 732:21–733:5.)

In response to the burdens described by Plaintiffs, Defendants countered with evidence of the protection to the health and safety of a woman seeking an abortion afforded by § 18.2-76. Defendants contend that, by legislating requirements for informed consent, all women obtain the same information, patients have information to reference on their own and discuss with doctors or others in their support network, and the physician has consistent talking points for patients. Multiple factors play into patient comprehension of an abortion procedure, including anxiety, education level, and potential complications, among others. The State therefore maintains that its information equips women from differing backgrounds with adequate information to make their own informed decision as to whether to have an abortion.

Regarding the ultrasound requirement, Dr. Slusher testified that the primary benefit of an ultrasound is an accurate determination of the stage of pregnancy, as well as ensuring the pregnancy is intrauterine and not ectopic. (*Id.* at 1551:8–21.) Offering patients with newly presented pregnancies the opportunity to view an ultrasound is the standard practice for initial visits in Dr. Slusher's practice.[24] (*Id.* at 1551:3–6.)

Dr. Slusher also emphasized the increased decisional certainty that results from the 24-hour waiting period associated with the ultrasound requirement. She testified that the

---

[24] Similarly, Dr. Nichols and Dr. Ramesh testified that, as of February 2019, Planned Parenthood Federation of America's standards and guidelines require an ultrasound be performed prior to an abortion. (*Id.* at 118:7–9; 304:16–305:8.)

ultrasound requirement provides women the opportunity to receive detailed information critical to an informed decision. (*Id.* at 1548:4–1549:4.) According to Dr. Slusher, most women have not previously undergone an abortion and may not understand exactly what the procedure entails from a medical or surgical perspective. (*Id.*) Thus, she testified that the waiting period allows an opportunity for a woman to ensure the abortion is the path she desires to take. (*Id.*)

Likewise, Dr. Lunsford testified that the ultrasound requirement provides a period of deliberation to ensure the patient wishes to proceed with an abortion. (*Id.* at 1273:24–1274:5.) She further testified regarding the power dynamics in the doctor-patient relationship. (*Id.* at 1266:11–1267:3.) According to Dr. Lunsford, patients may at times feel pressure during interactions with physicians to make momentary decisions. (*Id.*) The waiting period can thus mitigate the pressure by providing patients with an opportunity to step away, speak with close confidants, and proceed with greater certainty if they choose to do so. Thus, Defendants argue that decisional certainty is enhanced by the detailed information provided by an ultrasound and the reflection enabled by the waiting period.

In addition to those benefits, Defendants assert that the waiting period under § 18.2-76 furthers the State's interest in potential life. In *Casey*, the Supreme Court summarized the state's right to further that interest as follows:

> To promote the State's profound interest in potential life, throughout pregnancy the State may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose

> childbirth over abortion.  These measures must not be an undue burden on
> the right.

505 U.S. at 878.

In *Casey*, the Supreme Court addressed elements of Pennsylvania's informed

consent law similar to those currently before this Court.  In upholding Pennsylvania's

mandated information that medical providers were required to offer to prospective

abortion patients, the Court declined to adhere to existing precedent and concluded that

> [R]equiring that the woman be informed of the availability of information
> relating to fetal development and the assistance available should she decide
> to carry the pregnancy to full term is a reasonable measure to ensure an
> informed choice, one which might cause the woman to choose childbirth over
> abortion.  This requirement cannot be considered a substantial obstacle to
> obtaining an abortion, and, it follows, there is no undue burden.

*Id.* at 883.

Furthermore, in *Casey*, the Supreme Court reversed the district court's

determination that Pennsylvania's statutory 24-hour waiting period between obtaining the

information required for informed consent and an abortion procedure was

unconstitutional.  *Id.* at 887.  The district court in *Casey* had determined "that because of

the distances many women must travel to reach an abortion provider, the practical effect

will often be a delay of much more than a day because the waiting period requires that a

woman seeking an abortion make at least two visits to the doctor." *Id.* at 885–86.  The

district court thus found the law unconstitutional on the basis that it was particularly

burdensome for those with the fewest financial resources. *Id.* at 886.

The Supreme Court acknowledged that the district court's findings were troubling,

but ultimately concluded that they did not amount to an undue burden. *Id.* at 886–87.

Citing the state's interest in promoting life, the Court again reiterated that "a State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest." *Id.* at 886. While the district court in *Casey* had found that the law presented a particularized burden, it had not found that it amounted to a substantial obstacle to obtaining an abortion. *Id.* at 886–87. The Court emphasized that the finding in *Roe* was not a right to abortion on demand, but rather a right to decide to terminate a pregnancy without undue interference from the state. *Id.* at 887. Thus, it concluded that Pennsylvania's informed consent requirement did not impermissibly infringe that right.[25] *Id.*

As instructed by *Hellerstedt*, this Court has weighed the proffered benefits and burdens presented at trial pertaining to the application of § 18.2-76. This Court finds that, while Virginia's Informed Consent statute poses additional burdens, particularly with respect to poor and low-income individuals, Plaintiffs' evidence is insufficient for the Court to conclude that it amounts to a substantial obstacle to abortion access.

Closely guided by the Supreme Court's reasoning in *Casey*, this Court is not persuaded by the evidence that the provision of State-provided information under § 18.2-76 imposes an undue burden. The supplying of such information as a resource to women is within the State's authority to regulate abortion procedures, *see Casey*, 505 U.S. at 883, and Plaintiffs have not persuaded the Court to the contrary.

---

[25] The Fourth Circuit has previously cited this finding in *Casey* as its primary example of a state restriction that poses an "incidental effect on the woman's decision" but does not "reach the core of the protected liberty." *Bryant*, 222 F.3d at 167.

50

Turning to the burdens presented at trial regarding the ultrasound requirement, Plaintiffs' evidence that additional expenses and travel distances amounts to a substantial obstacle is undermined by the fact that § 18.2-76 does not require a woman to receive the mandatory ultrasound at the same clinic as where the abortion is performed. (Tr. 826:6–15.) Importantly, there are multiple free ultrasound providers located throughout the Commonwealth. The VDH website provides a list of 27 such providers. *Virginia Free Ultrasound Providers*, VA. DEP'T OF HEALTH, http://www.vdh.virginia.gov/pregnancy/free-ultrasound-providers/.

While Plaintiffs' experts did not factor these providers into their analyses, doing so would certainly be significant. For example, Dr. Collins's illustration of an additional 87-mile trip from Mount Jackson, Virginia to Charlottesville, Virginia is decreased to roughly 25 miles by taking into account the ultrasound provider located in Harrisonburg, Virginia. While not every rural locality has a free ultrasound provider, there are numerous options available in the western and southern portions of Virginia, which tend to be more sparsely populated. The apparent assumption in Plaintiffs' experts' burden analyses that a woman for whom travel expense and distance are prohibitive would not utilize free ultrasound services at a fraction of the distance considerably affects the weight the Court places on their testimony in assessing the ultrasound requirement.

Plaintiffs emphasize that the list of free ultrasound providers consists primarily of crisis pregnancy centers, which they characterize as organizations that oppose abortion. However, there is no indication in the record that a woman seeking to satisfy § 18.2-76's ultrasound requirement cannot obtain the ultrasound from a free provider and decline

51

additional information. Indeed, the VDH suggests the availability of these services. While Plaintiffs may prefer to perform a second ultrasound if the first was obtained elsewhere, the Court is not convinced that this would be more inconvenient than if § 18.2-76 excluded the ultrasound requirement's waiting period and Plaintiffs performed all aspects of an abortion procedure in a single visit. The Court reiterates that free ultrasound providers serve as an option to mitigate logistical costs for those for whom they represent a particular burden.

Factoring in out-of-state abortion providers also alleviates the burden of travel distance. For example, Dr. Myers testified that women living in Lee County, Virginia, which is the westernmost county in the Commonwealth, must travel 209 miles, or 3 hours and 39 minutes, to reach their nearest Virginia provider in Roanoke, Virginia. (Tr. 961:16–21.) Adding in a return trip would result in 418 total miles traveled, requiring travel times in excess of 7 hours. Importantly, however, this analysis ignores the availability of an abortion provider in Bristol, Tennessee—a city which straddles the borders of Virginia and Tennessee and serves as an urban center for sparsely populated counties in southwest Virginia. Bristol is roughly 60 miles from Lee County with a drive time of slightly over an hour.

With respect to delays in scheduling abortion procedures, the Court finds that there are too many contributing factors in the scheduling process to conclude that the ultrasound requirement causes undue delay or that the waiting period amounts to a substantial obstacle. As the Court already concluded in its analysis of the Physician-Only law, Plaintiffs have not demonstrated that this limitation amounts to an undue burden.

The record shows that Plaintiffs' clinics are able to facilitate patients within a reasonable time period, which takes into consideration the requirements of § 18.2-76.

Importantly, gestational demarcations early in pregnancy impact the type rather than the availability of an abortion procedure. While an unspecified number of patients may cross gestational cutoffs, the effect of the 24-hour waiting period is too attenuated based on numerous contributing factors beyond government regulations. As discussed above, the availability of free ultrasound clinics also mitigates constraints faced by poor and low-income individuals confronting scheduling conflicts. Given the attenuation of the effect of the 24-hour waiting period—a period previously upheld by the Supreme Court and which over half the states require prior to an abortion, with some states requiring up to a 72-hour waiting period—the Court is unable to conclude that it is an unreasonable length of time.

Regarding Dr. Myers's testimony on the rate of decline in abortions in Virginia as compared with the national rate, the underlying data is too tenuous to enable the Court to determine with reasonable accuracy the extent to which the Virginia rate was impacted by the ultrasound requirement.[26] Dr. Myers testified that the Virginia rate of decline was lower than the national rate in 2011, but reversed in 2012 and 2013, during which the Virginia rate far exceeded the national rate. (Tr. 1003:3–1004:2; Pls.' Ex. 867.) She attributes passage of the current form of § 18.2-76 in 2012 as a major contributor to that

---

[26] The parties stipulated that the number of abortions performed nationwide have declined between 2009 and 2015 based on available Centers for Disease Control and Prevention data. (Pretrial Statement, App. A ¶ 77, ECF No. 146-1.) They also stipulated that the number of abortions performed in Virginia has declined since 2009. (*Id.* ¶ 76.)

change. However, her data also reveals that in 2010, two years prior, the Virginia rate was considerably higher than the national rate—almost double. In contrast, the Virginia rate decreased substantially in 2014 along with the national rate and increased as compared to the national rate in 2015. The impact of the ultrasound requirement amidst these variations, if any, is highly uncertain.

The comparison of rates is further undermined by discrepancies in data collection. Dr. Myers calculated the national rate of decline in abortions using data collected by the Centers for Disease Control and Prevention ("CDC"). On cross-examination, Dr. Myers acknowledged that states vary substantially with respect to abortion data reported to the CDC, with some states not providing data at all. (Tr. 1021:5–1022:4.) This raises additional concerns regarding the accuracy of the represented national rates of decline.

Thus, Plaintiffs have not satisfactorily demonstrated the extent to which the ultrasound requirement has contributed to the declining rate of abortion in Virginia as compared with the national average, if at all. Both the Virginia and national rates of declines in abortions are multifaceted and can be attributed to various causes. (*Id.* at 634:12–15.) A finding with respect to the impact of the ultrasound requirement on changes in those rates would be speculative at best based on the current record.

With respect to Defendants' proffered benefits that further the State's interest in the health and safety of a woman seeking an abortion, it is uncontroverted based on the record that the ultrasound is the most accurate means by which to determine the stage of gestation. This was not only the uniform opinion of physicians at trial, but Planned Parenthood Federation of America requires an ultrasound prior to every abortion. The

Court is without an adequate basis to conclude that the State's requirement that an ultrasound be performed prior to an abortion constitutes an undue burden.

Turning to the benefits of decisional certainty that result from the 24-hour waiting period, "[t]he idea that important decisions will be more informed and deliberate if they follow some period of reflection does not strike [the Court] as unreasonable, particularly where the statute directs that important information become part of the background of the decision." *Casey*, 505 U.S. at 885. Common sense supports the notion that reflection upon receipt of detailed information about an abortion procedure bolsters a decision that is complex in many respects.

However, it is evident that a significant interest advanced by § 18.2-76's waiting period is the State's "profound interest in potential life." *Id.* at 878. The legislation mandates a 24-hour reflective period within which a woman contemplating an abortion may consider the information obtained through the informed consent process, including information from the ultrasound if she so chooses. It is a persuasive measure by the State to encourage women to choose childbirth rather than abortion, which is a valid basis upon which to regulate abortion so long as the measure does not amount to a substantial obstacle to access. *Id.*

The Court recognizes that the waiting period following the ultrasound adds a logistical complexity to an existing myriad of hardships faced by those with limited resources and support networks. However, in consideration of the evidence previously discussed, the Court is not persuaded by a preponderance of the evidence that § 18.2-76 amounts to a substantial obstacle preventing women's access to abortion in Virginia. The

Court underscores that its analysis does not turn simply on the merits of this policy. That determination is within the purview of the General Assembly. Rather, the Court's analysis is restricted to whether § 18.2-76 imposes an undue burden in contravention of the Fourteenth Amendment. This Court concludes that it does not.

## 4. PLAINTIFFS' FOURTH AMENDMENT CHALLENGE TO THE INSPECTION OF PLAINTIFFS' FACILITIES

Finally, having addressed each of Plaintiffs' surviving Counts, the Court turns to Count VIII of the Amended Complaint. Plaintiffs allege that unannounced inspections of abortion clinics performed by VDH violate the Fourth Amendment. The regulatory regimen calls for VDH officials to perform unannounced inspections of abortion facilities at least biennially. *See* 12 VAC § 5-412-100(A). Under this regulation, inspectors are granted a right of entry to clinic premises, although they are only permitted to enter with consent or an inspection warrant. *See* 12 VAC § 5-412-90.[27] Plaintiffs' Fourth Amendment challenge focuses on the consequence of non-compliance. "If the owner, or

---

[27] The entirety of 12 VAC § 5-412-90 states as follows:

Pursuant to § 32.1-25 of the Code of Virginia, any duly designated employee of the Virginia Department of Health shall have the right to enter upon and into the premises of any licensed abortion facility, or any entity the department has reason to believe is operated or maintained as an abortion facility without a license, in order to determine the state of compliance with the provisions of this chapter and applicable laws. Any such employee shall properly identify himself as an inspector designated by OLC; the abortion facility may verify the identity of the inspector prior to his admission. Such entries and inspections shall be made with the permission of the owner or person in charge, unless an inspection warrant is obtained after denial of entry from an appropriate circuit court. If the owner, or person in charge, refuses entry, this shall be sufficient cause for immediate revocation or suspension of the license. If the entity is unlicensed, the owner or person in charge shall be subject to penalties and other actions pursuant to § 32.1-27 of the Code of Virginia.

person in charge, refuses entry, this shall be sufficient cause for immediate revocation or suspension of the [abortion facility's] license." *Id.* According to Plaintiffs, the risk posed to their license for withholding consent renders their consent to VDH inspections involuntary, effectively allowing warrantless searches in contravention of the Fourth Amendment.

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "The Fourth Amendment prohibits unreasonable searches, and searches conducted without a warrant are per se unreasonable unless a valid exception to the warrant requirement is applicable." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). While Fourth Amendment protections are most frequently litigated in the context of criminal investigations, they also apply to administrative searches. *See See v. City of Seattle*, 387 U.S. 541, 545 (1967). Thus, "[t]his rule 'applies to commercial premises as well as to homes.'" *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015) (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978)).

Consent is a well-established exception to the warrant requirement. *Schneckloth*, 412 U.S. at 219. Of particular concern in situations where consent is given to government actors to perform a search is whether the consent was given voluntarily. *Id.* at 225–26. As noted, Plaintiffs contend that their consent to VDH inspections is legally

coerced, since refusal of entry is a legally sufficient cause for revocation or suspension of their license under 12 VAC § 5-412-90.[28]

Determining whether consent is voluntary requires a factual analysis in which the Court must consider the totality of the circumstances.[29] *Id.* at 226. Of particular relevance in the analysis are the characteristics of the party or nature of the enterprise asserting Fourth Amendment protections, as well as the conditions under which consent was given. *Lattimore*, 87 F.3d at 650. Given the nature of the services offered, abortion providers have a heightened obligation to protect the welfare of their clients. Knowledge of the ability to refuse is also a relevant consideration. *Id.*

Based on the record, consent is the basis upon which VDH inspectors have gained entry to Plaintiffs' facilities. Debra A. Marion ("Ms. Marion"), a Medical Facilities Inspector within VDH's Office of Licensure and Certification and a registered nurse, testified to her process for gaining entry to abortion clinics for inspection. According to

---

[28] The Court notes that while the parties argued this issue in the context of voluntary consent, another Fourth Amendment exception—the "closely regulated industry" exception—may also be relevant. That exception provides that certain businesses "'have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise.'" *Patel*, 135 S. Ct. at 2454 (quoting *Barlow's, Inc.*, 436 U.S. at 313). The handful of federal courts to have analyzed its application to abortion clinics have found it inapplicable. *See Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 550 (9th Cir. 2004); *Margaret S. v. Edwards*, 488 F. Supp. 181, 215–17 (E.D. La. 1980); *Akron Ctr. for Reprod. Health v. City of Akron*, 479 F. Supp. 1172, 1205 (N.D. Ohio 1979), *aff'd in part and rev'd in part on other grounds*, 651 F.2d 1198 (6th Cir. 1981), 462 U.S. 416 (1983). In the absence of briefing by the parties and with concern regarding the impact its application may have on patient privacy, the Court declines to consider it here.

[29] United States Supreme Court and Fourth Circuit guidance regarding whether consent is "voluntary" under the totality-of-the-circumstances test has come from the criminal investigation context. The Court is aware of no precedent precluding or altering this approach with respect to administrative searches.

Ms. Marion, entry points to most clinics are locked and require a representative from the clinic to admit the inspectors. (Tr. 1045:10–14.) Upon admittance, inspectors proceed to the reception area and identify themselves, typically for the second time. (*Id.* at 1045:14–17.) They request to meet with the person in charge in a private area. (*Id.* at 1045:18–20.) In that meeting, they review procedures for the inspection and request pertinent information from the person in charge, including patient records,[30] before beginning the inspection. (*Id.* at 1045:24–1046:15.)

The Court has found no evidence in the record that VDH inspectors have exercised coercion or made excessive claims of authority in seeking access to clinics for an inspection.[31] None of the facility operators testified that they felt threatened or intimidated by the inspectors. To the contrary, Ms. Marion testified that in the event that a clinic representative declined entry, she would consult with her supervisor before taking further action. (*Id.* at 1071:11–17.) Notably, the parties agree that there has been no instance in which Plaintiffs have declined entry to VDH inspectors. (Pretrial Statement, App. A ¶ 92.)

---

[30] The Fourth Circuit has previously upheld review by state medical inspectors of abortion patient records maintained by the clinic providing abortion services where regulations did not "require unnecessary disclosure of protected information, in violation of the privacy right identified in *Whalen* [*v. Roe*, 429 U.S. 589, 599–600 (1977)]." *Greenville Women's Clinic v. Comm'r*, 317 F.3d 357, 371 (4th Cir. 2002).

[31] Plaintiffs cite deposition testimony by Mr. Hilbert in which he opines that consent of an abortion facility is unnecessary for inspectors to enter their premises under 12 VAC § 5-412-90. (Pls.' Dep. Desigs. and Objs. Defs.' Counter-Desigs. 226, ECF No. 160-1; Hilbert Dep. 394:14–395:9.) However, Plaintiffs do not cite a single instance in which VDH officials have made such a claim of authority to gain entry to their facilities.

As could be expected, Plaintiffs describe feelings of anxiety among staff members with respect to inspections and isolated incidents of conflict with inspectors. (Tr. 296:22–297:4; 377:5–15; 565:22–566:2.) However, inspections by individuals of authority are inherently stressful. The Court has found no evidence that inspectors have acted unreasonably, abused their authority, or significantly disrupted business operations. Additionally, Plaintiffs testified not only that they comply with inspections, but they frequently *assist* inspectors with the process. For example, Falls Church staff members underwent special training to facilitate VDH inspections. The record demonstrates that while Plaintiffs find the inspection process burdensome, as any business would, they have grown familiar with it and sought to assist in making it as efficient as possible.

In addition to inspecting Plaintiffs' facilities and records, VDH inspectors also observe patient procedures. Ms. Marion testified that all observations involving patients require the patient's prior consent. (*Id.* at 1072:17–18.) She explained that inspectors generally rely on clinics to initially ask patients whether they would be willing to allow an inspector to observe their procedure. (*Id.* at 1047:5–12.) If the patient consents, inspectors then meet with the patient personally, explain that they are present to observe the care the patient is receiving, and have the patient sign a consent document. (*Id.* at 1047:13–23.) Thus, patients are typically afforded multiple opportunities to decline prior to observation of their procedure by inspectors. There is no evidence before the Court

that inspectors have observed a patient procedure without first procuring the patient's consent.[32]

Abortion providers are not the only entities regularly inspected by VDH in the Commonwealth. The types of facilities inspected by VDH are extensive, including dialysis facilities, ambulatory surgery clinics, psychiatric residential treatment facilities, Emergency Medical Treatment & Labor Act ("EMTALA") centers, hospitals, mobile x-ray facilities, outpatient physical therapy facilities, home care organizations, home health agencies, hospices, and rural health clinics. (*Id.* at 1041:22–1042:8; 1082:3–10.) Inspections of these facilities are similar to inspections of abortion facilities. (*Id.* at 1050:23–1051:2.)

The evidence also revealed that inspections of abortion facilities over time have resulted in decreases in the number of citations by inspectors. During the span of 2012 to 2014, citations in the category of Organization & Management decreased from 5 citations per facility to 1.8, Patient Care citations decreased from 3.2 per facility to 1.6 per facility, and Infection Prevention citations decreased from 2.5 per facility to 0.8 per facility. (Defs.' Adm. Exs. J-1 at 3.) The record further shows that the closure of a substandard abortion facility occurred following suspension of that facility's license due to numerous violations revealed by VDH inspections. (Tr. 1054:23–1066:17.) While the nature of

---

[32] Ms. Hagstrom-Miller testified that on one occasion a VDH inspector did not obtain written consent from a patient; however, she testified that the inspector still spoke with the patient beforehand. (*Id.* at 471:9–24.)

specific citations may differ, the record reflects that inspections have contributed to increased safety for patients at abortion facilities.

The heads of each Plaintiff facility testified that they only provide consent to VDH inspections because they believe they will lose their license if they do not. (*Id.* at 376:10–19; 431:2–10; 527:10–528:1.) The record contains no evidence that a facility's license has been revoked or suspended as a result of declining entry to VDH inspectors. The regulation does not provide that revocation or suspension is automatic or even imminent if a clinic declines entry and asks inspectors to instead obtain a warrant. Rather, it states that refusal of entry "shall be sufficient cause" for revocation or suspension of a license. 12 VAC § 5-412-90. Obviously, such action would be based on an assessment of the totality of the circumstances and history of compliance.

Licensure of an abortion facility is predicated on adherence to VDH regulations, which necessarily require entry for enforcement. *See* 12 VAC § 5-412-130(A). While the challenged regulation poses a risk to an abortion facility's license, so does noncompliance with VDH standards, the enforcement of which is a legitimate power of the State. "[A] state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power. The state's discretion in that field extends naturally to the regulation of all professions concerned with health." *Barsky v. Bd. of Regents*, 347 U.S. 442, 449 (1954).

The regulation requires a warrant in the absence of consent, and while the licensure of an abortion facility requires compliance with VDH regulations, enforced via

62

inspections, an abortion facility may nonetheless decline entry to government inspectors if they so choose. Suspension of a license is not a certain consequence.

Accordingly, upon review of the totality of the circumstances, the Court concludes that Plaintiffs have failed to establish that their consent to VDH inspections is involuntary. Plaintiffs are sophisticated business entities, staffed with medical professionals, operating under an extensive regulatory regimen. They are aware that the regulations provide for unannounced inspections of their facilities, which is a common occurrence among similarly situated licensed entities, as well as a public necessity to ensure the physical safety of patients. Further, as evidenced by this lawsuit, they are aware of the terms under which VDH may perform an inspection—terms that explicitly require that inspectors obtain their consent or an inspection warrant. There is no evidence on the record that Plaintiffs have declined an unannounced inspection or even raised an objection to one. To the contrary, the evidence supports a finding that inspections are a cooperative effort between the clinics and inspectors. Accordingly, the Court finds that Plaintiffs have failed to show that their consent to inspections is involuntary and, consequently, that a Fourth Amendment violation has occurred.

## V.   CONCLUSION

Among the difficult tasks confronted by a federal court resolving challenges to abortion statutes and regulations is distinguishing issues that rise to constitutional proportions from those vested in the legislative branch of government. Federal courts have carefully navigated this fragile boundary and exercised considerable restraint where

appropriate. This line of demarcation, however, is not well-illuminated and is sometimes difficult to identify in the midst of spirited public debate.

While the decision to undergo an abortion procedure is deeply personal, respect for potential life, along with the health and welfare of women seeking an abortion, are also cardinal considerations. States' rights to safeguard these well-recognized interests rest on firm precedential terrain, as long as they do not significantly inhibit a woman's constitutional right of access to a pre-viability abortion procedure. *Casey* requires reviewing courts to consider the burdens a law imposes on abortion access together with the benefits those laws confer. 505 U.S. at 887–98. This Court's resolution of these controversial issues is guided by these firmly enshrined tenets.

Based on the foregoing analysis, the Court finds the FGI Guidelines on Design and Construction for Health Care Facilities, mandated by 12 VAC § 5-412-370, Part VII, to be unnecessary and unduly burdensome with respect to first trimester procedures. The FGI Guidelines, however, are severable from the remainder of the regulations at issue in Count II, which were not shown to be otherwise unduly burdensome. Furthermore, the evidence presented precludes the Court from finding that enforcement of the FGI Guidelines as to surgical second trimester abortions is unduly burdensome.

With respect to the Hospital Requirement in Count III, requiring all second trimester abortions to be performed in general hospitals or outpatient surgical hospitals, pursuant to Va. Code Ann. § 18.2-73, the Court finds the requirement unduly burdensome in part. States have broad discretion to regulate medical care when supported by articulable medical necessity, provided it does not unduly impede a

woman's access to abortion care. The necessity that all second trimester procedures, including aspiration and similar non-surgical procedures, must be performed in a hospital setting is unsupported by the evidence. The evidence also demonstrated that it is unduly burdensome, based on the fact that only two Virginia facilities routinely perform second trimester procedures.

The Court therefore finds that enforcement of the FGI Guidelines with respect to first trimester abortion procedures, and the requirement that non-surgical[33] second trimester abortion procedures—up to the point of viability—be performed in outpatient surgical hospitals, present a substantial obstacle to women seeking an abortion and impose an undue burden on that right, in violation of the Due Process Clause of the Fourteenth Amendment. Enforcement of those provisions, in their current form, will be enjoined. As a result, enforcement of 12 VAC § 5-412-230(A), the regulation that prevents abortion facilities from performing second trimester abortion procedures, will be enjoined as to pre-viability, non-surgical second trimester abortion procedures. On the other hand, evidence of the heightened potential for complications warrant the requirement that surgical abortion procedures during the second trimester should be performed in a hospital setting.

With respect to Count IV, although Plaintiffs presented compelling evidence that APCs are capable of performing first trimester abortion procedures, courts have uniformly afforded states broad latitude in deciding what medical procedures should be

---

[33] A surgical procedure involves an incision into the body. Aspiration and medication abortions do not involve surgery. (Tr. 877:2–15.)

performed by physicians, absent proof that such restriction would be a substantial

obstacle to a woman's access to abortion services. While the limitation may be

inconvenient for some individuals, this Court is not convinced that it imposes an undue

burden.

The evidence revealed that second trimester abortion procedures clearly involve

enhanced risks and potential complications, particularly in the later stages. The record

evidence clearly justifies limiting second trimester abortion procedures to physicians

only. Therefore, based on a seamless line of authority, this Court cannot conclude that

the Physician-Only law at issue in Count IV, is either unduly burdensome or improvident

when weighed against the State's well-recognized responsibility for ensuring safe

abortion care.

For the reasons set forth in this Memorandum Opinion, the Court finds that both

the Informed Consent statute, Va. Code Ann. § 18.2-76 (Count V), and the Fourth

Amendment challenge to the facility inspection requirement, 12 VAC § 5-412-100(A)

(Count VIII), withstand constitutional challenge. Plaintiffs have failed to demonstrate by

a preponderance of the evidence that the requirements of Va. Code Ann. § 18.2-76,

requiring a mandatory ultrasound and waiting period, amount to a substantial obstacle

preventing a woman's access to abortion care in Virginia. Plaintiffs have further failed to

show that the statute's informed consent requirement imposes an undue burden.

Undoubtedly, the requirement that abortion clinics submit to biennial inspection,

pursuant to 12 VAC § 5-412-100(A), is burdensome for clinic personnel. However, it is

no more burdensome than inspection requirements for other medical facilities that

66

provide similar services. In fact, the evidence revealed that most clinics are not only cooperative, but assist with the inspection process. Inspectors are required to request permission prior to entry. If an abortion provider refuses to consent to inspection, the inspectors are required to obtain a search warrant before entering. License suspension is a possible but not automatic consequence of noncompliance, as it is with any other violation of regulatory requirements. *See* 12 VAC § 5-412-130(A). Abortion providers are aware of the inspection requirement when they are licensed and, according to the evidence, appear to uniformly comply. The Court therefore concludes that Plaintiffs' Fourth Amendment claims in Count VIII are unsupported by the evidence.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: September 30, 2019
Richmond, VA

67